**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **WIENER STÄDTISCHE VERSICHERUNG AG VIENNA INSURANCE GROUP,** )<br>)<br>)<br>)<br>**Plaintiff,** )<br>)<br>**v.** )<br>)<br>**VIVENDI UNIVERSAL, S.A., JEAN MARIE MESSIER, and GUILLAUME HANNEZO,** )<br>)<br>)<br>**Defendants.** )<br>)<br>)<br>) | **ECF CASE**<br><br>**Civil Action No. 1:08-cv-1111 (RJH)**<br><br>**Related to No.  02 Civ. 5571 (RJH)**<br><br><br>**Jury Trial Demanded** |

# **COMPLAINT**

**MOTLEY RICE LLC**
William H. Narwold (WN-1713)
Ingrid L. Moll (IM-3949)
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT  06103
Telephone:     (860) 882-1676
Facsimile: (860) 882-1682
*Attorneys for the Plaintiff*

**Of Counsel:**
**MOTLEY RICE LLC**
Joseph F. Rice
Ann K. Ritter
28 Bridgeside Blvd.
Mt. Pleasant, SC  29465
Telephone:     (843) 216-9000
Facsimile: (843) 216-9450

**CAPLIN & DRYSDALE, CHARTERED**
Leslie M. Kelleher (LMK-5943)
375 Park Avenue, 35th Floor
New York, NY  10152-3500
Telephone:     (212) 319-7125
Facsimile: (212) 644-6755
*Attorneys for the Plaintiff*

**Of Counsel:**
**CAPLIN & DRYSDALE, CHARTERED**
Nathan D. Finch
Kevin C. Maclay
One Thomas Circle, N.W.
Suite 1100
Washington, D.C.  20005
Telephone:     (202) 862-5000
Facsimile: (202) 429-3301

## BASIS OF ALLEGATIONS

Plaintiff is an investment fund organized under the law.  Plaintiff, by its undersigned attorneys, for its Complaint (the "Complaint") alleges the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters.

Plaintiff's information and belief is based on an investigation (made by and through attorneys), which investigation included, among other things, a review and analysis of public documents pertaining to Defendants; Securities and Exchange Commission (the "SEC" or "Commission") filings; other regulatory filings and reports publicly available; annual reports, press releases, published interviews, news articles and other media reports (whether disseminated in print or by electronic media); pleadings in other litigation pertaining to Defendants; and reports of securities analysts and investor advisory services.  Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE COMPLAINT

1.     Plaintiff brings this action for violation of the federal securities laws and of applicable state law against defendant Vivendi Universal, S.A. (hereinafter defined, along with its corporate predecessors in interest, as "Vivendi" or the "Company") and two of its former senior officers: defendant Jean-Marie Messier, Vivendi's CEO and Chairman (until he was forced to resign on July 3, 2002), and defendant Guillaume Hannezo, Vivendi's CFO (until he resigned on July 9, 2002).

2.     Vivendi is a media and telecommunications conglomerate with substantial holdings in the United States and Europe.  In December 2000, Vivendi's former parent, Vivendi, S.A., entered into a series of merger transactions (the "Merger"), with The Seagram Company

Ltd. ("Seagram") and French cable giant Canal Plus, S.A. ("Canal Plus"). Pursuant to the merger transactions: Vivendi, S.A. merged into its wholly-owned subsidiary, Vivendi Universal, S.A. (previously named Sofiee); Vivendi acquired the businesses of Canal Plus, other than its premium pay television channel, in which it acquired a 49% indirect interest; and Vivendi, through its subsidiaries, merged with Seagram. In July 2002, Vivendi reported that it had experienced a liquidity crisis, which it had improperly failed to disclose. Vivendi also began selling many of its assets to meet its debt obligations.

3.    Prior to this reported liquidity crisis, Vivendi, its former Chief Executive Officer ("CEO") Jean-Marie Messier ("Messier"), and its former Chief Financial Officer ("CFO") Guillaume Hannezo ("Hannezo") (collectively, "Defendants") committed multiple violations of the antifraud, books and records, internal controls and reporting provisions of the federal securities laws. Between approximately October 30, 2000 and August 14, 2002 (the "Relevant Time Period"), Vivendi, under the direction of Messier, Hannezo and/or other executive officers, reported materially false and misleading information about its "EBITDA" growth and liquidity in its SEC filings and public releases. Defendants and other executive officers of Vivendi also, directly or indirectly, were responsible for the improper and fraudulent accounting, thus overstating Vivendi's "EBITDA" in order to meet targets during two quarters in 2001, concealed various material commitments and obligations, and failed to disclose the full extent of Vivendi's involvement in a transaction to purchase shares of Telco, a Polish Telecommunications company.

4.    Prior to and after 2000, Messier took Vivendi on an acquisition binge that, according to published reports, resulted in the Company amassing approximately $18 billion in debt as he turned the Company from a water concern into an entertainment conglomerate.

Concomitantly, Mr. Messier orchestrated a scheme to conceal the severity of Vivendi's liquidity problems stemming from the massive debt load incurred as a result of these transactions. In fact, only days before his ouster by Vivendi's Board, Messier caused the Company to issue several press releases that falsely stated that Vivendi did not face an immediate and severe cash shortage that threatened the Company's viability going forward absent an asset fire sale. It was only after Vivendi's Board removed Messier from his position as CEO and Chairman that the Company's new management disclosed the severity of the Company's liquidity crisis and that the Company would have to sell assets and secure immediately both bridge and long-term financing or default on its largest credit obligations.

5.      By way of background, Vivendi, S.A. started out as a small French-based water utility known as Generale des Eaux until April 1999. Immediately prior to and during the Relevant Time Period defendant Messier caused Vivendi to embark on an extraordinary $77 billion acquisition binge that transformed Vivendi into a huge international conglomerate. In particular, as a result of its three-way, $46 billion Merger with Seagram (the parent of Universal Studios and Universal Music) and Canal Plus (one of Europe's largest cable TV-operators), announced in October 2000, Vivendi instantly became one of the world's largest media and entertainment companies. At all material times set forth herein, Vivendi's "Media and Communications" operations and its "Environmental Services" operations (which include its water utility-subsidiaries) constituted two core areas of the Company's business.

6.      In the period leading up to the October 2000 Merger and thereafter, Defendants reported strong revenue and earnings and falsely portrayed Vivendi as a company that was generating sufficient cash flow to satisfy its debt obligations on approximately $21 billion in debt that it had amassed in connection with financing its $77 billion acquisition spree — even though

other media and communication companies in the United States and Europe were suffering through a period of retrenchment and contraction.

7.     During 2001 and 2002, Vivendi acquired all or a portion of the outstanding shares or assets of various other media and telecommunications companies, including Houghton Mifflin Company, MP3.com, USA Networks, Inc., and Maroc Telecom.  Until it began disposing of certain assets in late 2002 to meet its debt obligations, Vivendi was one of Europe's largest companies in terms of assets and revenues, with holdings in the United States that included Universal Studios Group, Universal Music Group, and USA Networks, Inc.  The cost of these acquisitions, when combined with the Seagram and Canal Plus purchases, totaled more than $60 billion in cash, stock and assumed debt, and increased the debt associated with Vivendi's "Media & Communications" division from approximately €3 billion at the beginning of 2000 to over €21 billion in 2002.  During the Relevant Time Period the exchange rate for Euros to U.S. Dollars ranged from a high of approximately €1.18 to the U.S. Dollar to a low of €1.01 to the U.S. Dollar.

8.     The vast majority of these acquisitions made after the Vivendi/Seagram/Canal Plus Merger were paid for either using Vivendi stock as currency, or by borrowing against future earnings.  Thus, in order to sustain its growth by acquisition strategy, it was crucial for Defendants to continue to report favorable financial results in order to keep Vivendi's stock price high and to maintain its favorable credit ratings and access to additional debt financing.

9.     In July 2002, Messier and Hannezo resigned from their positions with Vivendi, and the Company's new management disclosed that Vivendi had experienced a liquidity crisis.  The liquidity problem that Vivendi finally began to publicly disclose in July 2002, and did not fully disclose until August 2002, was a stark contrast to the rosy financial picture that Defendants

and other executive officers of Vivendi had presented to the public over the preceding twenty-two months.  During the Relevant Time Period, in fact, Defendants and other senior executives of Vivendi engaged in or were responsible for a number of improper practices that produced materially false and misleading EBITDA results and/or concealed Vivendi's true financial condition, including:

- Issuing press releases that falsely portrayed Vivendi's liquidity and cash flow positions;

- Adjusting reserves and engaging in other accounting practices in violation of U.S. GAAP in order to increase Vivendi's EBITDA and meet ambitious earnings targets communicated to the market;

- Improperly consolidating earnings from subsidiaries it did not own a majority of into Vivendi's earnings;

- Failing to disclose the existence of various commitments and contingencies; and

- Failing to disclose part of its investment in Telco.

10.    As a result of Defendants' repeated false and misleading upbeat earnings announcements and assurances concerning the Company's growth and its ability to meet its massive debt obligations during the period from October 30, 2000 to August 14, 2002, the price of Vivendi's American Depository Shares ("ADS") and common stock (or "ordinary shares") was kept artificially inflated and persons (including Plaintiff) who purchased Vivendi securities were damaged when they bought Vivendi stock at artificially inflated prices which declined in value substantially as the true state of Vivendi's financial condition became known to the public.

## THE PARTIES

### PLAINTIFF

11.    WIENER STÄDTISCHE Versicherung AG VIENNA INSURANCE GROUP

("WSV") is based in Vienna, Austria and is an Austrian insurance company with approximately

$24 billion of assets under management.

### DEFENDANTS

12.    Defendant Vivendi is a "*société anonyme*" organized under the laws of France

and with its corporate headquarters at 42 Avenue Friedland 75380, Paris, Cedex 08, France.

During 2001 and 2002, Vivendi maintained offices in Paris, France and New York, New York.

Vivendi became a media and telecommunications conglomerate in December 2000 as a result of

the Merger transactions involving Seagram and Canal Plus.  Vivendi's ordinary shares trade on

the EuroNext Paris, S.A. (the "Paris Bourse"), and its ADSs trade on the New York Stock

Exchange and are registered with the Commission pursuant to Section 12(g) of the Exchange

Act, 15 U.S.C. § 78l.  Vivendi operates on a calendar fiscal year and is required to file annual

reports with the SEC on Form 20-F.

13.    Defendant Jean-Marie Messier, age 51, was CEO of Vivendi and its predecessor

companies from 1994 until July 2, 2002.  During that time Messier also served as Chairman of

Vivendi's Board of Directors.  Messier is a French citizen who, during the events complained of

herein, resided in New York, New York.

14.    Defendant Guillaume Hannezo, age 46, was CFO of Vivendi and its predecessor

companies from 1997 until mid-July 2002.  Hannezo is a French citizen who resides in Paris,

France.  From mid-2001 through at least July 2002, Hannezo resided in New York, New York.

15.     Defendants Messier and Hannezo are collectively referred to herein as the "Individual Defendants."  Vivendi and the Individual Defendants are collectively referred to herein as the "Defendants."

16.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the materially false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of Defendants identified above.  Both of the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day to day operation of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business operations, products, growth, financial statements, and financial condition, as alleged herein.  The Individual Defendants were involved in drafting, preparation and/or dissemination of the various public, shareholder and investor reports and other communications alleged herein, were aware of, or recklessly disregarded, that materially false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

17.     Because of their Board memberships and/or executive and managerial positions with Vivendi, both of the Individual Defendants had access to the adverse non-public information about the business, operations, finances, markets, financial statements, and present and future business prospects of Vivendi particularized herein through access to internal corporate documents, conversations or communications with corporate officers or employees, attendance at management and/or Board of Directors' meetings and committees thereof and/or via reports and other information provided to them in connection therewith.

18.    The statements made by the Individual Defendants, as particularized below, were materially false and misleading when made.  The true financial and operating condition of the Company, which was known or recklessly disregarded by the Individual Defendants, remained concealed from the investing public throughout the Relevant Time Period.  The Individual Defendants, who were under a duty to disclose those facts, instead misrepresented or concealed them during the Relevant Time Period.  As officers and directors and controlling persons of a publicly held company whose ADSs were, and are, registered with the SEC pursuant to the Securities and Exchange Act of 1934, were traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to Vivendi's financial condition and liquidity, performance, growth, operations, financial statements, business, products, markets, management, earnings and business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Relevant Time Period violated these specific requirements and obligations.

19.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company issued during the Relevant Time Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be materially misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but

not the public, each of the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the representations concerning the Company complained of herein were then materially false and misleading. Accordingly, both of the Individual Defendants were responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

20.    Each of the Individual Defendants is liable as a direct participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers or acquirers of Vivendi ADSs and ordinary shares (including Plaintiff) during the Relevant Time Period by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public (including Plaintiff) regarding Vivendi's businesses, operations, management and the intrinsic value of Vivendi ADSs and ordinary shares; (ii) enabled the Company to complete numerous acquisitions in its multi-billion dollar buying spree; (iii) permitted Vivendi to maintain its credit ratings so that Vivendi could accumulate more and more debt to make acquisitions on terms favorable to Vivendi; and (iv) caused Plaintiff and other members of the investing public to purchase or otherwise acquire Vivendi ADSs and ordinary shares at artificially inflated prices, which then lost value when the true state of Vivendi's financial condition became known.

## OTHER RELEVANT ENTITIES

21.    Cegetel Group ("Cegetel"), based in France, is a privately held telecommunications operator of fixed line and mobile telephony and Internet services. During the Relevant Time Period, Vivendi, through direct and indirect holdings, owned a substantial ownership interest in Cegetel.

22.    Elektrim Telekomunikacja Sp. zo.o ("Telco"), based in Poland, is a holding company that owns various telecommunications assets.  Vivendi has owned a stake in Telco since 1999.

23.    Maroc Telecom, based in Morocco, is a telecommunications operator of fixed line and mobile telephony and Internet services.  Vivendi acquired a 35% stake in Maroc Telecom in December 2000.

24.    Universal Music Group ("UMG"), based in the United States, is a wholly owned subsidiary of Vivendi.

## JURISDICTION AND VENUE

25.    In this Complaint, Plaintiff asserts claims under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78(j)(b) and 78t-1(a), and the rules and regulations promulgated thereunder by the SEC, including Rule 10b-5, 17 C.F.R. § 240.10b-5.  Plaintiff also asserts claims arising under applicable state law.

26.    This Court has jurisdiction over the subject matter of this action pursuant to: 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

27.    Pursuant to the "effect test" of extraterritorial jurisdiction, this Court may properly exercise subject matter jurisdiction over the claims of all investors who purchased or acquired Vivendi securities traded on U.S. Markets.

28.    This Court may also properly exercise subject matter jurisdiction over the claims of investors (such as Plaintiff) who acquired Vivendi ordinary shares traded on foreign markets under the "conduct test" articulated by the Second Circuit, which provides that a federal court has subject matter jurisdiction if (1) the defendant's activities in the United States were more

than 'merely preparatory' to a securities fraud conducted elsewhere, and (2) these activities or culpable failures to act within the United States 'directly caused' the claimed losses.

29.    Defendants engaged in extensive fraud-related conduct in the U.S., which was part of a single fraudulent scheme spanning the U.S. and France.  The domestic conduct was not merely "preparatory" or perfunctory acts, but led directly to losses by both foreign and domestic investors.  In addition to the substantial U.S. conduct in furtherance of the fraud, Vivendi has a vast U.S. presence that justifies the exercise of subject matter jurisdiction over the claims of any plaintiff who, relying on the health and value of Vivendi's substantial U.S. businesses, acquired Vivendi securities traded on foreign markets, and was defrauded by Defendants' misrepresentations.

30.    In addition, there was but a single worldwide market for Vivendi shares and ADSs which traded in tandem and that market was defrauded by Defendants' conduct, causing extensive effects both in this country and abroad.

31.    The fraud perpetrated on the worldwide market by Vivendi sprang directly from the Company's $77 billion acquisition spree, during which Vivendi acquired several high profile U.S. companies, spending in excess of $54 billion for its U.S. interests.  For example, just prior to and during the Relevant Time Period, the following U.S. companies, among others, were acquired in whole or in part by Vivendi:

| COMPANY ACQUIRED | U.S. LOCATION | PURCHASE PRICE |
| --- | --- | --- |
| Waste Management, Inc. | Houston, Texas | $103.5 million |
| US Filter Corp. | Palm Desert, California | $6.2 billion |
| Seagram Company Ltd. | Universal City, California | $34 billion |
| Uproar.com | New York, New York | $128 million |
| MP3.com, Inc. | San Diego, California | $400 million |

| COMPANY ACQUIRED | U.S. LOCATION | PURCHASE PRICE |
|---|---|---|
| Emusic.com | San Diego, California | $24 million |
| Houghton Mifflin Co. | Boston, Massachusetts | $2.2 billion |
| EchoStar Communications Corp. | Littleton, Colorado | $1.5 billion |
| USA Networks | New York, New York | $10.3 billion |

32.     In addition to Vivendi's U.S. acquisition activities, a significant number of Defendants' false and misleading statements were initially made in the U.S., and all were disseminated within the U.S.  Vivendi also regularly filed false and misleading reports with the SEC in the U.S., including Form 20-F Annual Reports and numerous Form 6-K Reports during the Relevant Time Period as alleged herein.

33.     Prior to and during the Relevant Time Period, false and misleading statements not made in the U.S. were disseminated into the U.S. and internationally through the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications and the facilities of the national securities markets.

34.     According to the Company's Form 20-F for the fiscal year ended December 31, 2001, signed and filed with the SEC on May 28, 2002 (the "2001 20-F"), over 54% of Vivendi's long lived assets, valued at €53.522 billion, were located in the U.S.  The 2001 20-F also states that Vivendi's 2001 U.S. revenue was purportedly over €12 billion.  In a February 17, 2002 interview on CNN, Messier stated that the Company "has 50,000 U.S. employees."

35.     Venue is proper in this District pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Vivendi is headquartered in Paris, France, but conducts business and maintains the Company's U.S. headquarters in this District.  In addition, Defendant Messier has resided in this District

since 2001 when he moved himself and his family into a $17 million penthouse apartment in

Manhattan. During his February 17, 2002 CNN interview, defendant Messier explained why he

moved to New York:

> Moving to New York, yes there [were] very simple reasons. The first one Vivendi Universal has 50,000 U.S. employees. They have a boss. Where is the boss? The boss is in the U.S. He's working there. I can meet with them. I can spend time with them. He is really the boss.

> The second goal was Vivendi International is a new group for many U.S. investors in the media field. We need and I needed to spend more time with the U.S. Universal community to explain the Vivendi Universal story, to go through all reasons of performances of prospects, and I think that it's just better to do it being an American, than being outside.

Similarly, in an interview on "Market Call" from New York on February 27, 2001, defendant

Messier reiterated that one of the primary reasons for moving to New York was to promote

Vivendi to U.S. investors and Wall Street:

> I'm not frustrated. I'm enthusiastic about doing and continuing (ph) and persuading this education job [for American investors and Wall Street analysts]. Since the merger, the level of U.S. investors in all capital has jumped from less than 10 percent to more than 25 percent. I have a very simple goal in mind. I want the level of U.S. investors, within Vivendi Universal, to reach as quickly as possible 50 percent of all capital . . .. I will take any necessary step to convince and educate Wall Street and U.S. investors.

In addition, many of the acts and practices complained of herein, including the dissemination of

materially false and misleading statements occurred in this District.

36.     In connection with the acts alleged in this Complaint, Defendants, directly or

indirectly, used the means and instrumentalities of interstate commerce, including but not limited

to the mails, interstate telephone communications and the facilities of the national securities

markets.

## FACTUAL BACKGROUND

37.     In June 1996, Messier became chairman of Generale des Eaux.  At that time, Generale des Eaux was – as it had been since it was founded in the 19th century – primarily a water utility company.  When Messier became CEO in 1996, Vivendi's stock and ADSs were trading in the €27 to €29 and $30 to $35 range, respectively.  Messier changed the name of Generale des Eaux to "Vivendi" in April 1999.

38.     After becoming CEO, Messier embarked on an extraordinarily ambitious plan to turn the Company into one of the world's largest media companies.  Prior to the Relevant Time Period, beginning in 1998, Vivendi acquired the following companies:

| COMPANY ACQUIRED | CLOSING DATE | % ACQUIRED[1] |
|---|---|---|
| Quotidien Sante | 4/9/98 | 100% |
| Linejebuss AB | 4/15/98 | 66.7% (33% owned) |
| Havas SA/Old | 6/2/98 | 70% (30% owned) |
| Cia de Saneamento do Parana | 6/8/98 | 41.38% |
| Ediciones Doyma SA | 6/25/98 | 50% |
| L'Etudient | 11/10/98 | 100% |
| ScVK | 11/18/98 | 43.17% |
| OVP-Vidal | 11/23/98 | 100% |
| Vivendi Universal | 12/15/98 | 10.5% |
| ALPINA GmbH | 1/5/99 | 100% |
| Cendant Software | 1/12/99 | 100% |
| Pathe | 1/26/99 | 19.6% (5% owned) |
| FCC | 3/5/99 | 28% |
| Aique | 4/20/99 | 100% |
| US Filter Corp. | 4/30/99 | 100% |

---

[1]    Pre-existing ownership interest, if any, is shown in parenthesis.

| COMPANY ACQUIRED | CLOSING DATE | % ACQUIRED[1] |
|---|---|---|
| SL Tunnelbanan AB | 5/4/99 | 60% |
| MediMedia | 5/12/99 | 100% |
| 18 Litre Water Division | 5/20/99 | 100% |
| Sani Gestion Inc. | 6/11/99 | 100% |
| MUSIDISC | 6/30/99 | 99.02% |
| Canal Plus | 7/22/99 | 15%<br>(34% owned) |
| British Sky Broadcasting Plc | 7/22/99 | 4%<br>(20.5% owned) |
| Aqua Alliance Inc. | 8/24/99 | 17%<br>(83% owned) |
| Pathe | 9/30/99 | 80.2%<br>(19.8% owned) |
| Superior Services Inc. | 11/11/99 | 100% |
| 23 GPU In. Power plants | 11/24/99 | 100% |
| Elektrim Telekomunikacja | 12/9/99 | 49% |
| Daesan Power Plant | 12/17/99 | 100% |
| The StayWell Company | 2/29/00 | 100% |
| Three V Health Inc. | 2/29/00 | 100% |
| Haniel Rohr; Kanal Service &<br>Haniel Industrie Reinigung | 3/28/00 | 100% |
| Prize Central Network | 3/29/00 | 100% |
| KD Offshore | 5/30/00 | 100% |
| Quod Bonom BV | 8/17/00 | 80% |
| Prelude et Fugue | 9/20/00 | 100% |
| Poland Com SA | 9/21/00 | 55.01% |

39.    Messier's early growth strategy required the Company to finance its acquisitions, which caused the Company to accumulate large amounts of debt. For example, in March 1999, Vivendi had to finance its $6.2 billion acquisition of U.S. Filter Corp. ("U.S. Filter") by raising approximately €5.7 through a convertible bond offering. Similarly, in December of 1999,

Vivendi increased its equity investment in Elektrim Telekomunikacja ("Telco"), a Polish conglomerate, to $1.2 billion (or 49% of Telco's equity) by investing an additional $250 million in cash and converting an earlier $615 million loan to Telco shares.

40.    In December 2000, the three-way Merger of Vivendi, Seagram, and Canal Plus closed.

41.    On December 22, 2000, the Financial Times reported that Vivendi had purchased a 35% stake in Maroc Telecom, S.A. ("Maroc Telecom"), Morocco's telephone monopoly, for approximately €2.3 billion.

## RELEVANT ACCOUNTING PRINCIPLES

42.    At all relevant times during the Relevant Time Period, Defendants represented that Vivendi's financial statements when issued were prepared in conformity with Generally Accepted Accounting Principles ("GAAP")[2] in France.  However, the Company violated GAAP and SEC reporting requirements by filing periodic reports with the SEC that did not accurately disclose the reasons for the material increases on reported EBITDA and operating earnings during the Relevant Time Period.

43.    Foreign issuers who are required to file annual reports with the Commission report the financial results of their operations in financial statements, which include an income statement and balance sheet, prepared in conformity with GAAP applicable in the United States, their home country, or some other jurisdiction.  Foreign issuers include these financial statements in annual reports that they file with the Commission on Forms 20-F.  Issuers that submit non-U.S. GAAP financial statements to the Commission must also include in their Forms 20-F, among other things, a reconciliation of net income to U.S. GAAP, and may also choose to

---

[2]    GAAP is recognized by the accounting profession and the SEC as the uniform rules, conventions and procedures necessary to define accepted accounting practice at a particular time.

include other disclosures required by U.S. GAAP. Foreign issuers also disclose other information to the U.S. public on Forms 6-K.

44. The SEC allows foreign issuers to prepare their financial statements in accordance with a comprehensive body of GAAP other than U.S. GAAP, provided that such statements contain a reconciliation to U.S. GAAP. In this regard, the financial results in Vivendi's consolidated earnings releases issued in the United States during at least portions of the Relevant Time Period were presented as "U.S. GAAP based" or on a "U.S. GAAP basis." Also, during some or all of the Relevant Time Period, U.S. GAAP applied to the financial results of several of Vivendi's business units, including Cegetel and UMG.

45. Item 18 of Form 20-F provides, among other things, that the financial statements shall disclose an informational content substantially similar to financial statements that comply with United States GAAP and SEC Regulation S-X. Item 18 also provides that the financial statements contain a discussion of the material variations in accounting principles, practices and methods from those generally accepted in the U.S. and a quantification of each material variation.

46. A company's income statement reports, among other things, revenue recognized, expenses incurred, and income earned during a stated period of time. Within an income statement, expenses are generally subtracted from revenues to calculate net income. A company's balance sheet reports, among other things, the assets and liabilities of a company at a point in time, usually as of the end of the company's fiscal quarter or fiscal year.

47. During the Relevant Time Period, Vivendi was a foreign issuer whose primary place of reporting and listing was in Paris, France. Vivendi was also required to file its annual consolidated financial statements with the Commission on Forms 20-F. Vivendi also furnished

certain information to the Commission on Forms 6-K during the Relevant Time Period. Also during the Relevant Time Period, Vivendi filed financial information in France with the Commission des Opérations de Bourse ("COB").

48.    During the Relevant Time Period, Vivendi's consolidated financial statements were prepared in conformity with French GAAP. However, the financial results in Vivendi's consolidated earnings releases issued in the United States during at least portions of the Relevant Time Period were presented as "U.S. GAAP based" or on a "U.S. GAAP basis." Also, during some or all of the Relevant Time Period, U.S. GAAP applied to the financial results of several of Vivendi's business units, including Cegetel and UMG.

49.    As set forth in Financial Accounting Standards Board ("FASB") Statement of Financial Accountings Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is that it provide accurate and reliable information concerning an entity's financial performance during the period being presented. Concepts Statement No. 1, ¶ 42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

50.    As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1). Management is responsible for preparing financial statements that conform with GAAP. As noted by the AICPA professional standards:

> [f]inancial statements are management's responsibility . . ..
> [M]anagement is responsible for adopting sound accounting policies and for establishing and maintaining internal control that

> will, among other things, initiate, record, process, and report
> transactions (as well as events and conditions) consistent with
> management's assertions embodied in the financial statements.
> The entity's transactions and the related assets, liabilities and
> equity are within the direct knowledge and control of management
> . . . . Thus, the fair presentation of financial statements in
> conformity with generally accepted accounting principles is an
> implicit and integral part of management's responsibility.

51.    During the Relevant Time Period, Vivendi emphasized two non-U.S. GAAP

measurements when it announced its financial results to the public.  First, Vivendi typically

announced in press releases and other public statements its earnings before interest, taxes,

depreciation, and amortization, which is commonly known as EBITDA.  Second, Vivendi

reported its "Operating Free Cash Flow" (also referred to as "Operational Free Cash Flow"),

which Vivendi defined in its earnings releases as "EBITDA minus capital spending minus

changes in working capital minus other expenses."

## DEFENDANTS' VIOLATION OF GAAP AND SEC RULES

52.    Vivendi's materially false and misleading financial statements resulted from a

series of deliberate senior management decisions designed to conceal the truth regarding

Vivendi's actual financial position and operating results.  Defendants caused the Company to

violate GAAP and SEC rules by, among other things:

     a.    Causing Cegetel to improperly depart from its historical
       practices in accounting for bad debt expense, thereby reducing
       bad debt expense and overstating accounts receivables;

     b.    Causing Cegetel to improperly defer approximately €14
       million in provisions for potential future payments and
       potential liabilities that Cegetel should have booked in 3Q:01;

     c.    Causing UMG to improperly accelerate €3 million in deferred
       revenue;

     d.    Causing UMG to improperly reduce the amount of corporate
       overhead charges allocated to UMG;

    e.   Improperly consolidating Cegetel's operating results with
        Vivendi's; and

    f.   Improperly consolidating Maroc Telecom's operating results
        with Vivendi's.

## DEFENDANTS' IMPROPER ACCOUNTING AT CEGETEL

**Defendants Improperly Accounted For Bad Debts**

53.    Vivendi's reported financial results during the Relevant Time Period were
materially false and misleading because Defendants caused the Company to improperly depart
from its historical methodology for determining the level of its reserve for bad debts during the
second quarter of 2001, thus overstating the Company's accounts receivables, total assets,
stockholders' equity and earnings.  That improper departure caused Cegetel's bad debts reserve
for the second quarter of 2001 to be €45 million lower than its historical methodology required.
As a result, Vivendi's overall EBITDA and operating income for the second quarter of 2001 was
increased by the same amount.

54.    Under U.S. GAAP, Statement of Financial Accounting Standards ("SFAS") No.
5, *Accounting for Contingencies* precludes the use of reserves, including excess reserves, for
general or unknown business risks, and the systemic or timed release of reserves into income.
Further, SFAS No. 5, ¶ 23, states that an estimate of losses on accounts receivable "normally
depend[s] on, among other things, the experience of the enterprise . . . and appraisal of the
receivables in light of the current economic environment."  As Defendants knew or were reckless
in not knowing, Cegetel reduced its provision for bad debts during the second quarter of 2001 at
a time when Cegetel was actually having more difficulty collecting on its bad debts.

55.    In addition, Accounting Research Bulletin ("ARB") No. 43, Chapter 3, Section A.
9 provides that the objective of providing for reserves against receivables is to assure that,

"[a]ccounts receivable net of allowances for uncollectible accounts . . . are effectively stated at the amount of cash estimated as realizable."

56.    During the Relevant Time Period, Vivendi changed its historical methodology for determining the level of its reserve for bad debts during the second quarter of 2001.  As a result of the change, the Company experienced a material gain in EBITDA and achieved its earnings estimates.  Vivendi, however, failed to disclose the change and the effects of the change on reported earnings as required by GAAP.

**Defendants Improperly Deferred**
**Provisions For Potential Future Payments And Potential Liabilities**

57.    In addition, Defendants improperly deferred to the third quarter of 2001 approximately €14 million in provisions for potential future payments and potential liabilities that according to GAAP Defendants should have recorded in the second quarter of 2001, thus understating liabilities and expenses and overstating stockholders' equity and earnings.

58.    GAAP normally reflects the application of the "all-inclusive" income statement concept.  This concept recognizes all income and expenses, even irregularly occurring losses or costs, in the results of operations in the period incurred, unless GAAP provides otherwise.  This "all-inclusive" concept "is intended, among other things, to avoid discretionary omissions of losses (or gains) from an income statement, thereby avoiding presentation of a more (or less) favorable report of performance . . . than is justified."  Concepts Statement No. 5, <u>Recognition and Measurement in Financial Statements of Business Enterprises</u>, ¶ 35.

59.    In addition, GAAP states that the "recognition of revenues, expenses, gains, and losses and the related increments or decrements in assets and liabilities—including matching of costs and revenues, allocation, and amortization—is the essence of using accrual accounting to measure performance of business enterprises.  The goal of accrual accounting for a business

22

enterprise is to account in the periods in which they occur for the effects of transactions and
other events and circumstances, to the extent that those financial effects are recognizable and
measurable."  Concepts Statement No. 3, <u>Elements of Financial Statements of Business
Enterprises</u>, ¶ 85.

60.     As a result of improper accounting, the Company's books improperly reflected
material increases in EBITDA and falsely indicated that the Company achieved its earnings
estimates.  Altogether, the foregoing improper adjustments at Cegetel totaled €59 million and
enabled Vivendi to show overall EBITDA growth of 35% for the second quarter of 2001.
Vivendi, however, failed to disclose the reasons for the substantial EBITDA increases and its
impact on reported earnings as required by SEC reporting requirements.

61.     Defendants knew or recklessly disregarded that the Company's public filings
during the Relevant Time Period failed to comply with the disclosure obligations under the
SEC's rules and regulations, including, among other things, the rules and regulations concerning
Management's Discussion and Analysis of Financial Condition and Results of Operations.  *See*
17 C.F.R. §229.303.

62.     During the Relevant Time Period, Defendants favorably compared Vivendi's
results for the comparable period of the prior year but failed to disclose that those results were
not comparable since: (i) Vivendi changed its historical methodology for determining the level of
its reserve for bad debts related to accounts receivables; and (ii) Vivendi improperly deferred to
the third quarter of 2001 approximately €14 million in provisions for potential future payments
and potential liabilities that Cegetel properly should have booked in the second quarter of 2001.
For example, in a press release dated July 23, 2001 Defendants disclosed that "[f]or the first half

of 2001, the company generated strong EBITDA growth of 77% to 2.2 billion euros versus pro

forma results for the first half of the prior year (62% excluding Maroc Telecom)."

63.    Additionally, APB Opinion No. 22, Disclosure of Accounting Policies, ¶ 7,

provides that "the usefulness of financial statements . . . [in] making economic decisions . . .

depends significantly upon the user's understanding of the accounting policies followed" by a

company.  In fact, GAAP states that information about the accounting policies adopted by a

reporting company is "essential for financial statement users."  Id. at ¶ 8.  Accordingly, GAAP,

in ¶ 12 of APB Opinion No. 22 provides:

> In general, the disclosure should encompass important judgments as to
> appropriateness of principles relating to recognition of revenue and allocation of
> asset costs to current and future periods; in particular, it should encompass those
> accounting principles and methods that involve any of the following:
>
>     a.    A selection from existing acceptable alternatives;
>
>     b.    Principles and methods peculiar to the industry in which the
>        reporting entity operates, even if such principles and methods
>        are predominantly followed in that industry;
>
>     c.    Unusual or innovative applications of generally accepted
>        accounting principles (and, as applicable, of principles and
>        methods peculiar to the industry in which the reporting entity
>        operates).

64.    Vivendi's Relevant Time Period financial statements were thus also false and

misleading and failed to comply with GAAP because they improperly failed to identify and

describe important judgments associated with its change of its historical methodology for

determining the level of its reserve for bad debts related to accounts receivables.  Accordingly,

investors were unable to assess the appropriateness of, or the risks associated with, Vivendi's

financial reporting.

## THE DEFENDANTS' IMPROPER ACCOUNTING AT UMG

**Defendants Caused UMG To Improperly
Accelerate €3 Million In Deferred Revenue**

65.      Vivendi's Relevant Time Period financial statements were also materially false
and misleading because the Defendants caused UMG to improperly accelerate approximately €3
million in deferred revenue that it received in connection with a contract between UMG and
other parties.  During the quarter ended September 30, 2001, UMG had deferred recognizing the
€3 million payment it received on the basis that this payment would have to be refunded if
Vivendi and the other parties to the contract failed to meet certain conditions by mid-December
2001.  The recognition of this €3 million payment as income in the third quarter of 2001 was not
in conformity with U.S. GAAP because those conditions were not met during the third quarter,
and the payment remained refundable.

66.      Concepts Statement No. 5 states that revenue cannot be recognized until it is
earned and that revenue is earned when the entity has substantially accomplished what it must do
to be entitled to the benefits represented by the revenues.  Defendants violated a fundamental
tenet of GAAP, that "[i]n assessing the prospect that as yet uncompleted transactions will be
concluded successfully, a degree of skepticism is often warranted."  Concepts Statement No. 5 ¶
81.  Accordingly, "as a reaction to uncertainty, more stringent requirements historically have
been imposed for recognizing revenues and gains than for recognizing expenses and losses, and
those conservative reactions influence the guidance for applying the recognition criteria to
components of earnings."  *Id.*

**Defendants Caused UMG To Improperly Reduce
The Amount Of Corporate Overhead Charges Allocated To UMG**

67.      In late October 2001, Vivendi improperly reduced the amount of corporate
overhead charges it allocated to UMG by €7 million.  This reduction in the corporate overhead

charges equaled the exact amount of additional earnings that Defendants determined that UMG needed in order to reach €250 million in EBITDA for the quarter ended September 30, 2001.

68.    This overhead allocation was not in conformity with Concepts Statement No. 6, Elements of Financial Statements, which states that allocations are assigned and distributed "according to a plan or a formula."  ¶ 142.  Further, SFAS No. 131, Disclosures about Segments of an Enterprise and Related Information, provides that amounts allocated to reported segment profit or loss "shall be allocated on a reasonable basis."  ¶ 29.  During the third quarter of 2001, Defendants based the overhead allocation charged to UMG not on a plan or formula, but primarily on a desire to reach a specific EBITDA target.  This conduct was in contravention of both Concepts Statement No. 6 and SFAS No. 131.

69.    Defendants caused Vivendi's results to not be in conformity with U.S. GAAP, and incorporated these inflated results into Vivendi's earnings releases.  These practices caused Vivendi's financial reports, press releases, and other market communications to be materially false and misleading.  During the third quarter of 2001, the Defendants favorably compared Vivendi's results for the comparable period of the prior year but failed to disclose that those results were not comparable or sustainable, since Vivendi's EBITDA included: (i) approximately €3 million in improperly accelerated deferred revenue that it received in connection with a contract between UMG and other parties; and (ii) Vivendi improperly reduced the amount of corporate overhead charges it allocated to UMG by €7 million.  For example, in Vivendi's third quarter 2001 press release on October 30, 2001, Messier stated that Vivendi's "'third quarter results for the media and communications businesses, with 24% revenue and 90% EBITDA growth, including organic growth of 8% and 36% respectively, are obviously strong despite the tough environment . . . .'"  Messier went on to say that the financial results "'reflect both our

higher potential for growth and greater resiliency to recessionary environments compared to many of our peers.'"

## THE DEFENDANTS VIOLATED SEC RULES

70.     Defendants knew or recklessly disregarded that the Company's public filings during the Relevant Time Period were materially false and misleading because they failed to comply with the disclosure obligations under the SEC's rules and regulations, including, among other things, the rules and regulations concerning Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A").  *See* 17 C.F.R. §229.303.  In this regard, Defendants knew that their MD&A disclosures were false and misleading because: (i) Vivendi changed its historical methodology for determining the level of its reserve for bad debts related to accounts receivables; (ii) Vivendi improperly deferred to the third quarter of 2001 approximately €14 million in provisions for potential future payments and potential liabilities that Cegetel properly should have booked in the second quarter of 2001; (iii) Vivendi improperly accelerated approximately €3 million in deferred revenue that it received in connection with a contract between UMG and other parties; and (iv) Vivendi improperly reduced the amount of corporate overhead charges it allocated to UMG by €7 million.

71.     In Vivendi's 2001 20-F, Defendants disclosed the following:

> Total operating income more than doubled to €3.8 billion.
> Operating income generated by our core businesses, at €3.8 billion,
> increased 145%, of which 59% was due to the inclusion of a full
> twelve-month results of the acquired Seagram's operations in 2001
> (compared to twenty-three days in 2000), 38% resulted from the
> 2001 acquisitions of Maroc Telecom, Houghton Mifflin and
> MP3.com, and the remaining 48% was generated by a combination
> of organic growth and the impact of less significant acquisitions
> and disposals.

72.     The above disclosure was materially false and misleading because Defendants failed to describe that the operating income increases were due to, among other things: (i)

Vivendi changing its historical methodology for determining the level of its reserve for bad debts related to accounts receivables; (ii) Vivendi improperly deferring to the third quarter of 2001 approximately €14 million in provisions for potential future payments and potential liabilities that Cegetel properly should have booked in the second quarter of 2001; (iii) Vivendi improperly accelerating approximately €3 million in deferred revenue that it received in connection with a contract between UMG and other parties; and (iv) Vivendi improperly reducing the amount of corporate overhead charges it allocated to UMG by €7 million. Item 303 of Regulation S-K requires public companies to:

> Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

Item 303 of Regulation S-K, 17 C.F.R. § 229.303(a)(3)(i). Paragraph 4 of the Instructions to Paragraph 303(a) states:

> Where the consolidated financial statements reveal material changes from year to year in one or more line items, the causes for the changes shall be described to the extent necessary to an understanding of the registrant's businesses as a whole . . .

73.     It is precisely because such "qualitative" information is important to investors that the SEC requires corporations to discuss their businesses and interpret their results. As the Securities Act Release No. 6711 states:

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A [Management Discussion and Analysis] is intended to give the investor an opportunity to look at the company

through the eyes of management by providing both a short and
long-term analysis of the business of the company.

74.    Similarly, Concepts Statement No. 1 states:

Financial reporting should provide information about an
enterprise's financial performance during a period.  Investors and
creditors often use information about the past to help in assessing
the prospects of an enterprise.  Thus, although investment and
credit decisions reflect investors' and creditors' expectations about
future enterprise performance, those expectations are commonly
based at least partly on evaluations of past enterprise performance.

¶ 42.

75.    In addition, the SEC, in its May 18, 1989 Interpretive Release No. 34-26831, has

indicated that registrants should employ the following two-step analysis in determining when a

known trend or uncertainty is required to be included in the MD&A disclosure pursuant to Item

303 of Regulation S-K:

A disclosure duty exists where a trend, demand, commitment,
event or uncertainty is both presently known to management and
reasonably likely to have material effect on the registrant's
financial condition or results of operations.

76.    According to Securities Act Release No. 6349:

[i]t is the responsibility of management to identify and address
those key variables and other qualitative and quantitative factors
which are peculiar to and necessary for an understanding and
evaluation of the individual company.

77.    Accordingly, in reporting its improved EBITDA and operating earnings during

the Relevant Time Period, Vivendi failed to disclose that a material element of those improved

results was because: (i) Vivendi changed its historical methodology for determining the level of

its reserve for bad debts related to accounts receivables; (ii) Vivendi improperly deferred to the

third quarter of 2001 approximately €14 million in provisions for potential future payments and

potential liabilities that Cegetel properly should have booked in the second quarter of 2001; (iii)

Vivendi improperly accelerated approximately €3 million in deferred revenue that it received in connection with a contract between UMG and other parties; and (iv) Vivendi improperly reduced the amount of corporate overhead charges it allocated to UMG by €7 million, even though SEC rules required such disclosures. Indeed, it was material for investors and the market to know whether Vivendi's EBITDA and operating earnings were sustainable. Accordingly, Vivendi's failure to identify to investors the true source of its EBITDA acted as an implicit, and false, representation that such EBITDA and operating earnings was sustainable.

**VIVENDI'S FINANCIAL STATEMENTS WERE MATERIALLY FALSE AND MISLEADING BECAUSE VIVENDI DID NOT POSSESS CONTROLLING FINANCIAL INTEREST IN AT LEAST ITS CEGETEL AND MAROC TELECOM SUBSIDIARIES AND COULD NOT PROPERLY CONSOLIDATE THEIR RESULTS**

78.     Vivendi did not possess controlling financial interest in at least its Cegetel and Maroc Telecom subsidiaries and therefore should not have consolidated the financial statements of such companies with its own. In so doing, Vivendi overstated its reported revenue, operating income and EBITDA and inflated its reported growth rates throughout the Relevant Time Period.

**Defendants Knew Or Recklessly Disregarded That Vivendi Did Not Have A Sufficient Ownership Interest To Properly Consolidate Cegetel's Financial Results Into Vivendi's**

79.     Defendants knew or recklessly disregarded that Vivendi did not have a sufficient ownership interest in Cegetel in order to properly consolidate under U.S. GAAP. During the Relevant Time Period, in contravention of GAAP, Vivendi improperly consolidated 100% of Cegetel's earnings and cash flows, which accounted for a significant portion of Vivendi's cash flows, despite the fact that it had a direct and indirect ownership interest in Cegetel of only 44%. According to the SEC complaint against Vivendi, between December 2000 and July 2002 over 30% of Vivendi's EBITDA and almost half of its cash flow was attributable to Cegetel and Maroc Telecom. SEC v. Vivendi Universal, Compl. ¶ 27 (Dec. 23, 2003).

80.    Accounting Research Bulletin ("ARB") No. 51 <u>Consolidated Financial Statements</u>, as amended by SFAS No. 94 <u>Consolidation of All Majority-Owned Subsidiaries</u>, requires that all investments in which a parent company has a "controlling financial interest," which is typically represented by the "ownership of a majority voting interest" (more than 50%), be consolidated.  ARB No. 51 ¶ 2; SFAS No. 94 ¶ 2.  While ARB No. 51 and SFAS No. 94 acknowledge exceptions to this general rule, a controlling financial interest is the principal condition for determining consolidation.  *See* SFAS No. 94 ¶¶ 1-2.

81.    Accordingly, because Vivendi only owned a 44% direct and indirect common equity in Cegetel, not a controlling financial interest, Vivendi improperly consolidated Cegetel.

82.    In Vivendi's 20-F for the year ended December 31, 2000 ("2000 20-F"), filed with the SEC on July 2, 2001, Defendants disclosed that "[t]he Company has a direct and indirect ownership interest in Cegetel totaling 44%.  Cegetel is consolidated because, through a shareholders agreement, the Company has a majority of the shareholder voting rights."

83.    The above disclosure was materially false and misleading because Defendants knew or recklessly disregarded that Vivendi did not establish a controlling financial interest through the shareholders' agreement to properly consolidate Cegetel under U.S. GAAP.  EITF 97-2, <u>Application of FASB Statement No. 94 and APB Opinion No. 16 to Physician Practice Management Entities and Certain Other Entities with Contractual Management Arrangements</u>, discusses whether an entity can establish a controlling financial interest based on a contractual management arrangement (shareholder's agreement) versus the ownership of a majority voting interest.  *See* EITF 97-2.  Although the EITF was drafted in response to consolidation issues in the health care industry, the SEC Observer stated that "[a]bsent unique industry characteristics, . . . the conclusions reached in this Issue may be applicable to similar arrangements in other

31

industries and that the SEC staff will consider this guidance when assessing the appropriate

accounting for those arrangements." *Id*. at 4.  An entity can establish a controlling financial

interest through a shareholder's agreement if the entity has both "control" and a "financial

interest," analyzed under six requirements.  Here, the four most pertinent of the six requirements

are:

> a.     Whether Vivendi exercised exclusive authority over all
> decision-making related to ongoing, major, or central operations of
> Cegetel.
>
> b.     Whether Vivendi exercised exclusive authority over all
> decision-making related to total compensation, as well as the
> ability to establish and implement hiring guidelines.
>
> c.     Whether Vivendi had a significant financial interest that was
> unilaterally salable or transferable.
>
> d.     Whether Vivendi had a significant financial interest that
> provided the right to receive income, both as ongoing fees and as
> proceeds from the sale of its interest in Cegetel.

84.     Vivendi, however, did not exercise control over Cegetel as defined by EITF 97-2.

EITF 97-2 defines control as having "exclusive authority over all decision making related to both

of the following: [o]ngoing, major, or central operations . . . [and] [t]otal . . . compensation . . . as

well as the ability to establish and implement guidelines for the selection, hiring, and firing . . . ."

EITF 97-2 at 5-6.

85.     First, Vivendi did not have the ability to exercise exclusive authority over all

decision-making related to ongoing, major, or central operations.  In this regard, the May 14,

1997 Shareholders' Agreement ("Agreement") states:

> The Executive Committee shall have the key role with respect to
> the strategy and management policy of CEGETEL and with
> respect to the supervision and overview of the management of
> CEGETEL's and the Group Companies' affairs by determining the
> Strategic Partners' common position with respect to all the major
> strategic decisions of CEGETEL and the Group Companies

> relating to commercial, financial, technical and operational matters
> . . . .

§ 3.2.1.1(a).

86.     According to the Agreement, the Executive Committee, consisting of seven members, including only one representative from Vivendi, required consensus from its Strategic Partners.  The Strategic Partners were comprised of Vivendi, British Telecommunications ("BT"), Mannesmann, and SBC International ("SBC") and "acknowledge[d] and agree[d] that they must attempt to reach unanimous agreement on the [functions] of the Executive Committee . . ." *Id*. at § 3.2.1.1 (a).

87.     Similarly, the French Financial Markets Authority decision dated November 3, 2004 noted that each Executive Committee member had:

> −  a veto right for issues pertaining to the company's existence or structure, such as changing its corporate purpose, by-laws or shareholders' agreement, transactions involving the capital stock resulting in the dilution of a partner's equity stake or an acquisition involving an amount over one billion francs, as well as for any transaction between one of the strategic partners and Cegetel or one of its subsidiaries;
>
> −  specific consent rights in such areas as approving budgets, business plans and annual financial statements, proposed year-end financial statements, investments and asset disposals, appointing CEOs, and changes in the dividend policy, etc.

Sanction Ruling Concerning Messier, Hannezo and the Vivendi Universal Co., at 10.

88.     Accordingly, Vivendi did not exercise exclusive authority because the Executive Committee had decision-making authority related to ongoing, major, or central operations and was controlled by the Strategic Partners, which operated by consensus, as defined under EITF 97-2.

89.     An example of Vivendi's lack of exclusive authority is evidenced by its cash-pooling arrangements maintained with Cegetel.  According to the SEC's Complaint against the

Company, Messier, and Hannezo, Vivendi maintained a cash-pooling arrangement with various of its subsidiaries.  As stated in the <u>SEC v. Vivendi Universal</u> Complaint, the arrangements with Cegetel, however, "were on different terms than these other pooling arrangements."  <u>SEC v. Vivendi Universal</u>, Compl. ¶ 63.  Primarily, the current account documents with Cegetel "contained an 'on demand' clause pursuant to which Cegetel could demand immediate reimbursement of the funds that it deposited with Vivendi at any time."  *Id*.

90.     Accordingly, because the cash pooling arrangement with Cegetel stated, among other things: (1) that it required unanimous approval of all shareholders; and (2) could be withdrawn at any time, Vivendi did not have exclusive authority over the cash pooling arrangements with Cegetel, and thus Vivendi did not exercise exclusive authority as defined under EITF 97-2.

91.     Also, Defendants knew or recklessly disregarded that Vivendi did not have a significant financial interest as defined by EITF 97-2.  Under EITF 97-2, a significant financial interest must fulfill two requirements: it must be "unilaterally salable or transferable . . . [and must] [p]rovide[] . . . the right to receive income, both as ongoing fees and as proceeds from the sale of its interest . . . in an amount that fluctuates based on the performance of the operations . . . and the change in the fair value thereof."  EITF 97-2 at 6.

92.     First, Vivendi was not able to unilaterally sell or transfer Cegetel, because each member of the Executive Committee had a veto right concerning Cegetel's "existence or structure," as noted in the French Financial Markets Authority's <u>Sanction Ruling Concerning Messier, Hannezo and the Vivendi Universal Co.</u>, at 10.

93.     Second, Vivendi did not have the ability to unilaterally sell its interest or transfer its own interest in Cegetel.  In this regard, the Agreement states:

> [Vivendi] undertakes neither to execute nor to enter into any
> agreement or undertaking which would or might result, directly or
> indirectly, in a Transfer of Shares, pursuant to which [Vivendi]
> would lose the CGE Holding during the Initial [five year] period . .
> .

94.     Third, Vivendi did not have the right to receive income, since it did not "have
access to Cegetel's cash flow because it [did not] meet the French requirement of 95-per-cent or
greater ownership."  'Vivendi is like a stray ship': Chairman has to persuade investors he has a
coherent plan for his conglomerate, The Gazette (Montreal, Quebec) (Mar. 30, 2002); see also
SEC v. Vivendi Universal, Compl. ¶ 26 (noting Vivendi's "inability unilaterally to access the
earnings and cash flow of [Cegetel].").  Additionally, the Paris Court of Appeals Decision noted
that "restrictions in access to the cash of its subsidiary Cegetel come from common law . . . ."
Paris Court of Appeals Decision of June 28, 2005 (R.G. No. 2005/02333).  Thus, Vivendi's
inability to access Cegetel's earnings and cash flow demonstrates that consolidation was in
violation of EITF 97-2.

95.     In addition, under French GAAP, exclusive control and the power to direct the
financial and operational policies of an enterprise is required in order to consolidate results.
Furthermore, French GAAP states that enterprises are **excluded** from consolidation where severe
and long lasting restrictions substantially call into question the control or influence exercised
over the enterprise.  (See Commercial Code, Article L33-19.)

96.     Additionally, due to Vivendi's inability to access Cegetel's cash flows, Vivendi's
representations in its financial statements that included Cegetel's cash flows were  materially
false and misleading.  For example, SFAS No. 95, Statement of Cash Flows, states that "[t]he
primary purpose of a statement of cash flows is to provide relevant information about the cash
receipts and cash payments of an enterprise during a period."  SFAS No. 95 ¶ 4 (Nov. 1987).
Additionally, the statement of cash flows should help investors in, among other things, to:

- "assess the enterprise's ability to generate positive future net cash flows"; and

- "assess the enterprise's ability to meet its obligations, its ability to pay dividends, and its needs for external financing[.]"

*Id*. ¶ 5.

97.    Thus, Vivendi's inclusion of Cegetel in its cash flow statements was false and misleading because, among other things, Vivendi's cash flows: (1) did not provide relevant information about cash receipts or cash payments; and (2) did not allow investors to assess Vivendi's ability to meet its obligations, pay dividends, and its needs for external financing.

98.    Accordingly, Vivendi's inclusion of Cegetel's cash flows in Vivendi's financial statements was false and misleading because Vivendi did not have access to the cash flow based on French common law and thus it did not allow investors to properly assess Vivendi's ability to meet its obligations, pay its dividends, and meet its needs for external financing.  Additionally, it did not have a significant financial interest as defined by EITF 97-2 because it did not have the right to receive income or cash flows from Cegetel.

99.    Moreover, Defendants knew or recklessly disregarded that BT, Mannessman, and SBC's exercise rights were sufficient to preclude Vivendi from consolidating Cegetel.  EITF 96-16, Investor's Accounting for an Investee When the Investor Has a Majority of the Voting Interest but the Minority Shareholder or Shareholders Have Certain Approval or Veto Rights, acknowledges that a controlling financial interest in an entity is generally evidenced by ownership of a majority voting interest although, in some instances, a minority shareholder may hold certain rights that, if deemed to be "substantive participating rights," can overcome the presumption of control by the majority owner.  EITF 96-16 at 7-8.  Specifically, EITF 96-16 states that the following corporate actions should be considered substantive participating rights

and would overcome the presumption that the investor with a majority voting interest should consolidate its investee:

> 1.  Selecting, terminating, *and* setting the compensation of management responsible for implementing the investee's policies and procedures.
>
> 2.  Establishing operating *and* capital decisions of the investee, including budgets, in the ordinary course of business.

*Id*. at 8.

100.   The EITF 96-16 notes that the foregoing, although not necessarily all-inclusive, are "rights [that] allow the minority shareholder to effectively participate in decisions that occur as part of the ordinary course of the investee's business and are significant factors in directing and carrying out the activities of the business."  *Id*.

101.   In Vivendi's 2001 20-F filed with the SEC, Defendants disclosed that Cegetel is "[c]onsolidated because, through a shareholders' agreement, [the Company] has a majority of the shareholder voting rights . . . ."  As discussed above, however, each Executive Committee member had veto rights for issues pertaining to the company's existence or structure, and specific consent rights in such areas as approving budgets, business plans and annual financial statements, proposed year-end financial statements, appointing CEOs, and changes in the dividend policy, etc.  *See* Sanction Ruling Concerning Messier, Hannezo and the Vivendi Universal Co., at 10.  Accordingly, under EITF 96-16, Vivendi was precluded from consolidating Cegetel because BT, Mannesman, and SBC could exercise rights that allowed them to effectively participate in the decisions that occurred as part of the ordinary course of Cegetel's business.  For example, in order for Vivendi to utilize the cash pooling arrangement, it required unanimous approval from BT, Mannessman, and SBC, which could be withdrawn at any time.

37

**Defendants Knew Or Recklessly Disregarded That Vivendi Did Not
Have A Sufficient Ownership Interest To Properly Consolidate Maroc**

102.    Defendants knew or recklessly disregarded that Vivendi did not have a sufficient

ownership interest in Maroc Telecom in order to properly consolidate its financial results with

and into Vivendi's under U.S. GAAP.  During the Relevant Time Period, in contravention of

GAAP, Vivendi improperly consolidated 100% of Maroc Telecom's earnings and cash flows,

which accounted for a significant portion[3] of the cash flows of Vivendi Universal, despite the

fact that it had a direct and indirect ownership interest in Maroc Telecom of only 35%.  ARB No.

51, as amended by SFAS No. 94, requires that all investments in which a parent company has a

"controlling financial interest," which is typically represented by the "ownership of a majority

voting interest" (more than 50%), be consolidated.  ARB No. 51 ¶ 2; SFAS No 94 ¶ 2.  While

ARB No. 51 and SFAS No 94 acknowledge exceptions to this general rule, a controlling

financial interest is the principal condition for determining consolidation.  *See* SFAS No 94 ¶¶ 1-

2.  In Vivendi's 2001 20-F, Defendants disclosed that:

> In the course of the partial privatization of Maroc Telecom,
> Vivendi Universal was chosen to be a strategic partner in the
> purchase of an interest in Morocco's national telecommunications
> operator for approximately €2.4 billion.  The transaction was
> finalized in April 2001, at which time Maroc Telecom began to be
> consolidated in the accounts of Vivendi Universal, as we obtained
> control through majority board representation and share voting
> rights.

103.    Defendants knew or recklessly disregarded that the above disclosure was

materially false and misleading because Vivendi did not establish a controlling financial interest

through the shareholders' agreement to properly consolidate Maroc under EITF 97-2.  An entity

can establish a controlling financial interest through a shareholder's agreement if the entity has

---

[3]    According to the SEC complaint against Vivendi, between December 2000 and July 2002 over 30% of Vivendi's
EBITDA and almost half of its cash flow was attributable to Cegetel and Maroc Telecom.  SEC v. Vivendi
Universal, Compl. ¶ 27 (Dec. 23, 2003).

both "control" and a "financial interest," analyzed under six requirements. Here, the four most pertinent of the six requirements are:

1. Whether Vivendi exercised exclusive authority over all decision-making related to ongoing, major, or central operations of Maroc.

2. Whether Vivendi exercised exclusive authority over all decision-making related to total compensation, as well as the ability to establish and implement hiring guidelines.

3. Whether Vivendi had a significant financial interest that was unilaterally salable or transferable.

4. Whether Vivendi had a significant financial interest that provided the right to receive income, both as ongoing fees and as proceeds from the sale of its interest in Maroc.

104.    Defendants knew or recklessly disregarded that Vivendi did not exercise control over Maroc as defined by EITF 97-2. EITF 97-2 defines control as having "exclusive authority over all decision making related to both of the following: [o]ngoing, major, or central operations . . . [and] [t]otal . . . compensation . . . as well as the ability to establish and implement guidelines for the selection, hiring, and firing . . . ."

105.    Indeed, Vivendi did not have the ability to exercise exclusive authority over all decision-making related to ongoing, major, or central operations. Under the original agreement between Vivendi and Maroc, senior management bodies were to be composed of (a) the Executive Board, with five members, of which two were from the Kingdom of Morocco and the rest representing Vivendi; (b) the Supervisory Board, with eight members, of which five represented the Kingdom of Morocco and three Vivendi; and (c) the general shareholders, with 65 percent of the voting rights going to the Kingdom of Morocco and 35 percent to Vivendi. *See* Sanction Ruling Concerning Messier, Hannezo and the Vivendi Universal Co., at 11.

106.    In this regard, Defendants knew, or were reckless in not knowing, that Maroc Telecom would be managed by a Supervisory Board and a Board of Directors. Vivendi would have three of the five seats on the Board of Directors. Most decisions, however, require Supervisory Board approval with qualified majority. As a consequence, Vivendi would have "very limited management" over the Maroc Telecom Company.

107.    The Supervisory Board had an integral role with respect to finance and operations, particularly decisions involving changes in accounting methods, creating significant subsidiaries, equity acquisitions and changes to the by-laws, all of which required a qualified majority of six of the eight members. *Id*. Accordingly, because each member of the Executive Board had a veto right concerning Maroc's "finance and operations decisions," Vivendi did not have the ability to exercise exclusive authority over all decision-making related to ongoing, major, or central operations. Indeed, Maroc was controlled by the Supervisory Board, which was operated by consensus, and therefore, did not allow for Vivendi to exercise exclusive authority, as defined under EITF 97-2.

108.    Defendants knew or recklessly disregarded that Vivendi did not have a significant financial interest as defined by EITF 97-2. Under EITF 97-2, a significant financial interest must fulfill two requirements: it must be "unilaterally salable or transferable . . . [and must] [p]rovide[] . . . the right to receive income, both as ongoing fees and as proceeds from the sale of its interest . . . in an amount that fluctuates based on the performance of the operations . . . and the change in the fair value thereof."

109.    Vivendi did not have the right to receive income, since it did not have access to Maroc's "cash flow because it [did not] meet the French requirement of 95-per-cent or greater ownership." 'Vivendi is like a stray ship' Chairman has to persuade investors he has a coherent

40

<u>plan for his conglomerate</u>, The Gazette (Montreal, Quebec) (Mar. 30, 2002). Thus, because of Vivendi's inability to access Maroc's earnings and cash flow, consolidation was improper under EITF 97-2.

110.    In addition, under French GAAP, exclusive control and the power to direct the financial and operational policies of an enterprise is required in order to consolidate results. Furthermore, French GAAP states that enterprises are ***excluded*** from consolidation where severe and long lasting restrictions substantially call into question the control or influence exercised over the enterprise. (*See* Commercial Code, Article L33-19.)

111.    Additionally, due to Vivendi's inability to access Maroc's cash flows, Vivendi's representations in its financial statements that included Maroc's cash flows were materially false and misleading. For example, SFAS No. 95 states that "[t]he primary purpose of a statement of cash flows is to provide relevant information about the cash receipts and cash payments of an enterprise during a period." SFAS No. 95 ¶ 4. Additionally, the statement of cash flows should, among other things, help investors to:

- "assess the enterprise's ability to generate positive future net cash flows"; [and]

- "assess the enterprise's ability to meet its obligations, its ability to pay dividends, and its needs for external financing[.]"

*Id*. ¶ 5.

112.    Thus, Vivendi's inclusion of Maroc's cash flow was materially false and misleading because, among other things, as a result of its inclusion, Vivendi's cash flows: (i) did not provide relevant information about cash receipts or cash payments; and (ii) did not allow investors to assess Vivendi's ability to meet its obligations, pay dividends, and its needs for external financing.

113.    Additionally, Vivendi's inclusion of Maroc's cash flows in Vivendi's financial statements was false and misleading because Vivendi did not have access to the cash flow based on French common law and thus it did not allow investors to properly assess Vivendi's ability to meet its obligations, pay its dividends, and meet its needs for external financing.  Moreover, it did not have a significant financial interest as defined by EITF 97-2 because it did not have the right to receive income or cash flows from Maroc.

114.    During 2001 and early 2002 Defendants also caused Vivendi's public filings to be false and misleading because they failed to disclose a secret side agreement that Vivendi entered in February 2001, requiring it to purchase an additional €1.1 billion stake in Maroc Telecom.  Instruction 3 to Item 303(a) states:  "The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results . . . ."

115.    Also, in its April 17, 1987 Securities Act Release No. 6711, the SEC has indicated that:

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance.  MD&A is intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company.

116.    Defendants were motivated to gain control of Maroc and consolidate its results due to the fact that Maroc Telecom carried little debt and generated additional EBITDA.  Therefore, in February 2001 Vivendi and the Moroccan government entered into a side agreement that required Vivendi to purchase an additional 16 percent of Maroc's shares by February 20, 2002 for approximately €1.1 billion, contingent on the Moroccan government

exercising an irrevocable put. In exchange, the Moroccan government granted Vivendi certain management rights over the operation of Maroc Telecom upon which Vivendi based its consolidation of Maroc Telecom.

117.    Defendants knew or recklessly disregarded that if Vivendi had properly disclosed the existence of, and the terms of, the secret side agreement, and in particular Vivendi's obligation to purchase an additional 16 per cent interest in Maroc, the public would have been alerted to Vivendi's future cash requirements and consequently the market price of Vivendi's securities would have reflected concern about Vivendi's ability to meet its cash needs.

118.    Vivendi failed to disclose these facts in its public filings with the SEC, the COB, and in other public statements that it made in 2001 and early 2002.

119.    For example, in its 2000 20-F filed on July 2, 2001, Vivendi stated:

> In December 2000, we announced that we had acquired a 35% stake in Moroccan telecommunications operator Maroc Telecom for approximately €2.3 billion. Maroc Telecom, which operates fixed-line and mobile telephone networks in Morocco, is estimated to have generated revenue of approximately €1.3 billion in 2000. In cooperation with Maroc Telecom, we intend to contribute our telecoms experience to the modernization of the telecommunications industry in Morocco.

The 2000 20-F was false and misleading, as it did not disclose the Maroc Telecom side agreement.

120.    Vivendi also failed to disclose its commitment with respect to Maroc Telecom in its periodic filing with the COB for the six-month period ended June 30, 2001. On October 17, 2001, Vivendi attached an English translation of that filing to a Form 6-K filed with the SEC. The COB filing and Form 6-K were reviewed and approved by Individual Defendants Messier and Hannezo and other senior Vivendi executives.

121.    Vivendi also failed to disclose the Maroc Telecom side agreement to analysts from Moody's Investors Services ("Moody's") and Standard & Poor's during the December 2001 "pre-clearance" meetings regarding the USA Networks and Echostar transactions. Defendants knew that if they had disclosed the existence of the Maroc Telecom put option, the credit rating agencies may have downgraded their credit rating of Vivendi.

122.    In February 2002, Vivendi and the Moroccan government agreed to extend the deadline for the irrevocable put option to September 2005.  Vivendi finally disclosed the renegotiated side agreement in its 2001 20-F, which was not filed until May 28, 2002:

> In connection with its interest in Maroc Telecom, Vivendi Universal and the Kingdom of Morocco contracted a reciprocal call and put option related to a 16% interest in Maroc Telecom currently held by the Kingdom of Morocco.  The options can be exercised from September 1, 2003 to June 1, 2005 between the parties at then fair value, except if before September 1, 2003, the Kingdom of Morocco places this 16% interest with a third party investor or if Vivendi Universal exercises preemption rights.

123.    Accordingly, Vivendi's financial statements during the Relevant Time Period were materially false and misleading because Defendants improperly consolidated Maroc, in contravention of GAAP.

**Additional GAAP Violations**

124.    As a result of the foregoing, Defendants caused Vivendi's reported financial results to violate, among other things, the following provisions of GAAP for which each Defendant is necessarily responsible:

a.   The principle that "[f]inancial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions" (Concepts Statement No. 1, ¶ 34);

b.   The principle that "[f]inancial reporting should provide information about the economic resources of an enterprise, the claims to those resources . . . and the effects of transactions, events and circumstances that change resources and claims to those resources" (Concepts Statement No. 1, ¶ 40);

c.   The principle that "[f]inancial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it . . .  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general" (Concepts Statement No. 1, ¶ 50);

d.   The principle that financial reporting should be reliable in that it represents what it purports to represent.  That information should be reliable as well as relevant is a notion that is central to accounting (Concepts Statement No. 2, Qualitative Characteristics of Accounting Information ¶¶ 58-59 (May 1980));

e.   The principle of completeness, which means that nothing "is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" (Concepts Statement No. 2, ¶ 79); and

f.   The principle that conservatism be used as a "prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered . . .  The best way to avoid injury to investors . . . is to try to ensure that what is reported represents what it purports to represent" (Concepts Statement No. 2, ¶¶ 95, 97).

**<u>OCTOBER 2000 – THE FRAUDULENT STATEMENTS BEGIN</u>**

125.    On October 30, 2000, Vivendi issued a Registration Statement filed on Form F-4 with the SEC and signed by Individual Defendants Messier and Hannezo in connection with the Merger of Vivendi, Seagram and Canal Plus.  The October 30, 2000 Form F-4 included a Joint Proxy Statement Prospectus, which was then mailed to Seagram security-holders and U.S. security-holders of Canal Plus and Vivendi S.A. beginning on November 3, 2000.  The Joint Proxy Statement Prospectus included in the Form F-4 and then mailed to stockholders – consisting of over 700 pages plus exhibits – purported to explain and solicit shareholder approval for the three-way Merger.  Among other information, in its Form F-4 Vivendi presented historical financial statements for FY 1999 and the first half of FY 2000.  Vivendi reported revenue of $16.247 billion and net income of $509 million for the first half of FY 2000, and revenue of $17.487 billion and net income of $254.6 million for the comparable period in 1999.  Vivendi also reported shareholders' equity of $11.957 billion and total assets of $73.611 billion as of June 30, 2000.

126.    However, Vivendi's historical financial statements contained in Vivendi's October 30, 2000 Form F-4 were materially false and misleading because, *inter alia*, Defendants were engaged in improper accounting practices which had the effect of materially overstating Vivendi's reported earnings and which failed to disclose Vivendi's growing cash flow problems and lack of liquidity, including: (a) improperly failing to disclose material commitments relating to its Cegetel subsidiary which had they been disclosed would have raised concerns in the market about the Company's liquidity and ability to access cash to meet its cash needs; (b) failing to disclose important legal restrictions on its ability to unilaterally access cash flow of subsidiary Cegetel; (c) improperly consolidating Cegetel's financial results into its own; and (d) overstating the Company's revenue from certain multi-year contracts.  In addition, Defendants failed to

disclose that Vivendi was suffering from a growing liquidity crisis and that it would necessarily need to sell valuable assets and/or restructure its debt obligations in order to remain solvent and avoid bankruptcy.

127.    On February 14, 2001, Vivendi issued a press release in Paris and New York announcing preliminary results for FY 2000:

> Vivendi Universal's preliminary total revenues for 2000 totaled 41.7 billion Euros with media and communications and environmental services, accounting for 40.0 billion Euros, a global 36.5% increase over 1999.
>
> Jean-Marie Messier, Chairman and CEO of Vivendi Universal said, "Vivendi Universal was created on December 8, 2000. The 2000 Vivendi figures are showing the considerable burst of growth of our communications activities in 2000 both in global growth and even more important with a near 20% internal growth. ***Vivendi Universal enters its first full year of operations with strong growth prospects and a very strong balance sheet. This new company is off to a fast start and we are very confident that we will meet the very aggressive growth targets we have set for ourselves both at the revenues and EBITDA levels.***" [emphasis added]

128.    On March 9, 2001, Vivendi issued a press release reporting "better than expected" fourth quarter and FY 2000 results. Vivendi announced actual revenues of €41.8 billion for FY 2000 including Media and Communications revenues of €13.6 billion and Environmental Services revenues of €26.5 billion. The press release further stated:

> Vivendi Universal announced today that on a PRO FORMA basis for calendar 2000, the Company reported 7.2 billion euros in EBITDA (earnings before interest, taxes, depreciation and amortization) for the period ending December 31, 2000, up 48 percent from 1999. Results reflect strong performance across the Company's business units – Media and Communications and Environmental Services. Actual EBITDA for the 12 months ended December 31, 2000, was 6 billion euros versus 4.3 billion euros in 1999.
>
> The PRO FORMA results were driven by growth in all business segments with the exception of Internet, in which development

costs related to business expansion continued to have a negative impact on earnings. . . .

Net income climbed 44 percent, before goodwill, to 2.8 billion euros or 4.4 percent basic shares up 19% and 60 percent, after goodwill, to 2.3 billion euros, from 1.4 billion euros. The Board of Directors of Vivendi Universal has recommended to the shareholders to approve an annual dividend of one euro per share, which will represent a high 47 percent pay-out ratio. . . .

Jean-Marie Messier, Chairman and [CEO] of Vivendi Universal, stated: "The strong results that Vivendi Universal has generated for calendar 2000 provide a very solid foundation for the Company's growth prospects in 2001**. *The robust performance of Vivendi Universal's business segments clearly reflects the fast pace and clear momentum that we have established as Vivendi Universal enters 2001.*** The Company's unique combination of content and distribution assets paves the way for enormous growth opportunities. We have our management teams and plans in place as we moves [sic] to execute the growth strategies. The management team, in particular, has been focused on the day-to-day operational performance and increased productivity of each of the Company's business units. I am very confident that, for Media and Communications, we will reach our revenue growth target of 10 percent and our aggressive EBITDA growth target of 35 percent for the period 2000-2002 and achieve superior returns for Vivendi Universal shareholders. . . . *Our businesses are strong, our management is focused and growth prospects are real and immediate.*" [emphasis added]

129.    On March 12, 2001, as reported in *La Tribune,* defendant Messier stated the

Company had exceeded expectations:

Franco-Canadian media and communication group Vivendi Universal SA (VU) has announced its results for 2000, which were in line with forecasts, and has confirmed its objectives for 2001. Presenting his group's results for the year, VU chairman Jean-Marie Messier commented: *"When we merged, it was said that our aims were too ambitious. Well, we have exceeded them!"* [emphasis added]

130.    The statements made by Defendants referenced in ¶¶ 127-129 were each

materially false and misleading because, *inter alia*, Defendants were engaged in improper

accounting practices which had the effect of materially overstating Vivendi's reported earnings

and failed to disclose Vivendi's growing cash flow problems and lack of liquidity, including: (a) improperly failing to disclose material commitments relating to its Cegetel and Maroc Telecom subsidiaries which had they been disclosed would have raised concerns in the market about the Company's liquidity and ability to access cash to meet its cash needs; (b) failing to disclose important legal restrictions on its ability to unilaterally access cash flow of subsidiaries Cegetel and Maroc Telecom; (c) overstating the Company's revenue from certain multi-year contracts; (d) improperly manipulating reserves for bad debts in the Cegetel subsidiary; (e) improperly failing to disclose other material off-balance sheet liabilities such the full extent of its interest in Telco; and (f) improperly consolidating the financial results of Cegetel and Maroc Telecom into Vivendi's own results. In addition, Defendants failed to disclose that Vivendi was suffering from a growing liquidity crisis and that it would necessarily need to sell valuable assets and/or restructure its debt obligations in order to remain solvent and avoid bankruptcy.

131. On April 23, 2001, Vivendi issued a press release announcing "very strong" first quarter 2001 results. The press release announced that Media and Communications revenues were up 10% to €5.9 billion, and Telecoms revenues were up 30% at €1.5 billion. The press release further reported that Media Communications EBITDA increased 112% to €900 million and that Telecoms EBITDA more than tripled to €433 million. The press release quoted defendant Messier as follows:

> "I am very pleased with Vivendi Universal's outstanding performance in our first quarter as a new company. All our results meet or exceed our key operating targets. ***We created significant momentum by delivering solid first quarter 2001 results in EBITDA, which more than doubled, and by generating double digit revenue growth.***
>
> These results show the focus and dedication of all our management teams, in executing the unique promise of Vivendi Universal around its global strategy. This is a great beginning. With our momentum, our targets and the drive of our executive team, ***I am***

> *extremely confident that, for Media and Communications, we will reach our annual EBITDA and revenue growth targets of 35% and 10%, respectively in 2001 and 2002 and achieve superior returns for Vivendi Universal shareholders. . . .*
>
> We are also ahead of targets for the synergies which indicate that the path of integration between our teams is great.  My only focus is and remains execution of this compelling media merger."  [emphasis added.]

132.    On April 24, 2001, defendant Messier addressed Vivendi's shareholders at the

Company's shareholders' meeting, the transcript of which was subsequently filed with the June

26, 2001 Form 6-K:

> *The foundations of our communications-related businesses are particularly healthy and strong.*  I would just like to emphasize a few points:
>
> - *a healthy balance sheet with total equity reaching 66 billion Euro;*
>
> - *a pro forma net debt that is practically non-existent – around three billion Euro;*
>
> - Vivendi Universal posted record-high net income, and has cash available for investing (participation in BskyB, etc.);
>
> - Vivendi has rapidly growing revenue, which reach the double digits annually, spread out through all the European and American markets (60% and 40%); extraordinarily large customer bases, several dozen million subscribers; business models often based on subscription – meaning loyalty, recurrence, predictable revenues, and very little dependence on the advertising market.
>
> Financially, Vivendi Universal, concerning the communications sectors, is rock solid – very stable with high growth. . . .
>
> In my role as the chairman and as an employee of the company, I owe you the company's results.  Here they are.  They are good. . . . Vivendi Universal, our company, your company, is solid.  Today, we are a leader, strong, dynamic, and profitable.  [emphasis added.]

133.    On May 18, 2001, Vivendi filed a Form 6-K with the SEC providing total revenue

information for first quarter of 2001.  This Form 6-K stated in part:

> ***Vivendi Universal revenue for first quarter of 2001 totaled 12.6
> billion euros, a global 34.5% increase over the first quarter of the
> prior year***.  Vivendi Universal's media and communications
> businesses accounted for 5.9 billion euros and environmental
> services businesses accounted for 6.7 billion euros.  [Emphasis
> added.]

134.    The statements made by Defendants referenced in ¶¶ 131-133 above were each

materially false and misleading because, *inter alia*, Defendants were engaged in improper

accounting practices which had the effect of materially overstating Vivendi's reported earnings

and failed to disclose Vivendi's growing cash flow problems and lack of liquidity, including: (a)

improperly failing to disclose material commitments relating to its Cegetel and Maroc Telecom

subsidiaries which had they been disclosed would have raised concerns in the market about the

Company's liquidity and ability to access cash to meet its cash needs; (b) failing to disclose

important legal restrictions on its ability to unilaterally access cash flow of subsidiaries Cegetel

and Maroc Telecom; (c) overstating the Company's revenue from certain multi-year contracts;

(d) improperly manipulating reserves for bad debts in the Cegetel subsidiary; (e) improperly

failing to disclose other material off-balance sheet liabilities such as the full extent of its interest

in Telco; and (f) improperly consolidating the financial results of Cegetel and Maroc Telecom

into Vivendi's own results.  In addition, Defendants failed to disclose that Vivendi was suffering

from a growing liquidity crisis and that it would necessarily need to sell valuable assets and/or

restructure its debt obligations in order to remain solvent and avoid bankruptcy.

135.    On June 1, 2001, Vivendi issued a press release announcing the acquisition of

Boston-based Houghton Mifflin Company.  The release (issued in Paris and Boston) stated in

part that:

Based on a total consideration of approximately $2.2 billion, which includes the assumption of Houghton Mifflin's average net debt of $500 million, the offer price represents 1.9 times 2001 estimated revenues of Houghton Mifflin, 7.7 times 2001 estimated EBITDA (earnings before interest, taxes, depreciation and amortization) and 10.7 times estimated EBITDA after book plate amortization.

136.    On July 2, 2001, Vivendi filed its 2000 20-F with the SEC, which was signed by defendant Hannezo.  The 2000 20-F contained Vivendi's "consolidated financial statements for the years ended December 31, 2000, 1999 and 1998 and as at December 31, 2000 and 1999."

137.    The statements made by Defendants in the Company's 2000 20-F were false and misleading because Defendants were engaged in improper accounting practices which had the effect of materially overstating Vivendi's reported earnings and failed to disclose Vivendi's growing cash flow problems and lack of liquidity, including: (a) improperly failing to disclose material commitments relating to its Cegetel and Maroc Telecom subsidiaries which had they been disclosed would have raised concerns in the market about the Company's liquidity and ability to access cash to meet its cash needs; (b) failing to disclose important legal restrictions on its ability to unilaterally access cash flow of subsidiaries Cegetel and Maroc Telecom; (c) overstating the Company's revenue from certain multi-year contracts; (d) improperly manipulating reserves for bad debts in the Cegetel subsidiary; (e) improperly failing to disclose other material off-balance sheet liabilities such as the full extent of Vivendi's interest in Telco; and (f) improperly consolidating the financial results of Cegetel and Maroc Telecom into Vivendi's own results.  In addition, Defendants failed to disclose that Vivendi was suffering from a growing liquidity crisis and that it would necessarily need to sell valuable assets and/or restructure its debt obligations in order to remain solvent and avoid bankruptcy.

**Vivendi's Misleading EBITDA Results For The Second And Third Quarters Of 2001**

138.    Vivendi, at the direction of its senior executives, improperly adjusted certain reserve accounts of its subsidiaries and made other accounting entries without supporting documentation and not in conformity with U.S. GAAP in order to meet ambitious earnings targets.  During the Relevant Time Period, Defendants referred to these improper efforts to meet or exceed earnings targets as "stretching."

139.    At the time of its December 2000 Merger with Seagram and Canal Plus, Vivendi and Messier predicted that the Company would generate annual EBITDA growth of 35% during 2001 and 2002.  In order to assure that Vivendi would reach that target, during 2001, Vivendi improperly adjusted various reserve accounts and prematurely recognized income in a manner that was not in conformity with U.S. GAAP, including, in certain instances, SFAS No. 5 and Concepts Statement No. 5.

### (i)    Improper EBITDA Adjustments during the Second Quarter of 2001

140.    In late June 2001, Vivendi, Messier, Hannezo and other Vivendi executives became concerned that Vivendi's EBITDA growth for the quarter ended June 30, 2001 might not meet or exceed market expectations.  As a result, Vivendi, at the direction of its senior executives, made various improper adjustments that raised Vivendi's EBITDA by almost €59 million, or 5% of the total EBITDA of €1.12 billion that Vivendi reported (excluding the results of the recently-acquired Maroc Telecom) for that quarter.

141.    Defendants increased Vivendi's EBITDA primarily by causing Cegetel, in the weeks leading up to Vivendi's earnings release for the second quarter of 2001, to depart from its historical methodology for determining the level of its reserve for bad debts (accounts receivable) during the second quarter of 2001.  That departure resulted in Cegetel taking a lower provision for bad debts during that quarter than its historical methodology required.  This

improper departure caused Cegetel's bad debts reserve for the second quarter of 2001 to be €45 million less than it should have been.  As a result, Vivendi's overall EBITDA for that period was increased by the same amount.

142.    During the Relevant Time Period, Cegetel's financial results were (improperly) fully consolidated into Vivendi's financial statements, which at that time were prepared in accordance with French GAAP, but reconciled to U.S. GAAP.  Under U.S. GAAP, SFAS No. 5 precludes the use of reserves, including excess reserves, for general or unknown business risks, and the systemic or timed release of reserves into income.  Further, SFAS No. 5, ¶ 23, states that an estimate of losses on accounts receivable "normally depend[s] on, among other things, the experience of the enterprise... and appraisal of the receivables in light of the current economic environment."

143.    As Defendants knew or were reckless in not knowing, Cegetel reduced its provision for bad debts during the second quarter of 2001 without the level of documentation and analysis that was required.  Further, the decision to take a lower provision for bad debts in the second quarter of 2001 occurred at a time when Cegetel was actually having more difficulty collecting on its bad debts.

144.    In addition to taking a lesser bad debt provision in the second quarter of 2001, Cegetel also, at the direction of Vivendi's senior executives, improperly deferred to the third quarter of 2001 approximately €14 million in provisions for potential future payments and potential liabilities that Cegetel properly should have booked in the second quarter of 2001. Altogether, those adjustments at Cegetel totaled €59 million and enabled Vivendi to show overall EBITDA growth of 35% for the second quarter of 2001.

145.    Those accounting adjustments at Cegetel were made without proper supporting documentation and as a result, Vivendi's reconciled U.S. GAAP financial statements (which incorporated Cegetel's results) were not in conformity with the requirements of SFAS No. 5.

**(ii)    Second Quarter 2001 Earnings Release**

146.    Vivendi issued a press release on July 23, 2001 boasting that it had achieved 35% EBITDA growth for the second quarter of 2001.  In highlighting this achievement, Messier told the market, "I can only re-emphasize our confidence.  We will at least meet our stated targets." The press release further claimed that, in just the first half of the year, Vivendi had already achieved 75% of its incremental EBITDA target for 2001.  The press release also represented that, except for Canal Plus and certain publishing operations, the results contained in the press release were "U.S. GAAP based."

147.    Vivendi's press release further reported Media and Communications revenues were up 16% (excluding Universal Studios Group) to €6.6 billion, and EBITDA grew 57% to €1.3 billion.  Concerning Vivendi's first half 2001 results for Media and Communications businesses, the press release stated in part:

> In the course of the first half of 2001, Vivendi Universal achieved three quarters of its full-year target of incremental EBITDA (nearly 800 million euros excluding Maroc Telecom, relative to the company's target of slightly more than 1 billion euros).
>
> In the first half of 2001, revenues increased to 12.4 billion euros (up 15% [excluding USG]), and EBITDA grew to 2.2 billion euros (up 77% over 2000 comparable period).

148.    Defendant Messier commented on the results, stating in part as follows:

> The results produced by Vivendi Universal in the second quarter are well ahead of market consensus….  They confirm the robustness of our businesses, with limited exposure to advertising; the benefits of a truly global position; and the fast progress of the reorganization and implementation of our recent merger.

55

With three quarters of the 'aggressive' incremental EBITDA target for the full year 2001 [1.12 billion euros of incremental EBITDA, or 35% over the pro forma 2000 guidance provided last October and slightly above 1 billion euros of incremental EBITDA over the final 2000 results] already achieved in the first half of the year, I can only re-emphasize our confidence.  We will at least meet our stated targets.

*Obviously, our current stock price does not fully reflect this situation in terms of EBITDA multiples or Enterprise Value to EBITDA to growth.  With the highest growth rates of the industry and the lowest multiples, our stock is definitely an attractive investment today.*

The first half has been a period of total operational focus in each of our businesses, while completing significant achievements in the implementation of the merger, reorganization and execution of our strategy.  [Emphasis added.]

149.    As a result of the various improper adjustments made to Cegetel's reserve accounts in the second quarter of 2001, these representations in Vivendi's press release were misleading.

150.    Vivendi also made false claims in this press release about the increase in the performance of its "Telecoms," including Cegetel, over the second quarter of 2000, when in reality over 8% of the Telecoms' EBITDA came from the improper adjustments of Cegetel's accounting reserves in violation of SFAS No. 5.

151.    Following the July 23, 2001 press release, Vivendi hosted a conference call to discuss the second quarter 2001 results and the Company's business and prospects.  During the call, Messier and others in Vivendi management stated:

- Vivendi was able to achieve strong results even in a down market and was in fact gaining market share.

- The Company was still on track to achieve strong growth in revenues and earnings in 2001, including EBITDA growth of 35%.

152.    On July 23, 2001, Vivendi common stock increased in price to €63.1 and the price of Vivendi ADSs rose from $52.39 per share to $55.00 per share, representing a 5% increase.

153.    The market reacted favorably to Vivendi's July 23, 2001 press release.  For example, analysts observed that Vivendi had beaten the expectations and results of its main competitors in the media industry.  One analyst noted that Vivendi's results were a "pleasant surprise," while another news report specifically noted that the results of Cegetel and Vivendi's other telecommunications businesses "defied . . . the Telecommunications meltdown."  In an analyst's report dated July 23, 2001, Robertson Stephens, Inc. ("Robertson Stephens") issued a "Buy" rating stating:  "We expect the company to perform well through a sluggish economy and to emerge strategically well-positioned."  Similarly, Merrill Lynch Capital Markets ("Merrill Lynch") issued a "Buy" rating in an analyst report dated July 26, 2001, stating in pertinent part as follows:

> Outperformance was across virtually all divisions particularly Film, Telecoms and Music.

> As a result, we are upgrading our 2001 OCF a second time by 2%.
> . . .

> Company re-confirmed its targets for 2001.  In a down music market, Universal is gaining share and is confident of double digit EBITDA growth.

154.    The statements made by Defendants referenced in ¶¶ 146-151 above were each materially false and misleading because, *inter alia*, Defendants were engaged in improper accounting practices which had the effect of materially overstating Vivendi's reported earnings and failed to disclose Vivendi's growing cash flow problems and lack of liquidity, including: (a) improperly failing to disclose material commitments relating to its Cegetel and Maroc Telecom subsidiaries which had they been disclosed would have raised concerns in the market about the

Company's liquidity and ability to access cash to meet its cash needs; (b) failing to disclose

important legal restrictions on its ability to unilaterally access cash flow of subsidiaries Cegetel

and Maroc Telecom; (c) overstating the Company's revenue from certain multi-year contracts;

(d) improperly manipulating reserves for bad debts in the Cegetel subsidiary; (e) improperly

failing to disclose other material off-balance sheet liabilities such as the full extent of its interest

in Telco; and (f) improperly consolidating the financial results of Cegetel and Maroc Telecom

into Vivendi's own results.  In addition, Defendants failed to disclose that Vivendi was suffering

from a growing liquidity crisis and that it would necessarily need to sell valuable assets and/or

restructure its debt obligations in order to remain solvent and avoid bankruptcy.

### (iii)    Improper Adjustments of UMG's EBITDA during the Third Quarter of 2001

155.    In early September 2001, as rumors circulated that Vivendi's earnings would be

disappointing, Vivendi's ADSs declined from the mid-$50s to the mid-$40s per share, and its

ordinary shares declined from the mid-€50s to the mid-€40s.  In response, Defendants

categorically denied any problems.  Vivendi, after the market closed on September 5, 2001,

reiterated its targets for 2001 and 2002.  Defendant Messier stated in an interview with *Reuters*

that evening, that "[n]o profit warning of any kind needs to be feared coming from Vivendi

Universal."

156.    On September 25, 2001, Vivendi issued a press release announcing "Strong First

Half 2001" results and a "Solid Outlook for 2002."  The press release reported that revenues

increased 11% to €26.4 billion, that EBITDA grew 42% to nearly €4 billion, that operating

income grew 65% to €1.9 billion, and that net income, before goodwill amortization, reached

€1.1 billion or €0.97 per share.  With respect to Media and Communication, the release reported

that first half 2001 revenues reached €12.4 billion, up 15%, EBITDA reached €2.2 billion euros,

up 77%, and that operating income nearly tripled to €946 million, up 184%. Concerning

Vivendi's environment business, the release reported that revenues were up 11% to €13.9 billion,

that EBITDA was up 12% to €1.76 billion, and that operating income was up 13% to €0.97

billion. Commenting on these results, the press release further quoted defendant Messier as

follows:

> ***Despite the current environment, we will reach all our previously
> stated revenue/EBITDA objectives for the 2001 year.*** I continue
> to express my confidence in achieving our more than 10% revenue
> growth targets for 2001 and our more than 35% EBITDA growth
> (versus the company's October 2000 guidance) at a constant asset
> base. This, combined with some extensions in the company's asset
> base (i.e., Maroc Telecom and Houghton Mifflin), should result in
> full-year Media and Communications EBITDA slightly north of 5
> billion euros. In the current environment, giving a 2002 target
> would not be meaningful, and we have yet to complete our 2002
> budget and plan process. Before the recent tragedy [of September
> 11], market consensus for 2002 EBITDA was not far from 6 billion
> euros. Despite the events, looking at the trends of our businesses
> and our defensive qualities, we are currently very comfortable [sic]
> with this expectation. [Emphasis added; footnote omitted.]

157.    Various improper adjustments to Vivendi's EBITDA also occurred in the third

quarter of 2001, and primarily affected the results of its music division, UMG. These improper

adjustments increased UMG's reported results for the quarter ended September 30, 2001 by at

least €10.125 million, or approximately 4% of UMG's total EBITDA of €250 million for that

quarter.

158.    Vivendi improperly increased UMG's results in order to reach a pre-determined

EBITDA figure at UMG for the quarter ended September 30, 2001 of €250 million. At that

level, UMG would have been able to show EBITDA growth of approximately 6% versus the

same period in 2000, and to outperform its rivals in the music business.

159.    At least two improper adjustments were made to UMG's reported results in order to reach an EBITDA figure of €250 million.  First, UMG prematurely recognized just over €3 million in deferred revenue that it received in connection with a contract between UMG and other parties.  During the quarter ended September 30, 2001, UMG had deferred recognizing the €3 million payment it received on the basis that this payment would need to be refunded if Vivendi and the other parties to the contract failed to meet certain conditions by mid-December 2001.  The recognition of this €3 million payment as income in the third quarter of 2001 was not in conformity with U.S. GAAP because those conditions were not met during the third quarter, and the payment remained refundable.

160.    Second, in late October 2001, Vivendi temporarily reduced the amount of corporate overhead charges it allocated to UMG by €7 million.  This reduction in the corporate overhead charges equaled the exact amount of additional earnings that Vivendi's senior executives determined that UMG would need in order to reach €250 million in EBITDA for the quarter ended September 30, 2001.

161.    This overhead allocation was not in conformity with U.S. GAAP.  Concepts Statement No. 6 states that allocations are assigned and distributed "according to a plan or a formula."  Further, SFAS No. 131 provides that amounts allocated to reported segment profit or loss "shall be allocated on a reasonable basis."  During the third quarter of 2001, Defendants based the overhead allocation charged to UMG not on a plan or formula, but primarily on a desire to reach a specific EBITDA target.  This conduct was not in conformity with either Concepts Statement No. 6 or SFAS No. 131.

162.    Both the corporate overhead adjustment and the premature recognition of the contract revenue occurred after UMG had submitted its accounts to Vivendi for the quarter.

Moreover, these accounting adjustments to UMG's EBITDA were made without proper documentation and were not in conformity with U.S. GAAP. Defendants caused Vivendi's results to not be in conformity with U.S. GAAP, and incorporated these inflated results into Vivendi's earnings releases. These practices caused Vivendi's financial reports, press releases, and other market communications to be materially false and misleading.

      **(iv)    Third Quarter 2001 Earnings Release**

163.    On October 30, 2001, Vivendi announced in its third quarter 2001 earnings press release, approved by Messier, Hannezo and other senior executives, that UMG had achieved €250 million in EBITDA for the quarter, and 6% EBITDA growth versus the same quarter in 2000. Vivendi touted these results and noted that UMG was able to show growth at a time when its major competitors in the music industry had seen a decrease in earnings. The press release also represented that, except for Canal Plus, the results contained in the press release were presented on a "U.S. GAAP basis."

164.    Because of the improper increases to UMG's EBITDA by, among other things, the premature recognition of deferred income and the reduction of overheard charges for the purpose of meeting Vivendi's target, Vivendi's statements and omissions created the false and misleading impression that UMG's EBITDA in particular, and Vivendi's overall EBITDA, were stronger than they really were. Further, Vivendi's representation that the results for UMG contained in the press release were presented on a "U.S. GAAP basis" was also false.

165.    The release announced that Media and Communications revenues were up 24% to €7.3 billion, and that EBITDA was up 90% to €1.5 billion. The release further reported that Telecom's revenues increased by 17% to €2.1 billion, and EBITDA grew by 31% versus *pro forma* results for the third quarter of 2000. The release also stated in pertinent part:

> ➢ On a pro forma basis, third quarter revenue growth was 8%, and EBITDA growth was 30%. Year-to-date revenues increased 9%, and EBITDA increased 46%.

> ➢ Company reaffirms confidence in achieving its growth targets: 10% revenue growth and 35% organic EBITDA growth in 2001

**"Our third quarter results for the media and communications businesses, with 24% revenue and 90% EBITDA growth, including organic growth of 8% and 36% respectively, are obviously strong despite the tough environment," said Jean-Marie Messier, Chairman and Chief Executive Officer of Vivendi Universal. "They reflect both our higher potential for growth and greater resiliency to recessionary environments compared to many of our peers**. . .

"Additionally, Vivendi Universal's media and communications businesses are presently less vulnerable to recessionary environments than many of our peers because of our strong defensive qualities . . . . Having the highest resiliency and lowest sensitivity to a recessionary environment explains our ability to outperform most of our peers. . . .

"An early look at the fourth quarter indicates that we are on track to meet our targets. ***I continue to express my confidence in achieving 10% revenue growth and 35% EBITDA growth in 2001 at a constant asset base.*** This, combined with some expansions in the company's asset base (i.e. Maroc Telecom and Houghton Mifflin), should result in full-year Media and Communications EBITDA slightly above 5 billion euros. [Emphasis added; footnotes omitted]

166. Following the October 30, 2001 Press Release, Vivendi hosted a conference call to discuss the third quarter 2001 results and the Company's business and prospects. During the call, Messier and others in Vivendi management stated:

- Vivendi was able to achieve strong results even in a down market and was in fact gaining market share.

- The Company was still on track to achieve strong growth in revenues and earnings in 2001.

167. Based on Defendants' statements, including those made during the conference call, securities analysts that followed Vivendi securities reacted positively to the Company's

reported financial results.  For example, on October 31, 2001, Morgan Stanley Dean Witter

("Morgan Stanley") issued an "OutPerform" rating, stating:

> We continue to accord Vivendi Universal an OutPerform rating
> with a €62 twelve-month price target.  Our investment thesis
> is based on VU's valuation, lack of sensitivity to economic recession,
> and diversity of revenue sources.  In a quarter in which all its peers
> were forced to revise their 2001 and 2002 outlooks downward to
> reflect continued US economic weakness exacerbated by the
> events of Sept 11, Vivendi Universal outperformed expectations
> and reiterated its full year guidance.  The divergence between VU
> and its peers reflects the company's high level of financial
> predictability, a direct function of owning a number of
> internationally diversified, market share-leading businesses that
> have a low dependence on advertising.

168.    The statements made by Defendants referenced in ¶¶ 155-156, 163-166 above

were each materially false and misleading because, *inter alia*, Defendants were engaged in

improper accounting practices which had the effect of materially overstating Vivendi's reported

earnings and failed to disclose Vivendi's growing cash flow problems and lack of liquidity,

including: (a) improperly failing to disclose material commitments relating to its Cegetel and

Maroc Telecom subsidiaries which had they been disclosed would have raised concerns in the

market about the Company's liquidity and ability to access cash to meet its cash needs; (b)

failing to disclose important legal restrictions on its ability to unilaterally access cash flow of

subsidiaries Cegetel and Maroc Telecom; (c) making improper accounting adjustments to falsely

increase UMG's EBITDA; (d) overstating the Company's revenue from certain multi-year

contracts; (e) improperly manipulating reserves for bad debts in the Cegetel subsidiary; (f)

improperly failing to disclose other material off-balance sheet liabilities such as the full extent of

its interest in Telco; and (g) improperly consolidating the financial results of Cegetel and Maroc

Telecom into Vivendi's own results.  In addition, Defendants failed to disclose that Vivendi was

suffering from a growing liquidity crisis and that it would necessarily need to sell valuable assets and/or restructure its debt obligations in order to remain solvent and avoid bankruptcy.

## DECEMBER 2001 – THE FRAUD WORSENS

169.    On December 6, 2001, Vivendi issued a press release announcing Edgar Bronfman's decision to resign from his position as Executive Vice Chairman.  Commenting on Bronfman's resignation, defendant Messier assured the investing public that Vivendi "is in a very strong position, with solid performance in virtually every business."  Messier's statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because he failed to disclose that Vivendi was not in a "very strong position" but, rather, was in a precarious financial position as a result of the accounting improprieties previously discussed above and was suffering from a liquidity crisis, as also discussed in further detail below.  Further, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Messier failed to disclose that Vivendi's purportedly "solid performance" was attributable to those accounting improprieties and to Defendants' active concealment of the liquidity crisis the Company was facing.

170.    One week later – after announcing that it would raise $2.5 billion by selling a $1.5 billion interest in BskyB and a $1.06 billion interest in Vivendi Environnement – Vivendi stated, as reported by the *Financial Times (London)* on December 14, 2001, that these asset sales would give Vivendi "room to manoeuvre" for additional acquisitions, and enable it "to cover any eventual needs from different opportunities for strategic partnerships."

171.    In December 2001, Vivendi held a series of critical meetings with analysts from Moody's Investors Services ("Moody's") and Standard & Poor's, companies that publish independent credit opinions, research and commentary to assist investors in analyzing the credit

risks associated with fixed-income securities.  The meetings with the analysts preceded

Vivendi's December 17, 2001 announcement that it would spend almost $12 billion to acquire

portions of USA Networks, Inc. ("USA Networks") and Echostar Communications ("Echostar").

Because these transactions required Vivendi to spend a large amount of cash and assume

additional debt, Vivendi sought "pre-clearance" from Moody's and Standard & Poor's that the

transactions, when announced, would not result in a downgrade of Vivendi's credit rating.

172.    During these meetings and in other public statements Defendants failed to

disclose future commitments regarding Cegetel and Maroc Telecom that, had Vivendi made the

required disclosures, would have raised concerns in the market about the company's ability to

meet its cash needs.  Vivendi also failed to disclose these commitments in its SEC filings on

Forms 20-F for the fiscal years ended 2000 and 2001.

173.    Moody's and Standard & Poor's based their rating of Vivendi's credit primarily

on the company's debt-to-EBITDA ratio.  At the time of the December 2001 meetings, both

Moody's and Standard & Poor's told Vivendi that its debt-to-EBITDA ratio was too high for it to

maintain its investment-grade status.  However, both credit rating agencies also told Vivendi that

they would not downgrade its credit rating if Vivendi committed to taking certain debt reduction

measures in 2002.  Senior officers of Vivendi assured Moody's and Standard & Poor's that

Vivendi would reduce its debt by several billion dollars during 2002.

174.    As a result of these assurances, neither Moody's nor Standard & Poor's

downgraded Vivendi after it announced the USA Networks and Echostar transactions.  However,

Vivendi had not informed Moody's or Standard & Poor's about certain undisclosed

commitments that existed at the time of these transactions.

175.    These commitments, if disclosed, would have alerted the public to Vivendi's future cash requirements and would have raised concerns in the market about Vivendi's ability to meet its cash needs.  There were three principal undisclosed commitments:

- The Cegetel current account;

- The Maroc Telecom side agreement; and

- The Telco transaction.

**(i)    The Cegetel Current Account**

176.    In the summer of 2001, Vivendi, at the direction of Messier, Hannezo and other senior executives, entered into an undisclosed current account with Cegetel, its most profitable and cash-flow positive subsidiary.  Pursuant to this current account, which operated much like a loan, Cegetel delivered excess cash to Vivendi on a short-term basis, beginning in August 2001. In return, Vivendi paid Cegetel a market rate of interest, and agreed to return the funds at the expiration of the current account agreement, which at first was December 31, 2001 and was then extended to July 31, 2002.

177.    Although Vivendi maintained cash-pooling arrangements with most of its subsidiaries, the funds that it received from Cegetel were on different terms than these other pooling arrangements.  Notably, the current account with Cegetel contained a specific expiration date.  Additionally, the Cegetel current account documents contained an "on demand" clause pursuant to which Cegetel could demand immediate reimbursement of the funds that it deposited with Vivendi at any time.

178.    Pursuant to the current account agreement, Cegetel delivered approximately €520 million to Vivendi in August 2001.  Between September 2001 and June 2002, the account

balance continued to grow, and at various times exceed €1 billion. Vivendi used this money to pay for ordinary operating expenses.

179.    Even though the Cegetel current account, and the possibility that Vivendi would have to repay it at any time and certainly no later than July 31, 2002, had a direct impact on Vivendi's liquidity condition, Vivendi did not disclose existence of the Cegetel current account in the liquidity section of its Form 20-F for the fiscal year ended December 31, 2001, which was filed with the Commission on May 28, 2002. Various Commission rules and regulations required disclosure of the Cegetel current account in Vivendi's Form 20-F. For example, Item 303 of Commission Regulation S-K requires issuers to identify any known "demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way." Moreover, Item 5(B)(1)(b) of the instructions to Form 20-F requires issuers to disclose "restrictions on the ability of subsidiaries to transfer funds to the company in the form of cash dividends, loans or advances and the impact such restrictions have had or are expected to have on the ability of the company to meet its cash obligations." Vivendi failed to adhere to either of these requirements in connection with its Form 20-F for the fiscal year ended December 31, 2001.

180.    In mid-June 2002, Cegetel's other shareholders demanded repayment of the current account from Vivendi. In order to repay Cegetel, Vivendi had to use proceeds from a recently completed asset sale, which Vivendi stated both in its June 26, 2002 press release and in meetings with Moody's and Standard & Poor's would be used to reduce Vivendi's debt. Indeed, despite including a list of purported upcoming expenditures in its June 26, 2002 press release, Defendants failed to disclose the existence of the Cegetel current account or the demand for its repayment.

(ii)    **Failure to Disclose the Maroc Telecom Side Agreement**

181.    During 2001 and early 2002, Defendants, along with other senior executives of Vivendi, also failed to disclose a side agreement that Vivendi entered into in February 2001 to purchase an additional €1.1 billion stake in Maroc Telecom, a telecommunications operator of fixed line and mobile telephony and Internet services based in Morocco.

182.    In December 2000, the Moroccan government sponsored an auction of 35% of the state-owned Maroc Telecom.  Vivendi won the auction with a bid of €2.35 billion.  Under the terms of the auction, the Moroccan government, which would retain a 65% stake in Maroc Telecom, required Vivendi to execute a shareholder agreement that would maintain the Moroccan government's control over Maroc Telecom's operations.  The terms of that shareholder agreement precluded Vivendi from consolidating Maroc Telecom's results.

183.    Defendants, however, wanted to gain control of Maroc Telecom and consolidate its results because Maroc Telecom carried little debt and generated substantial EBITDA.  By consolidating Maroc Telecom, Defendants hoped to increase Vivendi's EBITDA performance and, more importantly, improve the debt/EBITDA ratio used by Moody's and Standard & Poor's to evaluate Vivendi's credit.

184.    In February 2001, Vivendi and the Moroccan government entered into a side agreement that required Vivendi to purchase an additional 16% of Maroc Telecom's shares in February 2002 for approximately €1.1 billion.  In return, the Moroccan government granted Vivendi certain management rights over the operations of Maroc Telecom upon which Vivendi based its consolidation of Maroc Telecom.

185.    Even though Defendants knew of the existence and terms of the side agreement, they failed to disclose that Vivendi had committed to purchasing an additional 16% stake in

Maroc Telecom by February 2002 for €1.1 billion, contingent upon the Moroccan government's

exercise of the irrevocable put.  Vivendi failed to disclose these facts in its public filings with the

Commission, the COB, and in other public statements that it made in 2001 and early 2002.

186.    For example, on July 2, 2001, Vivendi filed its 2000 20-F, approved by Messier

and other senior executives, and signed by Hannezo, which disclosed the following about Maroc

Telecom:

### PURCHASE OF INTEREST IN MAROC TELECOM

In December 2000, we announced that we had acquired a 35% stake in Moroccan telecommunications operator Maroc Telecom for approximately €2.3 billion. Maroc Telecom, which operates fixed-line and mobile telephone networks in Morocco, is estimated to have generated revenue of approximately €1.3 billion in 2000.  In cooperation with Maroc Telecom, we intend to contribute our telecoms experience to the modernization of the telecommunications industry in Morocco.

187.    By omitting to disclose the Maroc Telecom side agreement, and in particular,

Vivendi's commitment to pay an additional €1.1 billion in February 2002 for additional shares of

Maroc Telecom, Vivendi's 2000 20-F was materially false and misleading.

188.    Vivendi also failed to disclose its commitment with respect to Maroc Telecom in

its periodic filing with the COB for the six-month period ended June 30, 2001.  On October 17,

2001, Vivendi furnished an English translation of that filing to the Commission on Form 6-K.

The COB filing and Vivendi's Form 6-K were reviewed and approved by Messier, Hannezo and

other senior executives.

189.    Vivendi also failed to disclose the Maroc Telecom side agreement to analysts at

Moody's and Standard & Poor's during the December 2001 "pre-clearance" meetings regarding

the USA Networks and Echostar transactions.  Vivendi's senior executives knew that if Vivendi

had disclosed this obligation to pay the Maroc Telecom put, the credit rating agencies may have

declined to maintain their credit rating of Vivendi.

190.    In February 2002, Vivendi and the Moroccan government agreed to extend the deadline for the side agreement to September 2005.  Vivendi finally disclosed the existence of the renegotiated side agreement in its 2001 20-F, filed on May 28, 2002.

(iii)    **The Telco Transaction**

191.    Defendants also failed to disclose in a timely manner all material facts concerning Vivendi's investment in a fund that purchased a 2% stake in Telco, a Polish telecommunications holding company.

192.    In June 2001, Vivendi, which owned 49% of Telco's equity, publicly announced its intention to purchase an additional 2% of Telco's shares from Vivendi's partner in the Telco joint venture.  This purchase would have increased Vivendi's ownership of Telco equity from 49% to 51%.  Vivendi anticipated that it would have to pay approximately €100 million for the additional Telco shares.

193.    After this announcement, Vivendi learned that Poland's antitrust authorities would have to approve the acquisition, a process that could have taken several months.  Vivendi also learned that the market in general, and the credit rating agencies in particular, might react negatively to Vivendi's acquisition of additional Telco shares.  As a result, rather than directly purchasing the 2% interest in Telco, Vivendi deposited $100 million into an investment fund administered by Société Générale Bank & Trust Luxembourg.  That fund subsequently purchased a 2% stake in Telco in September 2001, and continues to own those shares.

194.    Vivendi did not disclose all material details about this transaction until 2003.  Instead, Vivendi's 2001 20-F, filed with the Commission on May 28, 2002, states only the following concerning Vivendi's interest in Telco:

> Participation in Elektrim — In September 2001, Elektrim Telekomunikacja (Telco), in which Vivendi Universal has a 49%

70

interest,    acquired    all    of    Elektrim    S.A.'s    landline
telecommunications and Internet assets.

195.    Vivendi's statements and omissions concerning Telco in its 2001 20-F created the

false and misleading impression that Vivendi maintained no more than a 49% financial interest

in Telco, whether directly or indirectly, even though it had invested in a fund that purchased a

2% stake in Telco.  Defendants knew, or were reckless in not knowing, that that disclosure was

inadequate and misleading.

196.    On December 17, 2001, Vivendi issued a press release announcing the acquisition

of USA Networks for $10.3 billion.  Commenting on the acquisition, defendant Messier stated in

pertinent part as follows:

> Our strategy is clearly coming together.  Combining within the
> same operational entity, VUE, USG and the entertainment assets of
> USA creates a new U.S. major, which will benefit from the full
> integration of TV and movies activities with production and
> distribution.
>
> * * *
>
> **In addition, this strategic move will significantly benefit Vivendi
> Universal shareholders, because of its significant value-accretion
> at every level – EBITDA, net income and free cash flow.**  By
> using mainly non-core, consolidated assets to acquire this control,
> we are strongly positioned to enhance performance and value to
> Vivendi Universal shareholders.
>
> * * *
>
> At the end of just one year following our merger with Seagram and
> Canal Plus, we have put the pieces together in fulfilling our
> strategy.  In one short year, we have focused on integration and
> addressing our relative distribution weakness in the U.S. – and here
> we are today.  We expect that 2002 will be a year of growth,
> without further change in perimeter.

197.    On December 17, 2001, defendant Messier held a press conference with Barry

Diller, Chairman and CEO of USA Networks, from the St. Regis Hotel in New York City to

discuss the acquisition of USA Networks, the creation of Vivendi Universal Entertainment

("VUE") and Vivendi's prospects for 2002:

> **At the end of the day, this transaction is not putting pressure on Vivendi Universal.  On the reverse, what it allows us to do is to increase our [EBITDA] target for 2002 by more than ten percent.  It's to increase our net income in 2002 by roughly 200 million dollars.  It's to increase the net free cash flow of the group in 2002 by, let's say, three hundred and fifty million dollars.  At every level of the [P&L] and of the cash flow that you may look at, this transaction is very positive to VUE shareholders year one.**

> \* \* \*

> As far as the global [debt] ratio of the group is concerned, **our target is to have in '02 a [debt] to [EBITDA] ratio well below three times and especially we are focusing to reach that target ahead of the end of the first half of 2002,** which means that Vivendi Universal will end up its program of selling its non core asset in the first half of '02; it will give us very comfortable triple B credit rating targets that we are very comfortable with. . . .  **So, no cleaning of balance sheet because the balance sheet is clean**. . . . [W]e are committed to issue full US [GAAP] earnings starting Q1 of '02.  We already, in fact, worked on the basis of US [GAAP] accounting methods in '01 in order to build our track record at the time of this year, at the time of the release of our first full quarterly U.S. [GAAP] in '02.  **So we are already applying all US [GAAP] methodologies, including those relating to amortization.** [Emphasis added.]

198.    The statements made by Defendants referenced in ¶¶ 196-197 above were each

materially false and misleading because, *inter alia*, Defendants were engaged in improper

accounting practices which had the effect of materially overstating Vivendi's reported earnings

and failed to disclose Vivendi's growing cash flow problems and lack of liquidity, including: (a)

improperly failing to disclose material commitments relating to its Cegetel and Maroc Telecom

subsidiaries which, had they been disclosed, would have raised concerns in the market about the

Company's liquidity and ability to access cash to meet its cash needs; (b) failing to disclose

important legal restrictions on its ability to unilaterally access the cash flow of subsidiaries

Cegetel and Maroc Telecom; (c) overstating the Company's revenue from certain multi-year contracts; (d) improperly manipulating reserves for bad debts in the Cegetel subsidiary; (e) improperly failing to disclose other material off-balance sheet liabilities such as the full extent of its interest in Telco; and (f) improperly consolidating the financial results of Cegetel and Maroc Telecom into Vivendi's own results.  In addition, Defendants failed to disclose that Vivendi was suffering from a growing liquidity crisis and that it would necessarily need to sell valuable assets and/or restructure its debt obligations in order to remain solvent and avoid bankruptcy.

199.    In a January 7, 2002 press release, Vivendi announced that it had mandated Deutsche Bank AG and Goldman, Sachs & Co. to sell 55 million treasury shares - about half of the shares Vivendi had bought back just months earlier.  The approximately €3.3 billion ($3 billion) in proceeds, the company stated, were to be used "mostly to reduce the company's debt."

200.    The sale, coming so closely on the heels of Vivendi's massive shares buy-back program, raised concerns in the market that Vivendi had liquidity problems.  Although the offering price of €60 a share was a 4% discount from the previous day's close, the underwriters failed to sell all of the stock, and were required to take "investment positions" in the Company (i.e. keep the shares they were unable to sell).  The market price for Vivendi securities fell significantly.  On January 8, Vivendi shares traded for €59.20 each.  By January 30, the share price had dropped to €51.10, with a volume of 15 million shares.  The decline continued and, by February 5, Vivendi shares traded for €46.00 each, down 27% from the beginning of the year.

201.    The true scope of Vivendi's liquidity problems, however, was not fully revealed until months later.  Instead, as detailed below at ¶¶ 202-271 and 292-330 and elsewhere, Defendants falsely denied that there was any reason for concern and made affirmative misstatements to the market to attempt to prop up Vivendi's gradually declining share price.

202.    On February 6, 2002, *AFX News Limited* reported that in an attempt to dispel

concern about the Company's debt levels and accounting practices, a letter was distributed to the

Company's employees stating that no profit warnings were forthcoming:

> Vivendi Universal CEO Jean-Marie Messier said the media
> company will not make any change in its guidance for 2001
> earnings due for release on March 5, although the fourth quarter
> was a difficult period.
>
> Messier made the comment in a letter to Vivendi's staff,
> addressing the recent volatility and losses in the company's share
> price.
>
> "Some global markets, including the music market, declined
> during this period.  But despite the difficulties, *we are the only
> media company not to have issued a profit warning on its
> operating results and there's no change to that situation,*" said
> Messier.
>
> * * *
>
> *"There are no hidden risks and no speculative instruments,*" he
> said.  [Emphasis added.]

203.    The February 6, 2002 email posted on the company's web site for employees

made the following statement:

> Vivendi Universal's share has come under strong attack during
> recent weeks, and it has fallen heavily since the beginning of the
> year as it did in September 1999 and September 2001.
>
> With our 2001 financial statements due out on March 5, we are in
> the "forbidden" period during which we cannot communicate our
> figures in public, and we will adhere to that rule.
>
> It is important to let you know the situation of our company as
> many of you are employee-shareholders.
>
> - Are there any (bad) surprises hiding in our 2001 financial
>   results?
>   No. . .
>
> - Is there any major uncertainty about our level of debt?
>   No. . .

> ▪ Are there any hidden off-balance sheet transactions that could cause any particular fears or risks?
> No. . .

204.    On February 11, 2002, Vivendi issued a press release announcing its year-end 2001 Media and Communications results.  Vivendi announced Media and Communications "proforma revenue growth of 9% for the year ended December 31, 2001, reaching 28.9 billion euros."  The release further reported that Vivendi's Telecoms segment achieved 24% revenue growth in 2001, and that ***"[r]evenue growth was 10% using the 2000 perimeter excluding Universal Film, exactly in line with management estimates given 12 months ago."***  [Emphasis added.]

205.    Commenting on the results, defendant Messier stated:

> ***I am pleased that we achieved our ambitious target of 10% organic revenue growth in 2001, for the businesses resulting from Vivendi's merger with Seagram and Canal Plus.***  Organic growth is, more than ever in today's markets, the most important strength of Vivendi Universal.  Achieving the highest level of growth in our industry is a big differentiation of Vivendi Universal, and the operating management deserves recognition for fulfilling their growth objectives and outperforming their peers in a difficult year.  Our 2001 results give us confidence that we can achieve our growth targets again in 2002.  [Emphasis added.]

206.    On February 12, 2002, in response to the Company's early release of positive results, *The New York Times* reported:

> "Vivendi is one of the few companies in the global media sector which has not issued a revenue or Ebitda warning," said Mark Harrington of J.P. Morgan, referring to a common measure of gross operating profit.  "So it demonstrates the structural growth of the company relative to its global media peers," he said of today's report.

207.    On March 3, 2002, Messier was quoted in the *Financial Times* as stating that "Vivendi had only two significant off-balance sheet structures, one relating to shares it is selling

in BSkyB and another relating to four buildings: 'There are no hidden risks and no speculative instruments.'"

208.    The statements made in ¶¶ 202-205, and 207 above were false and misleading because Defendants were engaged in improper accounting practices which had the effect of materially overstating Vivendi's reported earnings and failed to disclose Vivendi's growing cash flow problems and lack of liquidity, including: (a) improperly failing to disclose material commitments relating to its Cegetel and Maroc Telecom subsidiaries which had they been disclosed would have raised concerns in the market about the Company's liquidity and ability to access cash to meet its cash needs; (b) failing to disclose important legal restrictions on its ability to unilaterally access the cash flow of subsidiaries Cegetel and Maroc Telecom; (c) overstating the Company's revenue from certain multi-year contracts; (d) improperly manipulating reserves for bad debts in the Cegetel subsidiary; (e) improperly failing to disclose other material off-balance sheet liabilities such as the full extent of its interest in Telco and (f) improperly consolidating the financial results of Cegetel and Maroc Telecom into Vivendi's own results.  In addition, Defendants failed to disclose that Vivendi was suffering from a growing liquidity crisis and that it would necessarily need to sell valuable assets and/or restructure its debt obligations in order to remain solvent and avoid bankruptcy.

**Vivendi's Misleading FY2001 Earnings Release And Other False Press Releases**

(i)    **March 5, 2002 Earnings Release for 2001 Fiscal Year**

209.    On March 5, 2002, Vivendi issued its earnings release for the 2001 fiscal year, approved by Messier, Hannezo and other senior executives, in which Vivendi announced that its Media & Communications business had produced €5.03 billion in EBITDA and just over €2 billion in Operating Free Cash Flow.  In its March 5, 2002 earnings press release, Vivendi

stated that both of these results were well ahead of EBITDA projections and that the cash flow figure in particular was well ahead of the company's own internal targets.  The March 5, 2002 press release also emphasized "the excellent operating results that have been achieved" and stated that the results "confirm the strength of Vivendi Universal's businesses across the board despite a very difficult global economic environment."  Further, the earnings release highlighted Vivendi's "fundamentally strong operating results" and claimed that Vivendi was "the only media and communications company not to change its numbers and targets."  The release also stated in part:

> After having been the only large media company not to modify any of its guidance for the year 2001, Vivendi Universal reiterates its confidence in the strength of its businesses and their performance and their ability to grow.  For 2002, no other new guidance will be expressed, apart from the company's full confidence to reach for its Media and Communications businesses . . . .

210.    The March 5, 2002 earnings release also stated that based on Vivendi's "excellent" operating results, including its EBITDA and cash flow figures, Vivendi would pay a dividend in May 2002 of €1 per share.

211.    The statements in the March 5, 2002 earnings release were materially misleading and falsely presented Vivendi's financial situation.  As Vivendi and its executive officers, including Messier and Hannezo, knew or were reckless in not knowing, the Company's financial condition at this time was worse than Vivendi indicated because of its inability unilaterally to access the earnings and cash flow of two of its most profitable subsidiaries, Cegetel and Maroc Telecom.

212.    During the Relevant Time Period, Vivendi owned Cegetel and Maroc Telecom along with other minority shareholders.  Due to legal restrictions, Vivendi (as a parent company) was not permitted unilaterally to access the cash flow of subsidiaries, such as Cegetel and Maroc

Telecom, in which there were other minority shareholders.  In fact, during the Relevant Time Period, Maroc Telecom did not transfer cash to Vivendi, and Vivendi only accessed Cegetel's cash through a short-term current account that Vivendi had to repay by July 31, 2002.  During the Relevant Time Period, over 30% of Vivendi's EBITDA and almost half of its cash flow was attributable to those two companies.

213.    As Vivendi, Messier, Hannezo and other Vivendi executive officers knew or were reckless in not knowing during the Relevant Time Period, Vivendi's inability unilaterally to access that cash flow substantially impaired Vivendi's ability to satisfy the debt obligations and other operating costs that Vivendi had amassed in connection with its many acquisitions.  As stated in the SEC v. Vivendi Universal Complaint, "In fact, at year-end 2001 and during the first half of 2002, Defendants and other senior executives of Vivendi knew or were reckless in not knowing that the Company's overall cash flow was 'zero or negative,' and that Vivendi 'produced negative cash flow from [its] core holdings' such as its entertainment businesses 'that [was] barely offset by inaccessible cash flow from minority interests' such as Cegetel and Maroc Telecom."  Compl. ¶ 28 (Dec. 23, 2003).  These factors hindered Vivendi's ability to reduce its debt and meet its cash obligations, and resulted in a liquidity condition that was in stark contrast to the representations made in Vivendi's public statements.

214.    Moreover, Vivendi's claim in its March 5, 2002 earnings release that, based on the company's "excellent" operating results, it would pay a €1 per share dividend compounded the misleading presentation of Vivendi's results.  In fact, Vivendi borrowed against credit facilities to pay the dividend, which cost more than €1.3 billion after French corporate taxes on dividends.

215.    On March 5, 2002, during an investor conference call, defendant Messier

discussed the Company's fiscal year 2001 results and fiscal year 2002 expectations as follows:

> I just want to say a very quick points before going to your
> questions.  And I – the first point here based on the fact that we
> experienced excellent operating results in the '01 and obviously
> that's very fortunate because this excellent operating results in '01
> are also in the captive of the future and then we'll drive our future.
> I think that we build our operational reserve but what I want to
> point out is that if we continue or renewed on the EBITDA growth
> target results and add to our main in the quarter '01.  We did all of
> this.   Our operating pre cash flow target, we average Euro 2
> million instead of the guidance of Euro 1.2 – 1.5 million [sic].
> Obviously the fact that the more you go to cash the more we over
> this – the guidance that we gave to the market is a strong sign of
> the quality of the casual management in working above the
> requirements and CAPEX management in '01.  That goes to the
> same direction is that we did overcome largely all targets in terms
> of cash service.  We save Euro 200 million EBITDA, we reach 300
> EBITDA 100 more and close to Euro 600 million total cash
> savings.  The operations and these business achievements, I think
> that we owed them to our competitive advantages that were evident
> in '01.  That:  (1) the excellent quality of management; (2) the fact
> that we gain market share in about every single of our business.
> Those gains of market shares coming from [scale and scope]; (3)
> the assets mix, maximize our ability to go to digitalization for
> delivery on the mobile devices; and (4) to our global footprint
> minimizes of earnings volatility.  That's the business achievement.

216.    On March 6, 2002, Lehman Brothers issued a positive report based in part on the

statements made by Vivendi's management in the March 5, 2002 conference call.

217.    Similarly, Bear Stearns issued a report on March 6, 2002, based on the March 5,

2002 conference call, stating in pertinent part as follows:

> The company disclosed that the €19 billion of net debt has an
> average maturity of 4-years and an average cost of 4.1%.
> Management pointed out that the strength of the group's finances
> is underlined by a recently negotiated 5-year credit facility at 45
> basis points over LIBOR.

* * *

> For '02, Management reiterated their guidance of 10% organic
> sales growth for all the Media Communications businesses, also
> expects EBITDA of close to €6 billion (pre-USA Networks and
> pre-Stream).

218.   The statements made by Defendants referenced in ¶¶ 209-210, and 215 above were each materially false and misleading because Defendants were engaged in improper accounting practices which had the effect of materially overstating Vivendi's reported earnings and failed to disclose Vivendi's growing cash flow problems and lack of liquidity, including: (a) improperly failing to disclose material commitments relating to its Cegetel and Maroc Telecom subsidiaries which had they been disclosed would have raised concerns in the market about the Company's liquidity and ability to access cash to meet its cash needs; (b) failing to disclose important legal restrictions on its ability to unilaterally access the cash flow of subsidiaries Cegetel and Maroc Telecom; (c) overstating the Company's revenue from certain multi-year contracts; (d) improperly manipulating reserves for bad debts in the Cegetel subsidiary; (e) improperly failing to disclose other material off-balance sheet liabilities such as the full extent of its interest in Telco and (f) improperly consolidating the financial results of Cegetel and Maroc Telecom into Vivendi's own results.  In addition, Defendants failed to disclose that Vivendi was suffering from a growing liquidity crisis and that it would necessarily need to sell valuable assets and/or restructure its debt obligations in order to remain solvent and avoid bankruptcy.

### (ii)    Additional False Press Releases in 2002

219.   In addition to its March 5, 2002 earnings release, Vivendi issued other press releases in the first half of 2002, all of which were authorized by Messier, Hannezo and other Vivendi executive officers, that presented a materially misleading picture of the Company's financial condition and concealed its growing inability to meet its financial obligations.

220.    On April 24, 2002, Vivendi issued a press release announcing its "strong" first quarter 2002 Media and Communications results.  Vivendi reported a "strong surge of operational free cash flow, up 159% to 1.4 billion euros, well ahead of expectations."  The release, issued in New York, further reported that "[n]et debt fell from approximately 19 billion euros to approximately 17 billion euros."  The release also reported Media and Communications "revenue organic growth of 13% to 6.8 billion euros; EBITDA growth, up 18% to 1.1 billion euros; and solid operating income growth, up 37% to 408 million euros."  Defendant Messier commented on these results as follows:

> The hard numbers in the first quarter show that Vivendi Universal has a winning strategy, and demonstrate our commitment to excellent management and delivering operating results quarter after quarter.  In the first quarter, each operating segment delivered its revenue targets, and most segments over-delivered EBITDA and operating free cash flow compared with their budgets. . .
>
> In a difficult environment, Vivendi Universal's businesses gained market share.  Cash management improved dramatically.  Finally, the revenue and cost synergies achieved in the quarter were significant.  Further gains will be driven by improving businesses that currently have negative operating free cash flow: Canal Plus and Internet operations.

221.    On April 29, 2002, Vivendi issued a press release announcing purportedly "strong" results for the first quarter of 2002, including a 12% increase in pro forma consolidated revenue to €13.2 billion.  The release, issued in New York, also reported that consolidated operating income grew 11% pro forma to €781 million, excluding goodwill amortization.  In the release, defendant Messier commented on the results as follows:

> The consolidated financial results for the quarter demonstrate that Vivendi Universal is delivering on the strategy, goals and targets that we have articulated to our shareholders.  In the first quarter of 2002, both Media & Communications and Vivendi Environment delivered their targets.

The Media & Communications financial results released last week, coupled with our consolidated results issued today, are testimony to our ability and conviction to deliver strong results in operations, cash flow, EBITDA and net income. As I said last week, because of our strong performance in the quarter, we are lowering our estimate of Media & Communications year-end Debt/EBITDA ration to less than 3x by December 31, 2002.

In a very difficult economic environment, characterized by many market uncertainties, Vivendi Universal's global businesses gained market share. In addition, strong improvement was achieved in cash management, debt reduction, synergies, management development and revenue growth.

222.    The April 29, 2002 press release further touted the Company's allegedly strong cash flow position:

On a pro forma basis, excluding Vivendi Universal's publishing businesses to be disposed of (including the B-to-B and Health businesses whose sale in expected to be completed n the second quarter), Media and Communications reported:

a.    *A strong surge of operational free cash flow, up 159% to 1.4 billion euros, well ahead of expectations;*

b.    Strong operating results in the first quarter: revenue organic growth of 13% to 6.8 billion euros: EBITDA growth, up 18% to 1.1 billion euros: and solid operating income growth, up 37% to 408 million euros. All were significantly ahead of budget. [Emphasis added.]

223.    Following the Company's April 29, 2002 Press Release, Merrill Lynch issued a research report dated April 30, 2002 that rated the Company a "strong buy" premised on the Company's allegedly strong financial position. Specifically, the Merrill Lynch report stated that the "strong buy" recommendation was based, in part, on the fact that "Vivendi has now stated its net debt/EBITDA objective is less than 3x by the end of 2002. . ."

224.    The statements made by Defendants referenced in ¶¶ 220-222 above were each materially false and misleading because, *inter alia*, Defendants were engaged in improper accounting practices which had the effect of materially overstating Vivendi's reported earnings

and failed to disclose Vivendi's growing cash flow problems and lack of liquidity, including: (a) improperly failing to disclose material commitments relating to its Cegetel and Maroc Telecom subsidiaries which had they been disclosed would have raised concerns in the market about the Company's liquidity and ability to access cash to meet its cash needs; (b) failing to disclose important legal restrictions on its ability to unilaterally access the cash flow of subsidiaries Cegetel and Maroc Telecom; (c) overstating the Company's revenue from certain multi-year contracts; (d) improperly manipulating reserves for bad debts in the Cegetel subsidiary; (e) improperly failing to disclose other material off-balance sheet liabilities such as the full extent of its interest in Telco and (f) improperly consolidating the financial results of Cegetel and Maroc Telecom into Vivendi's own results. In addition, Defendants failed to disclose that Vivendi was suffering from a growing liquidity crisis and that it would necessarily need to sell valuable assets and/or restructure its debt obligations in order to remain solvent and avoid bankruptcy.

225.    On May 3, 2002, Moody's lowered the Company's long-term debt rating to Baa3 – the lowest investment guide – one notch above "junk" status assigned to speculative investments. According to Moody's, the rating downgrade reflected Moody's concern that Vivendi "might not be able to reduce debt as quickly and comprehensively as planned."

226.    That same day, Vivendi issued a press release criticizing Moody's decision and attempting to downplay its significance:

> The company believes that this decision does not fully take into consideration the currently poor market conditions and the fact that the agency does not take into account immediately the whole of the debt reduction program planned by Vivendi Universal.

> This decision has no impact on Vivendi Universal's cash situation. It does not trigger any renegotiation clauses or advance repayments of bank credit lines. In addition, Vivendi Universal's use of commercial paper in the current amount of 1.6 billion euros is well covered by back-up lines of more than 3 billion euros, the availability of which will not be affected by the rating change.

Vendendi Universal affirms that it has every confidence in its ability to meet its operating targets for 2002, as proved by its first-quarter results. The company is totally determined to carry through its debt reduction program in order to make a rapid return to a comfortable position with a Baa2 rating.

227. As a result of Vivendi's efforts to reassure the markets, Defendants were able to limit the decline in the price of Vivendi's common stock and ADSs. Vivendi's ADSs closed down only $1.74 (from $30.67 to $29.07) on May 3, 2002.

228. On May 6, 2002, the *International Herald Tribune* reported:

Vivendi Universal SA could be forced to unwind billions of dollars in off-balance-sheet derivatives transactions if its credit rating slips any further, according to a detailed report of the company's accounts filed with U.S. regulators.

A downgrade Friday by Moody's Investors Service Inc. of Vivendi's long-term debt to Baa3 from Baa2 places the company's bonds within a notch of junk, or non-investment-grade status. That, in turn, puts the world's second-largest media conglomerate within a hair's breadth of triggering an immediate settlement of 3.5 billion ($3.21 billion) worth of so-called total return swaps, a kind of credit derivative, documents filed last month with the Securities and Exchange Commission show. Hundreds of millions of dollars in losses on a total return swaps and other esoteric derivatives deals have been the focus of at least one lawsuit filed against Enron Corp. and its auditor, Arthur Andersen LLP, by shareholders and employees of the bankrupt U.S. energy trader.

Derivatives are generally defined as financial instruments that derive their value from an underlying asset such as a stock. In a total return swap, parties make payments to each other based on an asset's appreciation and depreciation, with the payment rate determined by a complex formula. Vivendi stressed Friday that the rating change had no impact on its cash situation, adding that the move "does not trigger any renegotiation clauses or advance repayments of bank credit lines." The statement did not mention the possibility of accelerated settlement of debt or swap agreements.

Asked about the implications of a further ratings downgrade for its total return swap agreements, Antione Lefort, a Vivendi spokesman, declined to answer Sunday, saying: "This is not the subject. Our goal is to carry through the debt reduction program in

order to make a rapid return to a comfortable position with a Baa2 rating."

But in a 100-page annual financial statement filed with the SEC on April 15, Vivendi stated that it had entered into a number of long-term financing agreements that provided for early redemption if Moody's cut the company's credit rating below Baa3 or Standard & Poor's Corp. cut it below BBB-minus, its equivalent rating. S&P currently rates Vivendi at BBB with a stable outlook.

Vivendi's SEC filing says, "Total return swap agreements set up at the time of the sales of BSkyB and AOL Europe provide for an early unwind if Vivendi is downgraded below BBB-minus."

The report indicates that the total notional value of the two return swap transactions was 3.51 billion as of Dec. 31. Notional principal underlying a swap is usually much greater than the true risk exposure of the parties to the transaction. Vivendi did not quantify its actual risk exposure in the report.

The swap transactions relate to the sale of investments in rival media companies ordered by EU regulators as a condition for approval of Vivendi's $34 billion acquisition of Seagram Co. of Canada in December 2000. Vivendi agreed to dispose within two years of its 22 percent stake in British Sky Broadcasting Group PLC, the satellite-television unit of Rupert Murdoch's News Corp. Last September, Vivendi arranged a complex transfer of the stake to Deutsche Bank AG of Germany in exchange for a four-year, 4.2 billion loan. Vivendi also said in the filing that it had entered into a separate two-year total return swap transaction in June 2001 in connection with the sale of $719 million worth of preferred shares in AOL Europe, an AOL Time Warner Inc. unit, to an unidentified financial institution. Further details were not provided.

In response to these further negative press reports, the price of Vivendi ADSs closed down at $28.26 on May 6, 2002.

229. On May 28, 2002, Vivendi filed its 2001 20-F with the SEC, which was signed by defendant Hannezo. The 2001 20-F contained Vivendi's consolidated financial statement for the year ended December 31, 2001. The 2001 20-F also reported as follows:

*Net Cash Flow from Operating Activities* – Net cash flow provided by operating activities totaled €4.5 billion in 2001, an increase of €2 billion from 2000. The increase was attributed to operating

earnings generating incremental cash flow of €1.1 billion and improvements in working capital of €1.5 billion, partially offset by approximately €600 million of cash payments made for the settlement of restructuring and merger-related liabilities.  Of the improvements in working capital, €0.8 billion was generated by Vivendi Environment primarily due to the implementation of a receivables securitization program.  In 2000, operating activities provided net cash of €2.5 billion compared to €0.8 billion in 1999.  The significant improvement was primarily due to increased earnings generated by our Telecoms, Publishing and Environmental Services businesses.

*Net Cash Flow from Investing Activities* – Net cash flow provided by investing activities was €4.3 billion in 2001 compared to net cash flow used for investing activities of €1.5 billion in 2000.  Contributing to cash from investing activities was €9.4 billion from the sale of our spirits and wine business and €4 billion from the disposal of our investment in BSkyB, partially offset by capital expenditures for tangible and intangible assets net of sales proceeds of €4.9 billion and the acquisitions of Houghton Mifflin for €2.0 billion and Maroc Telecom for €2.4 billion.  In 2000, net cash used for investing activities was €1.5 billion compared to €12.9 billion in 1999.  The significant decrease primarily reflects fewer strategic acquisitions paid for in cash in 2000 compared to 1999. . . . Proceeds from the disposal of investments and fixed assets were €6.9 billion in 2000 compared to €4.5 billion in 1999, mainly attributable to the divestiture of non-core real estate, construction assets and GPU power generation plants.

*Net Cash flow from Financing Activities* – In 2001, net cash flow used for financing activities was €7.5 billion, the principal components of which included a €5.9 billion repayment of long-term borrowings and other liabilities, a €1.7 billion decrease in short-term borrowings, the purchase of treasury stock for €4.3 billion and cash dividends paid of €1.4 billion, partially offset by €5.2 billion proceeds from the issuance of long-term borrowings and other liabilities and €0.6 billion net proceeds from the issuance of common stock.  In 2000, net cash flow used for financing activities was €0.6 billion compared to net cash provided by financing activities of €13.7 billion in 1999.  The year-on-year variance was primarily due to the Merger Transactions.  In July 2000, the sale of 37% of Vivendi Environnement through an IPO contributed to an increase in financing transactions of €3.8 billion.

230.    This 2001 20-F was false and misleading because Defendants were engaged in improper accounting practices which had the effect of materially overstating Vivendi's reported earnings and failed to disclose Vivendi's growing cash flow problems and lack of liquidity, including: (a) improperly failing to disclose material commitments relating to its Cegetel subsidiary which had they been disclosed would have raised concerns in the market about the Company's liquidity and ability to access cash to meet its cash needs; (b) failing to disclose important legal restrictions on its ability to unilaterally access cash flow of subsidiaries Cegetel and Maroc Telecom; (c) overstating the Company's revenue from certain multi-year contracts; (d) improperly manipulating reserves for bad debts in the Cegetel subsidiary; (e) improperly failing to disclose other material off-balance sheet liabilities such the full extent of its interest in Telco and (f) improperly consolidating the financial results of Cegetel and Maroc Telecom into Vivendi's own results.  In addition, Defendants failed to disclose that Vivendi was suffering from a growing liquidity crisis and that it would necessarily need to sell valuable assets and/or restructure its debt obligations in order to remain solvent and avoid bankruptcy.

231.    On May 30, 2002, Vivendi issued a press release falsely stating that its "cash situation, which, the Company believes, is comfortable — even assuming an extremely pessimistic market — will enable the Company to continue its debt reduction program with confidence and with a view to creating the best possible value for its shareholders."  The press release further provided:

> Vivendi Universal confirms having obtained agreement from the banks to delete the clauses that linked the availability of credit lines to a rating level.  The Company's bank credit line are [sic] therefore, no longer dependent on rating agencies' decisions.
>
> **Additionally, the Company has no reason to anticipate or fear any further deterioration in its credit rating.**

232.    This press release was false and misleading because Vivendi's cash situation was not "comfortable," and Vivendi, Messier, Hannezo and other Vivendi executive officers knew at this time, or were reckless in not knowing, that Vivendi's cash flow was "zero or negative."

233.    On May 31, 2002, Vivendi ADSs closed up $1.23, at $31.05.

234.    Indeed, as reported in the October 31, 2002 *Wall Street Journal* article, the board, concerned there was a liquidity problem, had hired Goldman Sachs the day before, on May 29, 2002, to analyze the company's cash situation.

235.    On June 24, 2002, Goldman Sachs informed Vivendi's top executives and certain members of the board that Vivendi was in danger of having to file for bankruptcy as early as September or October.  That day, Vivendi's share price fell 25%, to €18.75.  Goldman Sachs repeated its findings to the full board the next day, June 25, 2002.

236.    On June 26, 2002, Vivendi issued a press release in response to media speculation regarding the Company's liquidity.  In that press release, Vivendi claimed that it had "around €3.3 billion in unused credit lines.  This is available to back up its commercial paper outstanding of nearly €1 billion.  The cash situation has greatly improved since the beginning of the year."  Vivendi also claimed that "[o]wing to its strong free cash flow, combined with the execution of the disposals program and potential bond issues, Vivendi Universal is confident of its capacity to meet its anticipated obligations over the next 12 months."

237.    Vivendi's access to credit, however, was much worse than this press release indicated.  In fact, the day before Vivendi issued its June 26, 2002 press release, at least €900 million of the €3.3 billion in Vivendi credit lines expired.  Further, by this date, Vivendi's "cash situation" had not improved since the beginning of the year, but rather had worsened as a result

of a demand made weeks earlier by Cegetel's minority shareholders for the repayment of a

current account pursuant to which Cegetel made its excess cash available to Vivendi.

238.    On June 26, 2002, defendant Messier discussed the Company's debt and liquidity

during an investor conference call as follows:

> I have read, I held in the markets all certainties, question, rumors
> in the current environment relating to views, view for yourselves,
> views for your accounting and I seen that in those circumstance.
> ***The best that we can do is to show you [that] there is no hidden
> liability that's you have all the information to come back.***
> [Emphasis added.]

239.    On June 26, 2002, the *Dow Jones International News* reported:

> Chairman Jean-Marie Messier said late Wednesday that he plans to
> stay in charge of the embattled media company despite criticism of
> his strategy and a crumbling share price. . .
>
> Messier sought to counter those doubts, opening the call with a
> comment that the company has no hidden, off-balance sheet
> liabilities and adding, ***"We feel very confident looking to our debt
> and cash analysis with all our commitments of the group for the
> coming 12 months."***

240.    Vivendi's June 26, 2002 press release and subsequent comments by defendant

Messier reassured a number of market analysts.  For example, on June 27, 2002, Merrill Lynch

issued a "strong buy" recommendation for the Vivendi stock, stating:

> We believe the rapid share price fall of some 25% in the last two
> weeks is unwarranted and expect ongoing deleveraging and
> improving confidence in the company's short term liquidity
> position should begin to revive interest in the shares.

241.    Defendants' attempts to reassure the market and to deny that it had any liquidity

problems were materially misleading.  Defendants knew, or were reckless in not knowing, that

Vivendi's financial condition was precarious and that there was significant risk that it would be

unable to pay its debts as they became due.

242.    The statements made by Defendants referenced in ¶¶ 231, 236, and 238-239, above were each materially false and misleading because, *inter alia*, Defendants were engaged in improper accounting practices which had the effect of materially overstating Vivendi's reported earnings and failed to disclose Vivendi's growing cash flow problems and lack of liquidity, including: (a) improperly failing to disclose material commitments relating to its Cegetel subsidiary which had they been disclosed would have raised concerns in the market about the Company's liquidity and ability to access cash to meet its cash needs; (b) failing to disclose important legal restrictions on its ability to unilaterally access the cash flow of subsidiaries Cegetel and Maroc Telecom; (c) overstating the Company's revenue from certain multi-year contracts; (d) improperly manipulating reserves for bad debts in the Cegetel subsidiary; (e) improperly failing to disclose other material off-balance sheet liabilities such the full extent of its interest in Telco and (f) improperly consolidating the financial results of Cegetel and Maroc Telecom into Vivendi's own results.  In addition, Defendants failed to disclose that Vivendi was suffering from a growing liquidity crisis and that it would necessarily need to sell valuable assets and/or restructure its debt obligations in order to remain solvent and avoid bankruptcy.

243.    On July 2, 2002, Vivendi's debt was downgraded again amid reports that the Company was in danger of default.  On July 2, 2002, *Bloomberg* reported that defendant Messier told employees in an e-mail that "he may have gone 'too fast, too far.  Some mistakes were made,' he said, 'They can all be fixed, and I had started doing so.'"  On July 3, 2002, Vivendi's CEO, Defendant Messier was forced to resign.

244.    Vivendi ADSs and ordinary shares collapsed upon these revelations, falling to as low as $13.40 and €13.90 and closing at $15.66 and €13.90, respectively, on huge volumes of 7.4 million ADSs and tens of millions of shares.

245.    On July 3, 2002, the Company, through its new management, published a press release acknowledging that the Company has "a short-term liquidity issue."  The release further stated that Vivendi had to repay creditors €1.8 billion by the end of July 2002 and that €3.8 billion in credit lines were up for renegotiation:

> [I]n light of the Moody's and Standard & Poor's downgrades of Vivendi Universal debt ratings of July 1 and 2, 2002, respectively, as well as other events that have occurred over the past several days, including the resignation of Mr. Jean-Marie Messier from his positions at Vivendi Universal, Vivendi Universal believes it is important to update the investor community and the markets generally regarding its short-term cash position and liquidity . . .
>
> As of July 3, 2002, Vivendi Universal has 1.2 billion euros of cash and 1.6 billion euros in unused credit lines of which at least 600 million euros can be used for general corporate purposes and the rest can be used as backing for certain types of its commercial paper (400 million euros of which is currently outstanding).
>
> ***Payments totaling approximately 1.8 billion euros remain due by the end of July.  These will be financed from resources totalling approximately 2.4 billion euros comprising cash and draw-downs on existing credit facilities.***
>
> Several of Vivendi Universal's credit lines automatically roll over at certain specific dates in accordance with their terms, subject to standard material adverse change provisions.  ***Of those, approximately 3.8 billion euros are scheduled to roll-over in July.***
>
> In addition, Vivendi Universal has initiated discussions with its main credit banks with a view to putting in place new credit facilities as soon as feasible.
>
> While Vivendi Universal has a short-term liquidity issue, the value of the group's broad and diversified assets by far exceed that of its debt. The new management is committed to a program of aggressive deleveraging and greater transparency in order to restore health and confidence in Vivendi Universal.  [Emphasis added.]

246.    On July 3, 2002, in *The Columbian*, Messier continued to defend Vivendi's financial statements:  "'There are no underestimated liabilities.  There are no overvalued assets.' Messier said, "'Our results are true, genuine and complete.'"

247.    On July 5, 2002, the *Globe and Mail* reported:

> With new management in place, ***Vivendi Universal SA finally admitted what its ousted chairman and chief executive officer, Jean-Marie Messier, had strenuously denied in recent weeks: The media-and-utility conglomerate is in a danger of a cash crunch.***
>
> Based on a detailed liquidity statement Vivendi put out late Wednesday, credit analysts estimate that Vivendi could face a cash shortfall of 2.7 billion euros ($2.64-billion U.S.) by the end of the year, expanding to as much as 5.5 billion euros by the middle of 2003, unless it can quickly secure a new multibillion-euro credit line from its lenders.
>
> The statement came after a three-hour board meeting late Wednesday in Paris where the Vivendi board accepted the forced resignation of Mr. Messier.  The board, as expected, chose Jean-Rene Fourtou, a top executive of Aventis SA, the Franco-German pharmaceutical giant, as its new CEO.
>
> In its statement, Vivendi said it must repay 1.8 billion euros this month and said the payment would be financed from 2.4 billion euros in existing cash and credit lines.  It also has a 3.8 billion-euro credit line that will roll over this month unless the banks determine there has been a "material adverse change" with the company.
>
> This grim outlook contrasts with Mr. Messier's recent assurance that the "treasury situation" at Vivendi – owner of Universal Studios, Universal Music Group, USA Networks and minority stakes in a host of other assets – was "comfortable even in the most pessimistic market hypotheses."  [Emphasis added.]

248.    The statements made by Defendants referenced in ¶¶ 243, and 245-247, above were each materially false and misleading because Defendants still failed to disclose the full magnitude of its growing liquidity crisis and that it would necessarily need to sell valuable assets and/or restructure its debt obligations in order to remain solvent and avoid bankruptcy.

249.    On August 14, 2002, the Company's new management stated that, pursuant to French GAAP, Vivendi suffered a €12 billion net loss for the first half of 2002 and would take an €11 billion goodwill write-down of depreciated assets.  Debt rating agency Standard & Poor's slashed Vivendi's long-term corporate credit to junk status that same day.  As the *Associated Press* reported on August 14, 2002:

> Vivendi Universal, the teetering French media conglomerate, reported a massive loss of $12 billion for the first half of the year and said it will pare debt by selling $10 billion in assets including the U.S. publisher Houghton Mifflin.
>
> Adding insult to injury, a ratings agency downgraded the company's debt to junk. . . .
>
> The sale of Houghton Mifflin, which the company only bought last year for $1.7 billion, appeared to mark a first step toward breaking up the entertainment and media empire built up by Vivendi's former chairman, Jean-Marie Messier, in a whirlwind of costly acquisitions.
>
> In all, Vivendi said it hopes to dispose of at least $9.8 billion worth of assets – half of them within nine months, the rest within two years.
>
> ***"We are facing a liquidity problem*,"** said chairman Jean-Rene Fourtou, who took over July 3 after Messier's ouster.  Fourtou said he would "try to avoid any fire sale, but we have negotiations that could be concluded very soon if the price was lowered." [Emphasis added.]

250.    In response to these further stunning developments, on August 14, 2002, Vivendi common stock closed at €11.89, down more than 4 euros (or approximately 25%) from its close the previous day.  Vivendi's ADSs suffered a similar decline, closing down $3.67 at $11.66.

## THE FALLOUT – A SMALLER COMPANY
## AND CRIMINAL AND CIVIL INVESTIGATIONS

251.    Defendants' improper accounting practices and failure to disclose the truth concerning Vivendi's liquidity crisis gave rise to fraud investigations on both sides of the

Atlantic. On July 9, 2002, *Bloomberg* reported that French stock market regulators, the COB, were "probing the Financial information released by Vivendi Universal SA since January 2002," and on July 10, 2002, *The Wall Street Journal* reported that French regulators raided Vivendi's Paris headquarters as part of an investigation into whether Vivendi had disclosed relevant information to investors in the prior 18 months. In addition, on October 29, 2002, *Bloomberg* reported that French prosecutors had opened a criminal investigation. As *Bloomberg* reported:

> The investigation will examine whether Vivendi "published false accounts for 2000 and 2001 to hide the true nature of its financial situation," a spokeswoman for the prosecutor's office said. It will also look at whether the Paris-based company gave misleading outlooks for 2001 and 2002.

252. On December 12, 2002, *Bloomberg* reported that a police team from the Finance Brigade of the Paris Public Prosecutor's office had raided both Vivendi's headquarters in Paris as well as Messier's home. The Finance Brigade raided Canal Plus' headquarters the next day, and also raided the homes or offices of various Vivendi directors.

253. In the United States, Vivendi's accounting practices and financial disclosures were also the subject of both a formal SEC investigation and a federal criminal investigation. As the November 5, 2002 *The Wall Street Journal* reported:

> The U.S. attorney's office is coordinating its probe with the U.S. Securities and Exchange Commission, which already has been conducting an informal inquiry into Vivendi, the company said in a statement.
>
> The main focus of the U.S. attorney's investigation, which is in its early stages, remains unclear, as does whether it will lead to any charges being filed. But one of the issues that has come under scrutiny by French authorities is the accuracy and timeliness of Vivendi's financial disclosures under its former chairman, Jean-Marie Messier, who was ousted in early July. France's stock-market watchdog, the Commission des Operations de Bourse, launched a probe at that time and is looking to see whether Mr. Messier may have misled his board and investors with overly rosy

assessments of Vivendi's financial health, according to people familiar with that probe.

The U.S. probe also may encompass accounting, as the Paris public prosecutor's office has included accounting in its own investigation. Among other issues, the Paris prosecutor's office said it would seek to establish whether Vivendi published "false accounts for the fiscal years that ended on Dec. 31, 2000 and Dec. 31, 2001."

On November 19, 2002, *Bloomberg* reported that the SEC's informal inquiry had been upgraded to a formal investigation.

254. In the wake of the public admission that the Company was facing a cash crunch, Vivendi's new management set about the process of raising revenue by jettisoning some of the conglomerate's major assets. Media reports indicated that the Company had enough cash to last only until October 2002, putting Vivendi in a dire position. To clean up the mess Messier's costly acquisitions had made of the Company's finances, Vivendi announced an ambitious plan to shed €16 billion in assets between July 2002 and the end of 2004. Vivendi's "fire sale" included the following dispositions:

| Date | Disposition | Price |
|---|---|---|
| July 2002 | B2B/Health | €150 million |
| July 2002 | Lagardére | €44 million |
| July 2002 | Vinci | €291 million |
| December 2002 | Vizzavi | €143 million |
| December 2002 | Houghton Mifflin | €1.567 billion |
| December 2002 | VUP publishing activities in Europe | €1.138 billion |
| December 2002 | Veolia Environment | €1.865 billion |
| December 2002 | EchoStar | €1.037 billion |
| December 2002 | Sithe Energies, Inc. | €319 million |
| February 2003 | Consumer Press division | €200 million |

| Date | Disposition | Price |
|---|---|---|
| February 2003 | Canal Plus Technologies | €191 million |
| April 2003 | Telepiùr | €831 million |
| May 2003 | Fixed-line Telecommunication in Hungary | €315 million |
| May 2003 | Comareg | €135 million |
| May 2003 | Interest in Vodafone Egypt | €43 million |
| June 2003 | InterActive Corp. warrants | €600 million |
| June 2003 | Interest in Sithe International | €40 million |
| June 2003 | VUE real estate | €276 million |
| October 2003 | Canal Plus Nordic | €48 million |
| February 2003 | Atica & Scipione | €31 million |
| March 2004 | Sportfive | €274 million |
| May 2004 | Vivendi Universal Entertainment | €2.312 billion |
| May 2004 | Kencell | €190 million |
| June 2004 | Monaco Telecom | €169 million |
| June 2004 | Egée and Cédre Towers | €84 million |
| August 2004 | Interests in VIVA Media | €47 million |
| September 2004 | Canal Plus Group headquarters | €108 million |
| October 2004 | UCI Cinemas | €170 million |
| December 2004 | 15% of Veolia Entertainment | €1.497 billion |

255.    Unfortunately for Vivendi, however, its woes were not limited to its bloated balance sheet.  On October 30, 2002, the Paris public prosecutor's office announced it had begun a criminal investigation into whether Vivendi had published false accounts for the years 2000 and 2001.  A few days later, Vivendi announced that a separate investigation had been opened on the other side of the Atlantic by the United States Attorney's Office for the Southern District of New York.  The U.S. Attorney announced that it planned to coordinate its efforts with the SEC, which had already begun to conduct an informal inquiry into Vivendi.

256.    On November 20, 2002, the SEC announced that it had upgraded its inquiry into Vivendi from an informal inquiry to a formal investigation.  The SEC made clear that it intended to review Vivendi's accounting and the veracity of its public disclosures.  In connection with these enforcement efforts, the SEC in September 2003 obtained a court order forcing Vivendi to place in escrow $23 million it had earmarked to pay a severance package Messier negotiated just before his ouster.  Messier was similarly barred from executing a judgment he had obtained via an arbitration in New York State Court concerning this severance package.

257.    On September 13, 2003, the COB – following a fourteen month investigation – announced its conclusion that the Defendants had made false financial disclosures.  The COB found that Defendants, among their other failures, had not disclosed to investors the growing cash problems Vivendi faced during the end of Messier's tenure.

258.    The United States-based investigations into the crisis engendered by Messier's more than $75 billion acquisition spree came to a stunning conclusion on December 24, 2003.  That day, the SEC filed and simultaneously settled securities fraud charges against Vivendi, Messier and Hannezo, imposing fines totaling $51 million.  The SEC charged Vivendi, Messier and Hannezo with multiple violations of the federal securities laws committed between December 2000 and July 2002.  Specifically, the SEC contended that these parties had engaged in a course of fraudulent conduct that disguised the Company's cash flow and liquidity problems, improperly adjusted accounting reserves to meet predetermined EBITDA targets, and failed to disclose material commitments at Cegetel.

259.    In addition to the massive fines imposed against them, Messier and Hannezo both entered into consent decrees permanently enjoining them from further violations of the federal

securities laws and barring them from service as officers or directors of any public companies for respective ten and five year periods.

260.    Subsequently, the SEC on April 14, 2004 issued an order instituting and simultaneously settling administrative cease and desist proceedings against John Luczycki, Vivendi's former Chief Accounting Officer and Controller.  The SEC found that Luczycki had willfully violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, ordering him to cease and desist from violating the antifraud provisions of the federal securities laws and prohibiting him from practicing as an accountant before the SEC for at least three years.

261.    While French regulators were slower to bring the Vivendi debacle to a conclusion, they imposed fines of €1 million each on the Company and Messier on November 3, 2004 – marking only the second time the French Financial Markets Authority had come this close to meeting its €1.5 million fine cap.

262.    On January 17, 2006, the Company announced plans to discontinue its ADS program, citing concerns over the costs of complying with United States disclosure requirements.

263.    In the end, Messier's $77 billion acquisition spree wreaked havoc on the Company, causing the Company's ADSs to suffer a staggering 85% decline from their Relevant Time Period high of $75.50 and its common shares to suffer an equally stunning 83.9% decline from their Relevant Time Period high of €86.50.

### ADDITIONAL FACTS CONCERNING
### THE DEFENDANTS' FAILURE TO DISCLOSE MATERIAL
### ADVERSE FACTS CONCERNING VIVENDI'S SEVERE LIQUIDITY PROBLEMS

264.    For the reasons set forth in the preceding ¶¶ 52-69, 78-124, 138-145, and 155-162, Defendants materially overstated Vivendi's financial performance during the Relevant Time Period in violation of GAAP.

265.    However, during the Relevant Time Period, Defendants also repeatedly made material misstatements and omissions concerning the Company's liquidity.  Unbeknownst to investors or the financial markets, and contrary to Defendants' repeated assurances that the Company was in strong financial condition, Vivendi's implementation of its growth-by-acquisition strategy caused it to overpay for businesses and saddled the Company with a huge debt burden that the operations of the acquired businesses could not satisfy.

266.    As a result, Vivendi was under great strain to meet its obligations in the ordinary course as they came due.  The causes of Vivendi's liquidity problems included the following:

(a)    **Inability to generate expected cash flows from acquired companies.**  As set forth in detail above in the section discussing Vivendi's manipulation of the accounting at its Cegetel and UMG subsidiaries, Vivendi's financial performance fell sufficiently short of the expectations that Defendants had fostered during the Relevant Time Period and Defendants caused Vivendi to engage in a variety of GAAP violations to conceal the Company's actual results.

(b)    **Vivendi's Undisclosed 2001 Stock Buybacks.**  Further exacerbating Vivendi's cash flow situation was defendant Messier's undisclosed and massive stock buy-back program, which – unbeknownst to investors – caused the Company to spend

approximately $6.3 *billion* of the Company's cash on acquiring Vivendi shares.  As

later reported in the *Wall Street Journal* on October 31, 2002:

> Mr. Messier, a former top investment banker with Lazard LLC, was famously fond of deal making.  But now it turns out he pursued many more deals than has been publicly known.  ***More important, he spent billions of dollars buying back Vivendi stock on the market last year without consulting his CFO or the board, according to people familiar with the situation.  Trying to prop up the stock price, he instead only sent Vivendi's debt soaring.***

> \* \* \*

> The board signed off on Mr. Messier's acquisitions.  But it did so without knowing the full extent of his spending spree, current and former board members say.  That is because Mr. Messier didn't tell the board about his single biggest expenditure: the purchase of 104 million Vivendi shares, or nearly 10% of the company's equity, on the stock market during 2001.  His purpose was to prop up the share price.  The cost:  $6.3 billion.

> Shareholders had earlier approved a resolution allowing Vivendi to buy back up to 10% of its shares.  But current and former directors say they expected to hear beforehand about such massive purchases.

> \* \* \*

> Mr. Hannezo opposed the stock purchases as a waste of cash . . . .  This resulted in Mr. Messier trying to circumvent his CFO on the buybacks.  The ex-chairman placed his stock orders by phone with two mid-level employees in the finance department.  Hubert Dupont Lhotelain and Francois Blondet, according to a person familiar with the matter . . . .

> In early December 2001, the CFO finally intervened by forbidding his subordinates to take Mr. Messier's phone calls, the person familiar with the situation says.  Mr. Hannezo set up a formal process to slow Mr. Messier down, requiring that the chairman request buybacks in writing, along with some justification.

> \* \* \*

> By December, the buybacks had taken their toll:  Vivendi was running out of cash, according to Mr. Hannezo's memo to the COB.  [Emphasis added.]

(c) **Undisclosed Off-Balance Sheet Liabilities.**    During the Relevant Time Period, Defendants also misled investors about an off-balance sheet liability that further threatened Vivendi's liquidity and ultimately cost Vivendi hundreds of millions of dollars and impaired Vivendi's liquidity crisis.    In late 2000 and 2001, Defendants wagered on the future success of the Company by selling put options to raise cash to fund executive compensation.    These put options obligated Vivendi to purchase in the future at least 22.8 million of its own shares, or approximately 2% of all outstanding Vivendi stock, at an average price of €69.    Even as Vivendi's share price dropped during 2001 and the first half of 2002, making it increasingly likely that the Company would take a staggering loss on the options, Defendants continued to conceal the true nature and extent of these liabilities, and to misrepresent Vivendi's true liquidity condition.    Moreover, even when Defendants finally made limited disclosures of its put obligations in the spring of 2002, the disclosures were woefully inadequate.    For example:

(i)      After being criticized by the French press for concealing the risk connected to the options, Vivendi claimed that defendant Hannezo went over the put options with analysts at an accounting workshop March 6, 2002 in Paris.    However, as the May 1, 2002 edition of *The Wall Street Journal* reported, ***"analysts who were present or listened in said Vivendi glossed over the issue,"*** [emphasis added] and Vivendi admitted that discussion of the puts was "easy to miss" at the accounting workshop.    Moreover, the slide presentation from this workshop, belatedly filed with the SEC

101

as an exhibit to Vivendi's May 2, 2002 Form 6-K, did not mention Vivendi's put obligations.

(ii)    On April 15, 2002, Vivendi disseminated its annual report on Form 6-K for FY2001 which contained a translation of its 2001 year end financial statements.  This translation also made only vague reference to Vivendi's put obligations:

> In connection with the sale of puts on its shares, Vivendi Universal had a commitment, at December 31, 2001, to buy 19.7 million shares at exercise prices ranging from €60.40 to €80.00 in 2002 and 3.1 million shares at an exercise price of €50.50 in January 2003.

Vivendi's annual report therefore did little to clarify the details of Vivendi's risks and obligations in connection with the put options. For example, other than specifying that Vivendi could be forced to purchase 3.1 million shares in January 2003, the report failed to inform investors of the scope, if any, of the Company's obligations with respect to the puts after December 31, 2001.  The report also failed to comment on whether the options were likely to be exercised given the decline in Vivendi's stock price, or their potential adverse impact on Vivendi's liquidity.

(iii)    On April 18, 2002 (as later reported by the May 1, 2002 *Wall Street Journal*) Laura Martin, head of Vivendi's investor-relations department, sent an e-mail to selected analysts that purported to clarify Vivendi's obligations with respect to the put options:

> In a sign that Vivendi itself was conscious it hadn't made clear enough the consequences of the put options, Laura Martin, who heads the company's investor-relations department, sent an e-mail to four analysts on April 18 spelling the put options out clearly.
>
> In the e-mail, Ms. Martin said Vivendi had 18 million put options outstanding that the company sold to undisclosed parties for 12 euros each and that carry an exercise price of 69 euros. She estimated the impact on the company's balance sheet at 50 million euros to 1.2 billion euros. The e-mail went on to say that, though previously raised at the [March 6, 2002] accounting workshop, the put options "were easy to miss."

(iv)    Still, Martin's "selective disclosure" failed to state the timetable for Vivendi's future obligations, preventing analysts and investors from making a reasonable assessment with regard to Vivendi's cash flow for the immediate future. In addition, Ms. Martin's range of potential liability was rendered meaningless by its impossibly large scope and failure to reference when the obligation would come due.

(v)     It was therefore not until May 28, 2002, in its 2001 20-F, that Vivendi began to inform investors about its true potential adverse effects ensuing from the put options:

> Except for one put sold in 1998, Vivendi Universal in 2001 sold puts to banks on 19.7 million ordinary shares at exercise prices ranging from €60.40 to €80.00 in 2002 and 3.1 million ordinary shares at an exercise price of 50.50 in January 2003. As of April 30, 2002, approximately 16 million of these puts remain outstanding. * * *
>
> Vivendi Universal's contingent liability relating to these puts is approximately €1.1 billion to settle the

16 million puts outstanding for cash at an average of €69 per put and approximately €540 million to settle the 16 million puts outstanding for cash by paying the banks the difference between the average of €69 per put and the market price per ordinary share of Vivendi Universal as of April 30, 2002.

(vi)     A later June 8, 2002 article in the *Economist* reported that Hannezo had confirmed that Vivendi was using cash each month to buy out the costly put options.

(vii)     In its 2002 half year financial statements released August 14, 2002, Vivendi disclosed the impact its put obligations had during the first six months of 2002 alone, noting the €239 million resulting expense.

**The Magnitude Of The Undisclosed Liquidity Problem**

267.     As subsequently reported by the *Wall Street Journal* in an article entitled <u>Damage Control:  How Messier Kept Cash Crisis at Vivendi Hidden For Months — Media Giant Was a Risk Well Before Investors Knew</u> and dated October 31, 2002, Vivendi's acquisition spree, together with the other factors referenced in the preceding paragraphs, had put Vivendi on the brink of catastrophe:

On Dec. 13, [2001], Guillaume Hannezo sent Jean-Marie Messier, chairman of Vivendi Universal SA, a desperate handwritten plea.

"I've got the unpleasant feeling of being in a car whose driver is accelerating in the turns and that I'm in the death seat," wrote Mr. Hannezo, the company's chief financial officer.  "All I ask is that all of this not end in shame."

That very day, unknown to investors and the Vivendi board, the company had narrowly averted a downgrade by credit-rating agencies, which would have made it difficult to borrow money and plunged the company into a cash crisis.  Mr. Hannezo (pronounced AN-ZO), implored his boss and longtime friend to take serious steps to reduce Vivendi's ballooning debt.

When the company's board met the next day to consider whether to approve a roughly $10 billion acquisition of USA Networks Inc.'s TV and film businesses, Mr. Messier made no mention of the close call with the rating agencies. Instead, when a director asked about Vivendi's financial profile, Mr. Messier said the company had no problem, according to two directors who were there.

The board endorsed the USA Networks deal, buying Mr. Messier's pitch that it would help complete Vivendi's transformation from a onetime water utility into an entertainment giant. He boasted that the company would be able to distribute the movies and music made by its Universal Studios and Universal Music units by means of cellular devices, as well as by satellite, cable and pay television.

But Vivendi was already in dire financial straits. The USA Networks deal, along with a $1.5 billion investment in satellite-TV operator EchoStar Communications Corp., in fact signaled the beginning of the end for Mr. Messier. The boy wonder of the French business establishment was ousted seven months later in, July, after directors discovered the company was skirting close to a bankruptcy filing.

As new management struggles to salvage the French conglomerate, it has become clear that Vivendi came close to financial disaster far earlier then previously thought. ***That picture is starkly at odds with the one repeatedly presented by Mr. Messier to investors and his board.*** [emphasis added]

268.     Similarly, citing an article first appearing in *Le Monde*, *Bloomberg* reported on

May 14, 2002 that Vivendi was close to insolvency at the end of 2001:

Vivendi Universal SA, the world's second-largest media company, was close to insolvency at the end of 2001 after delays in planned asset sales, French daily Le Monde said, without citing anyone.

Delays in the sale of the Seagram liquor unit and a French magazine business caused a "serious cash crisis" at the Paris-based company, which faced payments of about 10 billion euros ($9 billion) at the end of last year, the paper said. Today, Vivendi's businesses "barely produce the cash needed to pay the bills," according to the report.

* * *

> Vivendi's cash woes help explain why the company sold 55 million of its own shares in January, 9 percent of Vivendi Environment SA, as well as its stake in AOL Europe and British Sky Broadcasting Plc, Le Monde said. Since the beginning of the year, Vivendi shares have lost half their value.

269.    Although Defendants denied any pending liquidity crisis in response to the *Le Monde* report and reassured investors during the spring and early summer of 2002 that Vivendi could meet its obligations for the next 12 months, in reality the Company continued to teeter on the edge of bankruptcy. As the October 31, 2002 *Wall Street Journal* article further reported:

> In May [2002] Fehmi Zeko, head of the media group for Citigroup's Salomon Smith Barney investment bank, met with Mr. Bronfman in New York and told him what the bank had learned during its financial analysis in Paris. By then, news of Vivendi's costly put-option obligations had surfaced in the press, and Moody's Inventors' Service had downgraded Vivendi's debt to just a notch above "junk" level.

> After the meeting, Mr. Bronfman phoned Mr. Hannezo, who denied there was a problem, according to people familiar with the conversation. Mr. Bronfman nevertheless insisted that Vivendi bring in an outside firm to analyze its cash situation. At a meeting in New York on May 29, the board hired Goldman Sachs.

> **On June 24, the eve of Vivendi's next board meeting in Paris, Goldman Sachs bankers gave a detailed rundown of their conclusions to Vivendi's top executives and a handful of directors, including Mr. Bronfman, according to people familiar with the situation. The investment bank outlined four scenarios, one of which showed Vivendi having to file for bankruptcy protection as early as September or October. That day Vivendi's share price dropped 23%.**

> After Goldman Sachs grim presentation, Mr. Messier asked Mr. Bronfman to come to his office. Mr. Bronfman told Mr. Messier he should resign, as it was now clear Vivendi faced a severe cash crisis, according to a person familiar with the conversation.

> \* \* \*

> At the COB's request, Mr. Messier put out a detailed debt-and-liquidity statement the next morning, June 26. **Echoing four upbeat press releases he had issued in previous weeks, Mr.**

> **Messier said, "Vivendi Universal is confident of its capacity to meet its anticipated obligations over the next 12 months."** That afternoon he told analysts on a conference call that he planned to remain Vivendi's chairman for 15 more years.

> \* \* \*

> **At a French parliamentary hearing last month, Jean-Rene Fortou, Vivendi's new chairman, was asked about Vivendi's finances when he took the company's reins July 3. "Well, if Mr. Messier had stayed, the company would have gone bankrupt within 10 days," he said.** [Emphasis added.]

270.    Similarly on September 27, 2002, the *AFX News* reported:

> Vivendi Universal chairman Jean-Rene Fourtou said the company would have been forced to declare bankruptcy within 10 days if Jean-Marie Messier had not resigned, according to a report in Le Figaro.

271.    On December 13, 2002, the *Associated Press* reported, based on an article first appearing in *Le Monde*, that defendant Hannezo admitted that 2001 was marked by a series of errors, including underestimating the debt problem:

> Electronic mail seized in a probe of alleged financial irregularities at Vivendi Universal and other documents show a bitter climate of tension amid a growing debt crisis that led to the fall of flamboyant Chairman Jean-Marie Messier.

> Board member Edgar Bronfman Jr., of Canada's Seagrams empire, bought out by Vivendi, warned Messier in an e-mail that he could be courting danger with his "very costly personal shows," according to Friday's edition of the newspaper Le Monde.

> And former Financial Director Guillaume Hannezo, in a note to France's stock exchange watchdog, said Messier had turned Vivendi into a "permanent deal machine," while an "urban guerrilla atmosphere" gripped a divided board, the newspaper said.

> \* \* \*

> Hannezo, the former finance director, said in his 20-page report to the COB that 2001 was marked by the "accumulation of a series of errors," including underestimating the debt problem, according to Le Monde.

* * *

Hannezo, a key figure in the COB investigation, speculated that Vivendi could have been spared its debt mountain in 2001 "had it resolved to sell before buying . . . Unfortunately, it oriented itself toward the inverse choice, satisfying itself with potential riches," he wrote. Vivendi's shares tumbled around 75 percent this year.

## ADDITIONAL SCIENTER ALLEGATIONS

272.    Throughout the Relevant Time Period, Defendants intentionally, or at the very least recklessly, made materially false and misleading statements and concealed material information regarding Vivendi's financial condition, as alleged herein. Many of the misstatements and omissions were the results of intentional deception and intentional violations of GAAP by Defendants, for the purposes of boosting Vivendi's common share and ADS prices.

273.    As set forth elsewhere herein in detail, Messier and Hannezo – by virtue of their receipt of information reflecting the true facts regarding Vivendi, their control over and/or receipt and/or associations with the Company that made them privy to confidential proprietary information concerning Vivendi – were active and culpable participants in the fraudulent scheme alleged herein. The Individual Defendants knew and/or recklessly disregarded the false and misleading nature of the information that they caused to be disseminated to the market and to Plaintiff.

274.    Vivendi is charged with the knowledge possessed by its senior officers, including Messier and Hannezo.

275.    Messier's and Hannezo's intentional misconduct included, *inter alia*, authoring and enforcing improper accounting practices and demanding that Vivendi's employees misapply GAAP in order to mask the liquidity and cash flow situation that Vivendi was suffering.

276.    During the Relevant Time Period, Messier and Hannezo signed Vivendi's Forms 20-F, Annual Reports and/or Forms 6-K with knowledge that they falsely represented Vivendi's financial results, or with reckless disregard for their truth or falsity.

277.    By mid-December 2001, Defendants knew that Vivendi had just narrowly avoided a downgrade in its investment status by the credit rating agencies that, had it happened, would have nearly eliminated Vivendi's cash and would have deleteriously impacted the Company's ability to borrow more funds from its credit facilities for further acquisitions.  In fact, it was that near downgrade that gave Hannezo the "unpleasant feeling of being in a car whose driver is accelerating in the turns" with him in the "death seat," and led him to implore Messier that "all of this not end in shame."  Nevertheless, Messier chose to not mention the narrowly-averted credit rating downgrade when urging Vivendi's Board of Directors to approve the $10 billion acquisition of USA Networks' television and film business just two days later, and both he and Hannezo continued to sign off on Vivendi's false disclosures about, *inter alia*, its cash and liquidity situation.

278.    Additional evidence of Defendants' scienter is the fact that, even though Vivendi claimed in its March 5, 2002 earnings release that, based on the Company's "excellent" operating results, it would pay a €1 per share dividend, Vivendi had had to borrow against credit facilities to pay the dividend, which cost more than €1.3 billion after French corporate taxes on dividends.  Similarly, despite stating in Vivendi's June 26, 2002 press release that it had "around €3.3 billion in unused credit lines . . . to back up its commercial paper outstanding of nearly €1 billion" and that the cash situation had greatly improved since the beginning of the year, just one day before Vivendi issued that press release, at least €900 million of the €3.3 billion in Vivendi credit lines had expired, and Vivendi's cash situation had in fact worsened as a result of a

demand made weeks earlier by Cegetel's minority shareholders for the repayment of a current account pursuant to which Cegetel made its excess cash available to Vivendi.

279.    The magnitude of the impact of Defendants' fraud also strongly evidences Defendants' intentional or reckless conduct.  As set forth above, the revelation of Vivendi's truly dismal liquidity situation – including a €19 billion debt burden – caused it to teeter on the edge of bankruptcy, dried up its credit lines, caused its credit ratings to crumble, triggered its credit facility covenants' ratings thresholds, and led its lenders to refuse to extend to Vivendi sorely needed fresh credit.  Vivendi itself admitted that it faced having to reduce its debt by billions of euros in order to achieve an acceptable capital structure.  This cash and liquidity crisis did not happen overnight but, rather, was the direct result of Defendants' deliberate, steady collision course driven by their insatiable appetite for more acquisitions and the attendant prestige, power and money that would inure to them as the world's leading media and entertainment group.  The extent of the crippling debt load, which Vivendi only first started to publicly admit it was bearing in July 2002, directly belied the financial picture that Defendants presented to the securities markets during the Relevant Time Period.

280.    Defendants' scienter is further evidenced by the fact that, commencing immediately on the heels of the disclosure that the company's viability going forward was threatened absent a "fire sale of its assets," new management rapidly downsized the Company, sold off major assets and restructured it.  *See* ¶ 254 above.  Those actions demonstrate the extent of the bloat, waste and excess caused by Defendants' hunger for a global empire that they built by means of a fraudulent scheme that misled investors about Vivendi's financial condition, cash and cash flow positions, and liquidity situation.

281.    In the arbitration proceedings brought by Messier to enforce the terms of his termination agreement with Vivendi, Vivendi itself stated that Messier caused Vivendi's near collapse.  In addition, as reported by the Associated Press on December 13, 2002, Hannezo admitted that "2001 was marked by 'the accumulation of a series of errors,' including underestimating the debt problem."  Further, Vivendi's new CEO also admitted at a French parliamentary hearing in September 2002 that had Messier remained CEO of Vivendi beyond July 3, 2002, Vivendi would have gone bankrupt "within 10 days."

282.    The criminal, civil and regulatory authorities in the United States and in France (including the SEC, the United States Attorney's Office, public prosecutors in Paris and the COB) that investigated and/or commenced proceedings against Defendants all focused on the same question: whether Vivendi, Messier, Hannezo and other Vivendi executives misled investors with overly rosy assessments of the Company's financial health.  As a result of its investigation, the SEC found that Vivendi, Messier and Hannezo violated the federal securities laws, including Section 10(b) of the Exchange Act.  The French Financial Markets Authority concluded that Vivendi had committed irregularities in its financial disclosures and fined Vivendi and Messier €1 million each for making misleading financial disclosures between 2000 and 2002.

283.    Messier and Hannezo had the motive and opportunity to commit fraud because they had the means and the likely prospect of achieving concrete benefits from their fraudulent conduct.  Messier wanted Vivendi to be a worldwide empire and Vivendi was on an unrelenting quest to maintain and expand its enterprise.  In total, Vivendi spent over $75 billion in pursuit of Messier's ambition to create the world's number-one entertainment company through rapid acquisitions of companies in the United States and abroad, using Vivendi's securities

consideration. Defendants achieved that objective by artificially maintaining the value of Vivendi's common shares and ADSs and by propping up their price through the dissemination of the materially false and misleading statements described in detail above. In addition, Vivendi's ability to maintain positive credit ratings and thereby to obtain additional financing for further acquisitions depended on Defendants' fraudulent scheme. Vivendi's global reach could not have been achieved *without* Defendants' fraudulent inflation of Vivendi's share price.

284.    Messier had an even greater motive for inflating the appearance of Vivendi's financial performance from which he derived concrete benefit by virtue of his fraudulent conduct: his bonus was pegged to Vivendi achieving specific earnings results, stock options and other perks such as a personal assistant, security guards and the use of a $17 million Park Avenue penthouse at below market rate. As reported in Vivendi's 2001 20-F, Messier received 835,000 stock options and earned $4.8 million in compensation. Of that amount, more than $3 million – two-and-a-half times his salary – comprised his bonus, which he received because Vivendi's EBITDA had increased that year by more than 30%. Had Vivendi's earnings increased by more than 35%, Messier would have received three times his base salary as a bonus. Hannezo likewise received extremely lucrative compensation and remuneration that was dependent upon the Company's achievement of certain financial targets. By manipulating the Company's accounting to create the illusion that those targets had been achieved, Messier and Hannezo created an entitlement to bonuses they would not have received if the Company's financial results had been accurately reported.

285.    As CEO, Messier was the public voice of Vivendi and was therefore in a position to communicate, as he did during conference calls and in press releases and other public documents, false and misleading statements concerning the Company's financial condition, its

compliance with GAAP and the veracity of its financials. Messier signed or authorized all of the

Company's SEC filings, Annual Reports and press releases during the Relevant Time Period.

Hannezo signed many of the Company's SEC filings and Annual Reports, as alleged herein.

Further, Hannezo oversaw the Company's accounting and financial reporting, was responsible

for creating and approving accounting policies and procedures, and was directly involved in the

preparation of the Company's financial statements. Thus, Messier and Hannezo had the ability

to control the Company's accounting as well as the content of its financial statements and

disclosures. Both had the motive and the opportunity, which they took, to commit fraud.

286.    Vivendi had an obvious opportunity to commit fraud, because it published and

controlled the content of its own financial statements and other public statements, and because it

controlled its own accounting and financial reporting functions, by which the fraud was

perpetrated.

287.    Messier's and Hannezo's scienter is further evidenced by their clandestine insider

trading during the Relevant Time Period. According to an article in The Wall Street Journal

dated January 24, 2003, Messier and Hannezo (and other senior executives of Vivendi that were

part of Messier's "dream team") exercised options and sold stock days before an abrupt, huge

share placement in the first weeks of 2002 by Vivendi that Messier had arranged to raise

desperately needed cash. That transaction sent Vivendi's common share and ADS price

crashing. Specifically, as reported by *The Wall Street Journal*, on or about December 28, 2001,

just days after writing the "death seat" memo and before the stock sale transaction, Hannezo

exercised stock options that earned him a profit of €1.3 million ($1.4 million). An April 11,

2003 article in *The Wall Street Journal* reported that Vivendi acknowledged that Messier also

sold 152,000 shares on December 21, 2001 and 106,669 shares on December 27, 2001. In

addition, Agnes Touraine, head of Vivendi Universal Publishing, and Catherine Gros, chief of

Vivendi's communications department, also exercised stock options at or around the same time.

Shortly thereafter, on or about January 7, 2002, Vivendi unexpectedly sold 55 million shares of

treasury stock in a €3.3 billion deal.  Given their top roles at the Company, Messier and Hannezo

and these other executives knew or were in a position to know about that transaction.  The

market reaction to the sale caused the Company's share price to tumble, but not before Messier,

Hannezo and their cronies had the chance to exercise stock options at a profit.  It was not until

April 2003 when Messier admitted for the first time that in late 2001 he had sold a huge number

of Vivendi shares, worth at least €15 million.

288.    Had the conduct set forth above been taken into account when Hannezo's bonus

for 2001 was calculated, that bonus would have been reduced by approximately $148,000.

## APPLICABILITY OF PRESUMPTION OF
## RELIANCE AND FRAUD-ON-THE-MARKET DOCTRINE

289.    At all relevant times, the market for Vivendi's securities was an efficient market

for the following reasons, among others:

> (a)    Vivendi's ADSs met the requirements for listing, and were
> listed and actively traded on the NYSE, a highly efficient and
> automated market.  Vivendi's ordinary shares actively traded
> on the Paris Bourse;
>
> (b)    As a regulated issuer, Vivendi filed periodic public reports
> with the SEC and the COB;
>
> (c)    Vivendi regularly communicated with public investors via
> established market communication mechanisms, including
> through regular dissemination of press releases on the national
> circuits of major newswire services and through other wide-
> ranging public disclosures, such as communications with the
> financial press and other similar reporting services; and
>
> (d)    Vivendi was followed by several securities analysts employed
> by major brokerage firms who wrote reports which were
> distributed to the sales force and certain customers of their

respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

290.   As a result of the foregoing, the market for Vivendi's securities promptly digested current information regarding Vivendi from all publicly available sources and reflected such information in Vivendi's stock price. Under these circumstances, all purchasers of Vivendi's ADSs during the Relevant Time Period (including Plaintiff) suffered similar injury through their purchase of Vivendi's securities at artificially inflated prices, and a presumption of reliance applies as to claims arising under Section 10(b) of the Exchange Act.

291.   At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff, as well as other members of the investing public. As described herein, during the Relevant Time Period, Defendants made or caused to be made a series of materially false or misleading statements about Vivendi's business, prospects, operations and financial condition. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Vivendi and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. During the Relevant Time Period, in ignorance of the true financial condition of Vivendi, Plaintiff purchased or otherwise acquired Vivendi securities at artificially inflated prices. As set forth herein, the market price of Vivendi securities declined materially upon the public disclosure of the true facts which had been misrepresented or concealed, thus causing the damages complained of herein.

## MATERIALIZATION OF DAMAGES/LOSS CAUSATION

292.    Plaintiff repeats and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

293.    As a result of Defendants' dissemination of materially false and misleading information and failure to disclose material facts, the market prices of Vivendi's ADSs and ordinary shares were artificially inflated during the Relevant Time Period.

294.    For example, and without limiting the foregoing, on December 22, 2000, Vivendi issued a press release announcing that it had purchased a 35% stake in Maroc Telecom, S.A. ("Maroc Telecom") for approximately €2.3 billion.  Vivendi failed to disclose in the press release, *inter alia*, the existence of the Maroc Telecom side agreement, discussed in greater detail above at ¶¶ 116, and 182-185, and in particular Vivendi's commitment to pay an additional €1.1 billion in February 2002 for additional shares of Maroc Telecom.  Vivendi also failed to disclose its commitment with respect to Maroc Telecom in its periodic filing with the COB for the period ending June 30, 2001, and in its Form 6-K filed with the SEC on October 17, 2001.

295.    Throughout 2001, as set forth in greater detail in ¶¶ 71-197, above, Vivendi continued to disseminate materially false and misleading information and failed to disclose material facts in press releases and interviews, in SEC filings, and in statements to shareholders and analysts, *inter alia,* in order to maintain the artificially inflated prices of Vivendi securities. During that period as well, Defendant Messier caused Vivendi to spend approximately $6.3 billion in cash in a massive stock buy-back program.  According to the Wall Street Journal, Messier was "[t]rying to prop up the stock price, [but] he instead only sent Vivendi's debt soaring."  By December 2001 Vivendi was running out of cash, according to an October 2002 memo from Defendant Hannezo to the COB.

116

296.    In the first two weeks of December 2001, Defendants Messier and Hannezo and other senior executives at Vivendi had a series of critical meetings with analysts from Moody's and Standard & Poor's, companies that publish independent credit opinions, research and commentary to assist investors in analyzing the credit risks associated with fixed-income securities.  These meetings preceded Vivendi's December 17, 2001 announcement that it would spend almost $12 billion to acquire portions of USA Networks, Inc. ("USA Networks") and Echostar Communications ("Echostar").

297.    Moody's and Standard & Poor's based their rating of Vivendi's credit primarily on the company's debt-to-EBITDA ratio.  Because the USA Networks and Echostar  transactions required Vivendi to spend a large amount of cash and assume additional debt, Vivendi sought "pre-clearance" in the form of assurances from Moody's and Standard & Poor's that the transactions, when announced, would not result in a downgrade of Vivendi's credit rating by those agencies.  Such a downgrade would have made it difficult to borrow money and plunged the company into a cash crisis.

298.    During the meetings with Moody's and Standard and Poor's, Vivendi failed to inform the analysts of certain undisclosed future commitments that would have raised concerns about the company's ability to meet its cash needs, as detailed in ¶¶ 171-195 above.  These undisclosed commitments included the Maroc Telecom side agreement, the terms of Vivendi's current account with Cegetel, and Vivendi's investment in a fund that purchased an additional 2% of Telco's shares.  Vivendi's senior executives knew that if Vivendi had disclosed its obligations to pay an additional €1.1 billion in February 2002 for additional shares of Maroc Telecom, the possibility it would have to repay the Cegetel current account at any time and

certainly no later than July 31, 2002, or its indirect acquisition of additional Telco shares, the credit rating agencies may have declined to maintain their credit rating of Vivendi.

299.    Both Moody's and Standard & Poor's told Vivendi that its debt-to-EBITDA ratio was too high to maintain its investment-grade status.  However, both credit rating agencies also told Vivendi that they would not downgrade its credit rating if Vivendi committed to taking certain debt reduction measures in 2002.  Senior officers of Vivendi assured Moody's and Standard & Poor's that Vivendi would reduce its debt by several billion dollars during 2002.

300.    As a result of these assurances, neither Moody's nor Standard & Poor's downgraded Vivendi after it announced the USA Networks and Echostar transactions.

301.    If the undisclosed future commitments had been revealed, the public would have been alerted to Vivendi's future cash requirements, and the market price of Vivendi's securities would have been lower because of concerns about Vivendi's ability to meet its cash needs.

302.    As Defendant Hannezzo stated to the COB in his October 2002 memo, and as *Bloomberg* reported on May 14, 2002, Vivendi was close to insolvency at the end of 2001.  Vivendi's "cash woes," *Bloomberg* stated, "help explain why the company sold 55 million of its own shares in January [2002]."  In a January 7, 2002 press release, Vivendi announced that it had mandated Deutsche Bank AG and Goldman, Sachs & Co. to sell 55 million treasury shares - about half of the shares Vivendi had bought back just months earlier.  The approximately €3.3 billion ($3 billion) in proceeds, the company stated, were to be used "mostly to reduce the company's debt."

303.    The sale, coming so closely on the heels of Vivendi's massive shares buy-back program raised, concerns in the market that Vivendi had liquidity problems.  Although the

offering price of €60 a share was a 4% discount from the previous day's close, the underwriters failed to sell all of the stock, and were required to take "investment positions" in the Company.

304.    The market price for Vivendi securities fell significantly.  On January 8, Vivendi shares traded for €59.20 each.  By January 30, the share price had dropped to €51.10, with a volume of 15 million shares.  The decline continued and, by February 5, Vivendi shares traded for €46.00 each, down 27% from the beginning of the year.

305.    The true scope of Vivendi's liquidity problems, however, was not fully revealed until months later.  Instead, as detailed in ¶¶ 202-271 and 292-330 and elsewhere, Defendants falsely denied that there was any reason for concern and made affirmative misstatements to the market to attempt to prop up Vivendi's gradually declining share price.  In his February 6, 2002 letter to Vivendi employees, which was posted on the Company's website, Defendant Messier called the drop in Vivendi's share price "unfair," claiming that the share price had "no relation to our performance," and was "a victim of 'rumors and manipulation'" by speculators.  Messier categorically denied that the company had any "hidden risks" or "speculative instruments," and reported that there were no "(bad) surprises" in the 2001 financial results.  These statements were materially false and misleading, and had the intended effect of ensuring that the market prices of Vivendi securities remained higher than they would have been had there been full disclosure of Vivendi's true financial condition.

306.    On April 29, 2002, Vivendi issued a press release announcing its "strong" first quarter 2002 Media and Communications results, and reporting a "strong surge of operational free cash flow, up 159% to 1.4 billion euros, well ahead of expectations."  The release, issued in New York, further reported that "[n]et debt fell from approximately 19 billion euros to approximately 17 billion euros."  The release also reported Media and Communications "revenue

organic growth of 13% to 6.8 billion euros; EBITDA growth, up 18% to 1.1 billion euros; and solid operating income growth, up 37% to 408 million euros."

307.    The April 29, 2002, press release also announced purportedly "strong" results for the first quarter of 2002, including a 12% increase in pro forma consolidated revenue to €13.2 billion.  The release reported that consolidated operating income grew 11% pro forma to €781 million, excluding goodwill amortization.  In the release, Defendant Messier commented that the "consolidated financial results for the quarter demonstrate that Vivendi Universal is delivering on the strategy, goals and targets that we have articulated to our shareholders."  He claimed further that "strong improvement was achieved in cash management, debt reduction, synergies, management development and revenue growth," and announced that "we are lowering our estimate of Media & Communications year-end Debt/EBITDA ratio to less than 3x by December 31, 2002."

308.    The April 29, 2002 press release further touted the Company's allegedly strong cash flow position, stating that "Media and Communications reported: A strong surge of operational free cash flow, up 159% to 1.4 billion euros, well ahead of expectations."

309.    Following the April 29, 2002 press release, Merrill Lynch, in a research report dated April 30, 2002, rated the Company a "strong buy," premised on the Company's allegedly strong financial position.  Specifically, the Merrill Lynch report stated that the "strong buy" recommendation was based, in part, on the fact that "Vivendi has now stated its net debt/EBITDA objective is less than 3x by [the] end [of] 2002. . ."

310.    That same day, April 30, 2002, Vivendi disclosed that it had suffered a €17.01 billion loss in the first quarter of 2002, as it reduced the value of certain acquisitions. The market price for Vivendi shares fell to €36.40. Although the share price had fallen 41% since the

beginning of 2002, it was still artificially inflated as a result of Defendants' material misrepresentations and omissions of material facts regarding the financial condition of the Company.

311.    On May 3, 2002, Moody's lowered the Company's long-term debt rating to Baa3, which is the lowest investment grade, and only one notch above "junk" status assigned to speculative investments.  According to AFX News, the rating downgrade reflected Moody's concern that Vivendi "might not be able to reduce debt as quickly and comprehensively as planned by the company."  In addition, as reported in the October 31, 2002 *The Wall Street Journal* article, news of Vivendi's undisclosed costly put option obligation had begun to surface in the press in May.

312.    That same day, May 3, 2002, Vivendi issued a press release criticizing Moody's decision to downgrade Vivendi's debt, and attempting to downplay its significance.  The Company stated its belief that Moody's had not "fully take[n] into consideration the currently poor market conditions," and "the whole of the debt reduction program planned by Vivendi Universal."  Vivendi also stated that Moody's "decision has no impact on Vivendi Universal's cash situation.  It does not trigger any renegotiation clauses or advance repayments of bank credit lines."

313.    As a result of their efforts to reassure the markets by disseminating false and misleading information, Defendants were able to limit the decline in the price of Vivendi's common stock and ADSs.  Vivendi's ADSs closed down only $1.74 (from $30.67 to $29.07), and Vivendi's common stock closed down only €2,25 (from €33.77 to €31.52) on May 3, 2002.

314.    As set forth in greater detail in ¶ 228 above, on May 6, 2002, the *International Herald Tribune* reported that "a detailed report of the company's accounts filed with U.S.

regulators" on April 15 revealed that if Vivendi's credit rating slips any further," the company "could be forced to unwind billions of dollars in off-balance-sheet derivatives transactions." The *Herald Tribune* report noted that Vivendi had failed to "mention the possibility of accelerated settlement of debt or swap agreements" in its May 3, 2002 press release. The market price of Vivendi shares dropped to €30.00 on May 7, 2002.

315.    On May 30, 2002, Vivendi issued a press release stating that its "cash situation, which, the Company believes, is comfortable — even assuming an extremely pessimistic market — will enable the Company to continue its debt reduction program with confidence and with a view to creating the best possible value for its shareholders." This press release was false and misleading because Vivendi's cash situation was not "comfortable," and Vivendi, Messier, Hannezo and other Vivendi executive officers knew at this time, or were reckless in not knowing, that Vivendi's cash flow was zero or negative.

316.    Indeed, as reported in the October 31, 2002 *Wall Street Journal* article, the Vivendi board, concerned there was a liquidity problem, had hired Goldman Sachs the day before, May 29, 2002, to analyze the company's cash situation.

317.    Vivendi's false press release fooled the market. On May 31, 2002, Vivendi ADSs closed up $1.23, at $31.05 and its common stock closed up €1.52, at €33.60.

318.    On June 24, 2002, Goldman Sachs informed Vivendi's top executives and certain members of the board that Vivendi was in danger of having to file for bankruptcy as early as September or October. That day, Vivendi's share price fell 25%, to €18.75. Goldman Sachs repeated its findings to the full board the next day, June 25, 2002.

319.    The following morning, June 26, 2002, at the request of the French COB, Vivendi issued a press release, which responded to media speculation regarding the Company's liquidity.

In that press release, Vivendi claimed that it had "around €3.3 billion in unused credit lines * * * to back up its commercial paper outstanding of nearly €1 billion. The cash situation has greatly improved since the beginning of the year." Vivendi also claimed that "[o]wing to its strong free cash flow, combined with the execution of the disposals program and potential bond issues, Vivendi Universal is confident of its capacity to meet its anticipated obligations over the next 12 months."

320.    Later that day, June 26, 2002, the *Dow Jones International News* reported, Defendant Messier had opened an investor conference call "with a comment that the company has no hidden, off-balance sheet liabilities and add[ed], 'We feel very confident looking to our debt and cash analysis with all our commitments of the group for the coming 12 months'."

321.    Vivendi's access to credit, however, was much worse than the June 26 press release and Defendant Messier's comments in the investor conference call indicated. In fact, just the day before, on June 25, 2002, at least €900 million of the €3.3 billion in Vivendi credit lines expired. Further, by this date, Vivendi's "cash situation" had not improved since the beginning of the year, but rather had worsened as a result of a demand made weeks earlier by Cegetel's minority shareholders for the repayment of a current account pursuant to which Cegetel made its excess cash available to Vivendi.

322.    Vivendi's June 26, 2002 press release and subsequent comments by Defendant Messier, however, had reassured a number of market analysts. For example, on June 27, 2002 Merrill Lynch issued a "strong buy" recommendation for the Vivendi stock, stating its belief that "the rapid share price fall of some 25% in the last two weeks is unwarranted," and its expectation that "ongoing deleveraging and improving confidence in the company's short term liquidity position should begin to revive interest in the shares."

323.    As stated by the SEC in its December 23, 2003 complaint, at ¶ 34,

> Defendants' attempts to reassure the market and to deny that
> [Vivendi] had any liquidity problems were materially misleading.
> Defendants knew, or were reckless in not knowing, that Vivendi's
> financial condition was precarious and that there was significant
> risk that it would experience the liquidity crisis that occurred in
> July 2002.

324.    Defendants' June 26, 2002 statements, which were identified by the SEC as

"materially misleading," buoyed the market prices of Vivendi securities.  On July 1, 2002,

Vivendi's shares were trading at €23.90, an artificially inflated price.

325.    On July 2, 2002, Vivendi's debt was downgraded again amid reports that the

Company was in danger of default.  According to one published report, the downgrade "sparked

near-panic selling in Paris" that caused Vivendi shares to plunge 25% for the day, to a new 15-

year trading low of €17.8, on a volume of almost 55 million shares.  The same credit agency

report also disclosed that Vivendi's financial obligations in 2002 could be as much as $3 billion

more than – or approximately twice as large as – what most analysts had expected.

326.    Defendant Messier still persisted in his efforts to cover up the full extent of

Vivendi's cash flow problems and accounting irregularities.  That same day, July 2, 2002,

*Bloomberg* reported that Defendant Messier "told employees in an e-mail that while he may have

gone 'too fast, too far,' there are 'no hidden risks' in the company's accounting."

327.    On July 3, 2002, the Vivendi board forced the CEO, Defendant Messier, to resign.

Panic selling continued, and the prices of Vivendi ADSs and ordinary shares collapsed even

further, falling to as low as $13.40 and €13.90 and closing at $15.66 and €13.90, respectively, on

huge volume with tens of millions of shares.  The board obtained Defendant Hannezo's

resignation a few days later.

328.    On July 3, 2002, Vivendi's new management published a press release acknowledging that the Company has "a short-term liquidity issue." The release further disclosed that, by the end of the month, Vivendi had to repay creditors €1.8 billion, and that €3.8 billion in credit lines were up for renegotiation.

329.    Defendants, however, still did not disclose Vivendi's true financial condition. The public was not yet aware that Defendants were engaging in improper accounting practices that resulted in a material overstatement of Vivendi's reported earnings. Nor had Vivendi yet disclosed the full extent to which it was suffering from a growing liquidity crisis, and how adversely that crisis would affect it.

330.    In addition, Defendant Messier still refused to admit any wrongdoing. On July 3, 2002, the day of his ouster, Defendant Messier was quoted in *The Columbian* as stating that there were "no underestimated liabilities" and "no overvalued assets" on Vivendi's financial statements, and that the Company's previously reported financial results were all "true, genuine and complete." Vivendi's stock price began to rebound, hitting €18.20 on July 18, 2002. The stock closed at €15.90 on August 13.

331.    On August 14, 2002, Vivendi's true financial condition was finally disclosed. The Company's new management stated that, pursuant to French GAAP, Vivendi suffered a €12 billion new loss for the first half of 2002 and would take an €11 billion goodwill write-down of depreciated assets. Vivendi also reported that it would have to sell approximately $10 billion in assets in an effort to reduce its debt, which significantly diminished the earnings capacity of the Company. As the *Associated Press* reported on August 14, 2002, Vivendi's new chairman, Mr. Jean-Rene Fortou, admitted that "[w]e are facing a liquidity problem."

332.    In response to these further stunning developments, on August 14, 2002, the market price of Vivendi common stock plunged nearly another 25% from its close the previous business day, closing at €11.89.  The market price of Vivendi's ADSs suffered a similar decline, closing down $3.67 at $11.66.

333.    The closing price of $11.66 on August 14, 2002 for Vivendi's ADSs represented a stunning decline of more that $44.00 per ADS (or 79%) from the inflated levels at which they had traded at the beginning of 2002, and an incredible and near total collapse of $63.84 per ADS – or more than 85% -- from its inflated Relevant Time Period high (in January 2001) of $75.50 per ADS.  The price of Vivendi's common stock suffered similarly shocking declines.  It had become clear that Vivendi would never again be a large-growth company, as Defendants had portrayed it throughout the Relevant Time Period.

334.    Throughout the Relevant Time Period, Defendants were aware of material non-public information concerning Vivendi's fraudulent conduct (including, *inter alia*, its dissemination of false and misleading accounting statements).  Throughout this period, Defendants willfully and knowingly concealed this adverse information, and Plaintiff's damages were the foreseeable consequence of Defendants' concealment of this information.

335.    At all relevant times, the material misrepresentations and omissions of Defendants particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff, as well as other members of the investing public.  As described herein, during the Relevant Time Period, Defendants made or caused to be made a series of materially false or misleading statements about Vivendi's business, prospects, operations and financial condition.  These material misstatements and omissions created in the market an unrealistically positive assessment of Vivendi and its business, prospects and

operations, causing the Company's securities to be overvalued and artificially inflated at all relevant times.

336.    Unaware of the true financial condition of Vivendi, Plaintiff purchased and/or acquired Vivendi securities in reliance on the integrity of the market price of those securities and/or upon the public statements drafted, issued, prepared and/or disseminated by Defendants, and Defendants manipulated the price of Vivendi securities through their misconduct as described herein.  Each time information regarding Vivendi's true financial condition was partially and/or fully disclosed, the share price of Vivendi stock fell significantly, and Plaintiff suffered economic losses as a direct and proximate result of Defendants' misconduct.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

337.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  Moreover, the specific statements pleaded herein were not "forward looking statements" when made, but rather were untrue statements of historical facts or events.  To the extent that any of the statements identified herein as materially false and misleading are held by the Court to be forward-looking statements, there were no meaningful cautionary statements identifying important then-present factors that could, and indeed did, cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those materially false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was

authorized and/or approved by an executive officer or director of Vivendi who know that those statements were false when made.

## CLASS ACTION TOLLING

338.    Plaintiff did not know, and could not reasonably have discovered before – at the earliest – July 2, 2002 that Vivendi's financial statements and Defendants' other public statements regarding the Company's financial condition were materially false and misleading. On that date, Vivendi's debt, which had been downgraded to one notch above "junk" status on May 3, 2002, was downgraded for a second time, sparking near-panic selling in Paris.  This selling frenzy crushed Vivendi's common share prices, causing the stock to drop 25% to a new 15-year low of €17.80.  Following his July 2, 2002 ouster, Messier continued to deny any wrongdoing, steadfastly maintaining that the Company's financial results were all "true, genuine and complete."

339.    These attempts to reassure the market, however, would ultimately prove futile. On August 14, 2002, Vivendi was at long last forced to reveal its financial woes, announcing that it had suffered a massive $12 billion loss in the first half of 2002 and that it would have to sell $10 billion in assets to reduce its debt.  Jean-Marie Fortou, Messier's successor, flatly admitted, "Vivendi Universal is facing a liquidity problem."

340.    Prior to – at the earliest – July 2, 2002, the statutes of limitations on Plaintiff's claims were tolled by Defendants' active and continuing concealment of the falsity of their statements.  Further, the statutes of limitations on Plaintiff's claims were again tolled beginning on July 18, 2002, due to the filing of a securities class action complaint on that date in Rosenbaum Partners, L.P. v. Vivendi Universal, No. 02 Civ. 5571 (now pending as the Securities Class Action).  Plaintiff was a member of the putative class in that action, which asserts claims

against Vivendi and Messier pursuant to Section 10(b), Rule 10b-5 and Section 20(a) of the Exchange Act.  Those claims arise out of the same facts and circumstances as the claims in this Complaint.

341.    By Order dated May 21, 2007, the Court ruled on the Plaintiff's motion for class certification in the Securities Class Action.  The Court certified a class of all purchases of Vivendi securities located in the United States, England, France and The Netherlands.  Accordingly, the statutes of limitations on Plaintiff's claims remained tolled between July 18, 2002 and May 21, 2007.

342.    All of Plaintiff's claims have been brought within the applicable statutes of limitations, after giving effect to tolling and the relation-back doctrine.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder Against All Defendants

343.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

344.    This Count is asserted against all Defendants for violations of Section 10(b) of the Exchange Act 15 U.S.C. ¶ 78(j)(b) and Rule 10b-5, 17 C.F.R. ¶ 240.10b-5 promulgated thereunder.

345.    During the Relevant Time Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Relevant Time Period did:  (i) deceive the investing public, including Plaintiff, as alleged herein; (ii) enable Vivendi to complete several acquisitions, as described herein, using its artificially inflated securities as currency; and (iii) cause Plaintiff and other members of the investing public to purchase Vivendi's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan

and course of conduct, defendant Vivendi and the Individual Defendants, and each of them, took the actions set forth herein.

346.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Vivendi's ADSs and ordinary shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

347.    Defendants, individually and in concert, directly or indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Vivendi as specified herein.

348.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Vivendi's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Vivendi and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a

course of business which operated as a fraud and deceit upon the purchasers of Vivendi ADSs and ordinary shares (including Plaintiff) during the Relevant Time Period.

349.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts:  (i) the Individual Defendants were high-level executives and/or directors at the Company during the Relevant Time Period and members of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

350.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Vivendi's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' misstatements of the Company's business, financial condition, operations and growth throughout the Relevant Time Period, Defendants, if they did not have

actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to

obtain such knowledge by deliberately refraining from taking those steps necessary to discover

whether those statements were false or misleading.

351.    As a result of the dissemination of the materially false and misleading information

and failure to disclose material facts, as set forth above, the market price of Vivendi's ADSs and

ordinary shares were artificially inflated during the Relevant Time Period.  In ignorance of the

true financial condition of Vivendi, Plaintiff, relying on the integrity of the market and/or on the

statements and reports of Defendants containing the misleading information, purchased or

otherwise acquired Vivendi securities at artificially inflated prices from at least October 30, 2000

to August 14, 2002.  The market price of Vivendi securities declined materially upon the public

disclosure of the true facts which had been misrepresented or concealed as alleged herein.

352.    Had Plaintiff known the truth concerning the misrepresented and omitted facts

described above, they either would not have purchased or otherwise acquired their Vivendi

securities at all, or would have done so only at substantially lower prices.

353.    As a direct and proximate cause of Defendants' active and primary participation

in Vivendi's scheme to defraud the investing public by, among other things, concealing the fact

that Vivendi's operations and financial condition were dramatically weaker than what their

public statements portrayed, Plaintiff suffered damages.  Plaintiff purchased and/or acquired

Vivendi securities in reliance on the integrity of the market price of those securities and/or upon

the public statements drafted, issued, prepared and/or disseminated by Defendants, and

Defendants manipulated the price of Vivendi securities through their misconduct as described

herein.  Furthermore, Defendants' misconduct proximately caused Plaintiff's losses.  Each time

information regarding Vivendi's true financial condition was partially and/or fully disclosed, the

share price of Vivendi stock fell significantly, and Plaintiff suffered economic losses as a direct and proximate result of Defendants' misconduct.  Plaintiff's damages were a direct and foreseeable consequence of Defendants' failure to disclose and their concealment of, *inter alia*, the true state of the business operations and financial condition of Vivendi.

354.    Throughout the Relevant Time Period, Defendants were aware of material non-public information concerning Vivendi's fraudulent conduct (including, *inter alia*, its dissemination of false and misleading accounting statements).  Throughout this period, Defendants willfully and knowingly concealed this adverse information, and Plaintiff's damages were the foreseeable consequence of Defendants' concealment of this information.

### COUNT II

**Violations of Section 20(a) of the
Exchange Act Against the Individual Defendants**

355.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

356.    The Individual Defendants acted as controlling persons of Vivendi within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operation and/or intimate knowledge of the false and misleading statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after

these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

357.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

358.    As set forth above, Vivendi and the Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered damages in connection with its purchases of the Company's securities during the Relevant Time Period.

## COUNT III

### Common Law Fraud
### and Deceit Against All Defendants

359.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

360.    Vivendi and the Individual Defendants were required to present the Company's financial condition in a fair and accurate manner in, among other documents, reports that Vivendi was required to file with the SEC and in press releases and public statements.

361.    As detailed herein, Defendants made materially false and misleading representations of fact, or omitted to state material facts which they had a duty to disclose to Plaintiff and the investing public regarding the Company's financial results and then-existing business condition.

362.    The Individual Defendants knew or had access to material, adverse non-public information about Vivendi and, *inter alia*, its operations and financial results, which were not disclosed.  Both of the Individual Defendants drafted, reviewed and/or approved the misleading statements, press releases, reports and other public representations about the Company identified in this Complaint.

363.    When making the false and misleading representations, Defendants knew that they were false or made them with reckless disregard for the truth and as a positive assertion. Defendants made and/or caused to be made the false and misleading representations with the intent that they be acted upon by others, including most particularly investors and potential investors in Vivendi (including Plaintiff).

364.    The aforesaid misrepresentations and omissions by Defendants constitute fraud and deceit under applicable law.

365.    Plaintiff, relying on the integrity of the market and/or on the statements and reports of Vivendi and the Individual Defendants containing the misleading information, purchased Vivendi securities at artificially inflated prices.

366.    Plaintiff acted in justifiable reliance on Defendants' false and misleading representations, without knowing that they were false, when making investment decisions regarding Vivendi securities.  The materially false and misleading statements by Defendants also induced Plaintiff to retain their Vivendi securities.

367.    At the time that Plaintiff purchased and/or held Vivendi securities, they did not know of any of the false and misleading statements and omissions, and justifiably relied upon the representations made by Defendants in purchasing and/or retaining such securities.  Plaintiff justifiably relied upon the relied on the misrepresentations in the Company's SEC filings, press

releases, and other public statements in purchasing and/or retaining their holdings

of Vivendi securities.

368.    As a direct and proximate result of the fraud and deceit of Defendants, Plaintiff

suffered injury.

## COUNT IV

### Aiding and Abetting Common Law
### Fraud Against the Individual Defendants

369.    Plaintiff repeats and re-alleges each and every allegation contained in the

foregoing paragraphs as if fully set forth herein.

370.    As alleged herein, Defendants committed common law fraud and deceit by

making material false and misleading representations of fact, or omitting to state material facts

which it had a duty to disclose, to Plaintiff and the investing public.

371.    As previously set forth herein, the Individual Defendants aided and abetted this

fraud by knowingly and substantially assisting in the fraud, with knowledge or reckless disregard

that their actions were part of an overall fraudulent scheme.  The Individual Defendants'

assistance included, *inter alia*, preparation and/or review and approval of documents containing

false and misleading statements, or omitting material information, for the purpose of enabling the

Company to inflate its operating results and earnings.

372.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff

suffered injury.

## COUNT V

### Common Law Negligent Misrepresentation
### Against all Defendants

373.    Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein, except allegations that the Defendants made the untrue statements of material facts and omissions intentionally or recklessly.  For purposes of this claim, Plaintiff asserts only strict liability and negligence claims and expressly disclaims any claim of fraud or intentional misconduct.

374.    This claim is brought by Plaintiff against Defendants under common law principles of negligence.

375.    Defendants made materially false and misleading statements, as set forth above, regarding, *inter alia*, the financial condition and the accounting policies and practices of the Company.

376.    Defendants knew, or should have known in the exercise of reasonable care, that their statements regarding the Company's financial statements and accounting policies and practices during the Relevant Time Period were materially false and misleading.

377.    Defendants owed Plaintiff a duty of reasonable care in connection with the provision of information concerning Vivendi's financial condition.  Defendants Vivendi, Messier and Hannezo breached this duty by including in Vivendi's financial statements untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

378.    Plaintiff, as investors, were entitled to reply upon, and were justified in relying upon, the representations made by Defendants, set forth above, regarding the Company's financial statements, accounting policies and practices, and compliance with GAAP.  Plaintiff

relied on the superior knowledge and expertise of Defendants and justifiably relied to its detriment on Defendants' representations when deciding to purchase and refrain from selling Vivendi's securities.

379.     As alleged above, Defendants materially misrepresented Vivendi's financial results and its compliance with GAAP throughout the Relevant Time Period.

380.     Plaintiff had no knowledge of the false and misleading nature of Defendants' statements when purchasing and/or acquiring and refraining from selling Vivendi's securities, and believed them to be true.  Had Plaintiff been aware of the true facts, they would either not have purchased or acquired Vivendi's securities, or would not have purchased the securities at inflated prices.

381.     As a direct and proximate result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Vivendi's securities was artificially inflated and Plaintiff sustained damages in connection with its purchases and holding of Vivendi's securities when the price of the securities declined.

382.     Defendants' conduct constitutes the making of negligent misrepresentations (including negligent omissions to state facts in connection with statements that were made) under applicable state law.

**COUNT VI**

**Unjust Enrichment**
**Against All Defendants**

383.     Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

384.     Defendants' scheme to hide Vivendi's liquidity crisis and artificially inflate its share prices through the use of improper accounting methods unjustly enriched Defendants, at

Plaintiff's expense, by artificially inflating the price Plaintiff paid for Vivendi securities during the Relevant Time Period.

385.    Defendants' retention of the unjustly acquired amounts violates the fundamental principles of justice, equity, and good conscience.

386.    Accordingly, Defendants should be ordered to return any funds obtained at Plaintiff expense as a result of their scheme.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands judgment on its behalf as follows:

1.    Awarding Plaintiff compensatory damages against all Defendants, jointly and severally, in an amount to be determined at trial, together with prejudgment interest at the maximum rate allowable by law;

2.    Awarding Plaintiff the right to rescind its Vivendi securities to the extent they continue to hold such securities;

3.    Awarding Plaintiff on the common law fraud claim asserted above an amount of punitive or exemplary damages to the extent such damages are available under applicable law in an appropriate amount to accomplish the purposes and aims of such damages, in an amount to be determined at trial under appropriate procedures against Defendants;

4.    Awarding Plaintiff the costs of this suit, including reasonable attorneys' and accountants' and experts' fees and other disbursements; and

5.    Awarding Plaintiff such other and further relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury on all counts so triable.

Date:  February 1, 2008

*/s/ William H. Narwold*
William H. Narwold (WN-1713)
Ingrid L. Moll (IM-3949)
**Motley Rice LLC**
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103
Telephone:   (860) 882-1676
Facsimile:   (860) 882-1682
*Attorneys for the Plaintiff*

**Of Counsel:**
Joseph F. Rice
Ann K. Ritter
**Motley Rice LLC**
28 Bridgeside Blvd.
Mount Pleasant, SC 29465
Telephone:   (843) 216-9000
Facsimile:   (843) 216-9450

and

Leslie M. Kelleher (LMK-5943)
**Caplin & Drysdale, Chartered**
375 Park Avenue, 35 Floor
New York, NY  10152-3500
Telephone:   (212) 319-7125
Facsimile:   (212) 644-6755
*Attorneys for the Plaintiff*

**Of Counsel:**
Nathan D. Finch
Kevin C. Maclay
**Caplin & Drysdale, Chartered**
One Thomas Circle, N.W.
Suite 1100
Washington, D.C.  20005
Telephone:   (212) 319-7125
Facsimile:   (212) 644-6755